IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KRYSTAL ARCHIE, SAVANNAH BROWN, TELIA BROWN, and JHAIMARION JACKSON, | ) ) ) |
| Plaintiffs, | ) ) |
| | ) Case No. 19 CV 4838 |
| v. | ) |
| | ) Judge Robert W. Gettleman |
| CITY OF CHICAGO, | ) ) |
| Defendant, | ) ) |
| | ) |
| DAVID ALVAREZ, JR., BRADLEY R. ANDERSON, SAMUEL ANGEL, LUCAS K. BOYLE, CORNELIUS BROWN, CRAIG BROWN, ANTHONY P. BRUNO, BRANDON CAMPBELL, YVETTE CARRANZA, DANIELLE M. CUSIMANO, ANTHONY V. CUTRONE, EMELIO F. DE LEON, CLARK W. EICHMAN, MICHELLE S. FRACTION, VICTOR J. GUEBARA, CRAIG M. HAMMERMEISTER, STEVEN HOLDEN, TONITA S. JONES, STEVEN G. LEVEILLE, CHRISTOPHER J. MARAFFINO, ANTONIO D. MIRANDA, SEAN RYAN, HUGO F. SANCHEZ, TIMOTHY J. SCHUMPP, CURTIS L. WEATHERSBY, CARL M. WEATHERSPOON, SCOTT P. WESTMAN, RAYMOND H. WILKE, and RUSSELL L. WILLINGHAM, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Krystal Archie alleges that teams of Chicago police officers armed with assault

rifles raided her apartment three times in four months, knocking down her doors, breaking her

furniture, and pointing their guns at the heads of her children, ages seven, eleven, and fourteen. The three raids took place in February, April, and May 2019. Each involved a warrant to search a suspected drug dealer.

The February raid allegedly began with a search of an apartment one floor up and ended with officers chasing the suspect downstairs into Archie's apartment. Archie was at work. The officers allegedly held Archie's children at gunpoint and searched the apartment for drugs, breaking things and finding nothing. The April and May raids, unlike the February raid, were based on search warrants for Archie's apartment. The officers were looking for drug dealers. Both allegedly were men. There allegedly were no men living or staying in Archie's apartment. These raids were much the same: the officers allegedly broke things, held the children at gunpoint, and searched for drugs and drug dealers, finding nothing.

Archie and her three children—Savannah Brown, Telia Brown, and Jhaimarion Jackson—sue the police officers who raided her apartment. They claim that the officers violated their rights under Illinois law and the United States Constitution. They also sue the officers' employer: the City of Chicago. They claim that the City knew that its police officers routinely use excessive force against children, yet chose to forgo meaningful reform.

The City and the defendant officers move to dismiss the second amended complaint. For the following reasons, their motions are granted in part and denied in part.

## **DISCUSSION**

Count III alleges that four officers submitted search warrant applications without probable cause. The court dismisses Count III against all defendants other than Bradley

2

Anderson, Russell Willingham, Craig Brown, and Clark Eichman. Plaintiffs do not allege that other officers were involved with submitting the warrant applications.

Count V alleges that officers unreasonably seized Archie by handcuffing her for an hour while the officers searched her apartment. The court dismisses Count V against all defendants based on qualified immunity. Plaintiffs cite no case finding excessive force claim based on handcuffing alone. Seventh Circuit law clearly establishes that officers may not apply handcuffs knowing that doing so will cause needless pain or injury, but plaintiffs do not allege that Archie's handcuffs caused her pain.

Count X alleges intentional infliction of emotional distress and negligent infliction of emotional distress. On plaintiffs' motion, Count X is dismissed against all defendants as to negligent infliction of emotional distress.

Count XI alleges that the officers trespassed on Archie's apartment. The court dismisses Count XI against all defendants. Entering someone's property without permission is not trespass when done pursuant to a valid search warrant.

Counts VII through XII allege various state law claims. On plaintiffs' motion, these counts are dismissed against the City of Chicago.

**1      Count I, section 1983: <u>Monell</u> liability (February, April, and May 2019 raids)**

Plaintiffs Savannah, Telia, and Jhaimarion assert a claim against defendant City of Chicago under <u>Monell v. Dep't of Social Services of City of New York</u>, 436 U.S. 658 (1978). Under <u>Monell</u>, municipalities are liable for constitutional violations when they are the "moving force" behind those violations. <u>Id.</u> at 694. A municipality might be liable for constitutional violations caused by: (1) official policies; (2) widespread and well-settled practices; or

3

(3) officials with final policy-making authority. Thomas v. Cook County Sheriff's Department, 604 F.3d 293, 303 (7th Cir. 2010).

The City argues that plaintiffs fail to state a Monell claim. To avoid dismissal, plaintiffs' claim must be plausible. Plaintiffs' claim is plausible if the court, taking their allegations as true, can reasonably infer that the City is liable. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). For the following reasons, the court concludes that plaintiffs state a Monell claim.

Plaintiffs allege that the City caused their constitutional rights to be violated because of four practices: (1) the City's police officers use excessive force against children of color under fifteen years of age, often pointing guns at them; (2) the City's police accountability entities fail to prevent officers from using excessive force against children; (3) the City has failed to adopt training or policies requiring officers to avoid using unreasonable force against children; and (4) the City has allowed a "code of silence" to exist among officers and to pervade the police accountability system. The court reads these alleged practices as "a set of interrelated, mutually-reinforcing customs or practices." Spearman v. Elizondo, 230 F. Supp. 3d 888, 893 (N.D. Ill. 2016). The combination of these practices allegedly "contribute[s] to civil rights violations of the kind" alleged by plaintiffs: children suffering excessive force at the hands of police officers. Id.

Plaintiffs allege that the City was put on notice by a report from the United States Department of Justice in 2017 ("DOJ report"), two years before the defendant officers began raiding plaintiffs' apartment. Among other things, the DOJ report found that the Chicago Police Department engages in a pattern or practice of unreasonable force. According to the DOJ report, this pattern or practice of unreasonable force "includes the use of excessive less-lethal force against children."

4

The DOJ report describes an officer who retaliated against teenage boys for playing basketball on the officer's property. The officer "pointed his gun" at the teenage boys, "used profanity, and threatened to put their heads through a wall and to blow up their homes." And the officer allegedly "forced them to kneel and lie face-down, handcuffed together, leaving visible injuries on their knees and wrists." The DOJ report found that even after the mothers of the boys reported what happened to the Independent Police Review Authority, the officer "was never interviewed" and "received a five-day suspension."

Many of these findings mirror what the defendant officers here allegedly did to plaintiffs Savannah, Telia, and Jhaimarion. They allege that the defendant officers forced them to lie down on the floor and that they pointed guns at their heads from two feet away. These DOJ findings also increase the plausibility that: the City's police officers use excessive force against children, often pointing guns at them; the City's police accountability entities fail to deter officers from continuing to use excessive force against children; and the City has failed to adopt training or policies requiring officers to avoid using unreasonable force against children.

Other parts of the DOJ report describe Chicago police officers: (1) "deploy[ing] a canine to locate two boys, ages 12 and 14, who had broken into a school and stolen some candy and basketballs"; (2) pulling a twelve-year-old Latino boy off his bike, handcuffing him, and placing him against a fence based on "a report of 'two male Hispanics running from' the area"; and (3) grabbing an eight-year-old girl "by her hair, sw[inging] her around, and chok[ing] her while breaking up a fight in a school hallway." Suffice it to say that these examples and others raise an inference that Chicago police officers have a widespread practice of using excessive force against children.

5

The City dismisses these incidents, observing that they took place "in settings unrelated to the execution of a residential search warrant." Searching a residence for drugs is surely more dangerous than breaking up fights in elementary school hallways. A "search for narcotics" might "give rise to sudden violence or frantic efforts to conceal or destroy evidence." Michigan v. Summers, 452 U.S. 692, 702 (1981). But these were children aged seven, eleven, and fourteen, allegedly facing ten or more officers armed with shields and assault rifles. These officers did not need to hold plaintiffs at gunpoint to neutralize whatever threat they might have posed.

This is a motion to dismiss, not a trial on the papers. Plaintiffs benefit from all reasonable inferences. It is reasonable to infer from the DOJ report's findings—and from plaintiffs' allegations—that Chicago police officers have a widespread practice of using excessive force against children in all sorts of contexts, including when officers execute residential search warrants. It is reasonable to infer that plaintiffs were victims of this practice. And it is reasonable to infer that the City is deliberately indifferent to these constitutional violations. The DOJ report was issued in 2017—two years before the defendant officers allegedly raided plaintiffs' apartment three times in four months, breaking down the back door once, the front door twice. All this is to say plaintiffs tell "a story that holds together," Swanson v. Citibank, N.A., 614 F.3d 400, 404 (7th Cir. 2010), even setting aside their citations to other cases and to the 2016 report issued by the City's Police Accountability Task Force. The City's motion to dismiss plaintiffs' Monell claim is denied.

## 2      Count II, Fourth Amendment: unlawful search (February 2019 raid)

Plaintiffs assert unlawful search claims against the defendant officers who entered and searched their apartment in February 2019 raid. These officers allegedly did so without plaintiffs' consent and without a warrant. Such searches are "presumptively unreasonable." Doe v. Heck,

327 F.3d 492, 511 (7th Cir. 2003). Plaintiffs allege that officers searched their apartment and left a mess. The officers allegedly broke a dresser drawer and damaged plaintiffs' cable box.

The officers argue that the complaint is an impermissible "group pleading" that fails to give fair notice. See Twombly, 550 U.S. at 555. The court disagrees. Plaintiffs allege that the following officers tossed, dumped, and thoroughly searched plaintiffs' entire apartment for approximately 30 minutes: David Alvarez, Yvette Carranza, Curtis Weathersby, Scott Westman, and Russell Willingham. These officers were allegedly directed to do so by Sergeants Anthony Bruno and Cornelius Brown. Other officers allegedly broke a dresser drawer in Telia's room, damaged the cable box, and left a mess in every room in the apartment; among these officers was Craig Brown. Plaintiffs' allegations against the remaining officers are not as specific, but they allege that the other officers also participated in the search: Bradley Anderson, Samuel Angel, Emelio De Leon, Victor Guebara, and Steven Holden. Consequently, the court finds that Count II sufficiently alleges a Fourth Amendment violation against the officers.

3      **Count III, Fourth Amendment: search warrant applications submitted without probable cause (April and May 2019 raids)**

Plaintiffs claim that the applications supporting the April and May 2019 search warrants failed to establish probable cause. See Beauchamp v. City of Noblesville, 320 F.3d 733, 742–43 (7th Cir. 2003). Plaintiffs bring Fourth Amendment claims against the defendant officers involved in those raids. For the April raid, plaintiffs allege that the search warrant application was prepared without corroborating allegations that the target was connected to plaintiffs' apartment. Plaintiffs allege that there was in fact no connection. The officer who allegedly prepared the application was Anderson. It was allegedly rubberstamped without meaningful review by Lieutenant Willingham.

Plaintiffs' allegations for the May raid are similar. Plaintiffs allege that the search warrant application was prepared without corroborating that the target entered plaintiffs' apartment or that the target was otherwise connected to the apartment. Plaintiffs allege that there was in fact no connection. The officer who allegedly prepared the application was Craig Brown. Like the April raid, the application was allegedly rubberstamped without meaningful review—this time by Lieutenant Eichman.

The officers argue that these allegations fail to allege that any other officers were personally involved in violating plaintiffs' constitutional rights. See Palmer v. Marion County, 327 F.3d 588, 594 (7th Cir. 2003). The court agrees. The court dismisses Count III against all defendants other than Anderson, Willingham, Craig Brown, and Eichman. Plaintiff does not allege that any other defendants were involved in submitting the applications supporting the search warrants.

**4        Count IV, Fourth Amendment: excessive force and unreasonable search of Archie's apartment (February, April, and May 2019 raids)**

Plaintiff Archie asserts excessive force and unreasonable search claims against the defendant officers who entered and searched her apartment in February, April, and May 2019. Archie claims that the officers unreasonably seized her, using excessive force and searching her apartment unreasonably. The officers allegedly failed to knock and announce their presence, repeatedly pointed guns at Archie, handcuffed her without need and for an unreasonably long time, cursed and insulted her, and intentionally damaged or destroyed her property. See Baird v. Renbarger, 576 F.3d 340, 344 (7th Cir. 2009) ("[G]un pointing when an individual presents no danger is unreasonable and violates the Fourth Amendment."); Rooni v. Biser, 742 F.3d 737, 742 (7th Cir. 2014) ("A person has the right to be free from an officer's knowing use of handcuffs in a

8

way that would inflict unnecessary pain or injury, if that person presents little or no risk of flight or threat of injury."); United States v. Ramirez, 523 U.S. 65, 71 (1998) ("Excessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful and the fruits of the search are not subject to suppression.").

The officers argue that plaintiffs fail to allege that during the February raid, Westman, De Leon, Guebara, Holden, Anderson, or Angel searched her apartment or damaged her property. The court disagrees. Westman "and others" allegedly "tossed, dumped, and thoroughly searched plaintiffs' entire apartment for approximately 30 minutes." The court reasonably infers that "others" refers to the other officers who allegedly entered the apartment. Those officers include De Leon, Guebara, Holden, Anderson, and Angel. They (among others) allegedly broke down the apartment door and rushed inside with rifles drawn. That they might have helped ransack the apartment is a fair inference on a motion to dismiss.

The officers also argue that plaintiffs fail to allege that the officers who participated in the May raid destroyed any property. Not so. Plaintiffs allege that the following officers "broke open the back doors to the apartment with 3–6 big blows": Cornelius Brown, Craig Hammermeister, Anthony Cutrone, Carl Weatherspoon, Raymond Wilke, Steven Leveille, Timothy Schumpp, Christopher Maraffino, Michelle Fraction, Tonita Jones, and Clark Eichman. These officers allegedly "began tearing apart and searching plaintiffs' entire apartment for the third time." Cutrone, Hammermeister, and Maraffino allegedly searched the living room. The other officers allegedly searched the remainder of the apartment. Archie alleges that she "could hear her family's belongings being thrown around and shattered while she sobbed." When the officers left, they allegedly "left the broken doors wide open."

9

These allegations give the officers fair notice. Archie's claims of excessive force and unreasonable search thus avoid dismissal. Archie's claims of unconstitutional seizure of property (Count VI) and conversion (Count XII) avoid dismissal for the same reasons.

**5        Count V, Fourth Amendment; Count IX, Art. 1, § 6 of the Illinois Constitution: unreasonable seizure (May 2019 raid)**

Archie asserts false arrest claims against the defendant officers who entered her apartment in May 2019. Yet she was not arrested. Her "false arrest" claims center on allegations that she was needlessly handcuffed for an hour. The court thus assumes that plaintiffs mean to claim that Archie was unreasonably seized—a reasonable inference from the complaint's allegations. But Archie's federal unreasonable seizure claims are barred by qualified immunity.

**5.1      Failure to state a claim**

"An officer's authority to detain incident to a search is categorical . . . ." Muehler v. Mena, 544 U.S. 93, 98 (2005). Thus, so far as plaintiff Archie claims that the length of her detention was unreasonable, she fails to state a claim. See id. ("[The plaintiff's] detention for the duration of the search was reasonable . . . because a warrant existed to search [the address] and she was an occupant of that address at the time of the search.").

But an officer's authority to detain "is circumscribed by the Fourth Amendment's insistence on reasonableness." Stainback v. Dixon, 569 F.3d 767, 772 (7th Cir. 2009). Using handcuffs is reasonable when "the governmental interests outweigh the marginal intrusion" on a detainee's liberty. Mena, 544 U.S. at 99. Liberty sometimes wins out: "[A]n officer may not knowingly use handcuffs in a way that will inflict unnecessary pain or injury on an individual who presents little or no risk of flight or threat of injury." Stainback, 569 F.3d at 772.

10

The officers argue that Archie fails to state a claim. The court disagrees. The officers allegedly went to the apartment to execute a warrant authorizing the search of a 40 to 45-year-old man for heroin, money, and residency documents. Archie alleges that no man had ever spent time in her apartment in May 2019. When the officers showed up, she and a friend—presumably, another woman—were sitting in the living room, talking. "Within minutes" after the officers broke through the back door, the officers allegedly "knew that the target was not in the apartment." There were no "signs of him ever being there, such as mail addressed to him, legal and financial papers with his name on them, male clothes, etc."

These allegations state a claim for unreasonable seizure. Drawing all reasonable inferences in plaintiffs' favor, the officers had little need to handcuff Archie upon entry. She was, after all, not the subject of the search warrant and did not otherwise present a threat. The "governmental interests" did not "outweigh the marginal intrusion" on Archie's liberty.  Mena, 544 U.S. at 99. And whatever governmental interest there was in keeping Archie in handcuffs evaporated within minutes when the officers realized that the target—a man—was not in the apartment and that there were no signs of him ever being there.

Archie's claims for false arrest and imprisonment under the Illinois Constitution (Count IX) avoid dismissal for the same reasons. See Naperville Smart Meter Awareness v. City of Naperville, 900 F.3d 521, 525 (7th Cir. 2018) ("[T]he Illinois Supreme Court will interpret a provision of the Illinois Constitution in the same way as a similar provision in the Federal Constitution absent certain exceptional circumstances."), citing People v. Caballes, 851 N.E.2d 26, 31–46 (Ill. 2006).

### 5.2    Qualified immunity

The defendant officers are nonetheless entitled to qualified immunity against Archie's claims of unreasonable seizure under federal law. Qualified immunity shields government officials against damages suits. Officials are immune from suit unless they violate a constitutional right that was clearly established at the time of the violation. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The right must be framed in "the specific context of the case, not as a broad general proposition," Saucier v. Katz, 533 U.S. 194, 201 (2001), and its "contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Hope v. Pelzer, 536 U.S. 730, 739 (2002) (citation and quotation marks omitted). A right can be clearly established without a case directly on point: "[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question," giving officials "fair warning" that their acts are unconstitutional. Id. at 741 (citation and quotation marks omitted).

The Supreme Court's demand for specificity bars Archie's claim. "[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (quotation marks and alteration omitted). For qualified immunity, Mena's general balancing of governmental interests against marginal intrusions will not do. 544 U.S. at 99. Plaintiffs "ha[ve] not directed the court to any case finding an excessive force claim based merely on the use of handcuffs, at least without any claim that the handcuffs were applied in a way that inflicted unnecessary pain or injury." Prip v. Erwin, No. 14-CV-552-WMC, 2015 WL 4394526, at *7 (W.D. Wis. July 16, 2015) (dismissing claims based on qualified immunity).

12

Seventh Circuit law clearly establishes that officers violate the Fourth Amendment when they handcuff detainees knowing that "the handcuffs will cause unnecessary pain or injury." Day v. Wooten, 947 F.3d 453, 461–63 (7th Cir. 2020) (reviewing caselaw). But plaintiffs do not allege that Archie's handcuffs hurt or injured her or that the officers knew about it. Without such allegations, the officers are entitled to qualified immunity.

**6      Count VII, state law: assault (February, April, and May 2019 raids)**

Plaintiffs intended to assert assault claims under state law against the defendant officers but did so against only the City of Chicago. (Perhaps unsurprisingly, the officers did not move to dismiss these claims.) Plaintiffs seek leave to replead their assault claims to include the defendant officers, stating that the omission was a scrivener's error.

Plaintiffs are granted leave to file a third amended complaint that revises the assault claims to include the defendant officers. The complaint must conform to the other rulings in this order. After plaintiffs file their third amended complaint, defendants may renew their motion to dismiss plaintiff's assault claims.

**7      Count VIII, state law: battery (April and May 2019 raids)**

Plaintiffs Archie and Savannah Brown assert claims of battery under state law against the defendant officers. Battery is the "willful touching of another person" without consent. Pechan v. DynaPro, Inc., 251 Ill. App. 3d 1072, 1084 (Ill. App. 1993). Archie alleges that she was handcuffed during the May 2019 raid. Savannah, who was fourteen, alleges that during the April 2019 raid, an officer placed a foot on her back and pointed a rifle at the back of her head. Then the officer allegedly grabbed her wrist and handcuffed her.

Archie states battery claims against each officer who participated in the May 2019 raid. Archie alleges that during the raid, "[o]fficers . . . handcuffed Ms. Archie and her friend and

13

confined them to the living room couch for the duration." She alleges that "[o]n information and belief, defendant officer Fraction or Jones handcuffed Ms. Archie," and "Officer Fraction patted her down." Defendants move to dismiss the claims against all officers other than Fraction and Jones. But Archie did not identify Fraction and Jones with certainty. Any of the other officers could plausibly have been the ones who handcuffed Archie, making those officers liable for battery as alleged in the complaint.

Savannah similarly states battery claims against each defendant officer who participated in the April 2019 raid. Savannah alleges that during the raid, while she "was lying face down on the floor in her bedroom, an officer put his foot on top of the middle of her back and pointed his long, assault rifle at the back of her head and at her face at point-blank range." This officer then allegedly "started handcuffing her and stopped only when she protested that she was only 14 years-old." Savannah alleges that "[o]n information and belief, this was officer [Hugo] Sanchez, [Antonio] Miranda or [Samuel] Angel." Defendants move to dismiss Savannah's battery claims against all officers other than Sanchez, Miranda, and Angel. Because Savannah, like Archie, did not identify these officers with certainty, that motion is granted..

**8      Count X, state law: intentional infliction of emotional distress (February, April, and May 2019 raids)**

Plaintiffs assert state law claims of intentional infliction of emotional distress against the defendant officers. (Plaintiffs have voluntarily dismissed their state law claims of <u>negligent</u> infliction of emotional distress, agreeing that such claims would fail as a matter of law.) Intentional infliction of emotional distress is a tort with three elements: (1) the defendant engaged in "truly extreme and outrageous conduct"; (2) the defendant "intend[ed]" to "inflict severe emotional distress" or "kn[ew]" that there was "a high probability" of causing severe

14

emotional distress; and (3) the conduct "in fact" caused severe emotional distress. <u>Schweihs v. Chase Home Finance, LLC</u>, 2016 IL 120041, ¶ 50 (Ill. 2016).

The officers argue that plaintiffs' allegations fail the first element. Not so. To quote defendants' argument is to refute it:

> Defendant Officers are alleged to have brandished their weapons when entering Plaintiffs' residence to execute [a] search warrant that had been approved by a judge. Such conduct is lawful and is routine during the execution of search warrants. As such, it certainly does not rise to extreme and outrageous or utterly intolerable in a civilized society.

Holding a prone, unarmed fourteen-year-old girl at gunpoint while she begs for life and cries for her mother might or might not be routine for officers executing search warrants, but their doing so would violate more than a few laws and would outrage anyone living in a civilized society with any sense of decency. Such conduct is extreme. Breaking down an apartment door and taunting a crying mother of three children, ages fourteen, eleven, and seven, while shattering their belongings, is also extreme. Plaintiffs' allegations easily raise an inference that the officers are liable for intentional infliction of emotional distress.

**9      Count XI, state law: trespass**

Plaintiffs assert trespass claims under state law against the defendant officers who participated in the April and May raids. Plaintiffs have voluntarily dismissed their trespass claims against the officers involved in only the February raid. As for the other officers, plaintiffs fail to state a claim. "It cannot be contended that going upon the land pursuant to an express order of the court would constitute a trespass." <u>City of Tuscola v. Otto</u>, 33 Ill. App. 3d 853, 856 (Ill. App. 1975). The officers raided Archie's apartment pursuant to search warrants that were valid even if the applications supporting them were flawed. See <u>Weeks v. City of Chicago</u>, No. 12 C 10056,

15

2014 WL 3865852, at *3 (N.D. Ill. Aug. 6, 2014) (dismissing trespass claims because the defendant officers were acting pursuant to a valid search warrant).

Some cases suggest an exception: "a party cannot stand behind a court order which was obtained through the party's own wrongful conduct." Skierkewiecz v. Gonzalez, 711 F. Supp. 931, 935 (N.D. Ill. 1989). Even if Illinois law recognizes this exception for trespass claims, plaintiffs have not argued that their claims qualify. The court thus dismisses plaintiffs' trespass claims. See Lekas v. Briley, 405 F.3d 602, 614 (7th Cir. 2005) ("[E]ven though a complaint may comply with the simple notice pleading requirements of Rule 8(a)(2), it may nonetheless be dismissed under Rule 12(b)(6) if the plaintiff does not present legal arguments supporting the substantive adequacy or legal merit of that complaint.") (quotation marks omitted), quoting Kirksey v. R.J. Reynolds Tobacco Co., 168 F.3d 1039, 1041 (7th Cir. 1999).

## CONCLUSION

For these reasons, the defendant officers' motion to dismiss [Doc. 83] and Defendant City of Chicago's motion to dismiss [Doc. 85] are granted in part and denied in part. The court dismisses the following counts of plaintiffs' second amended complaint. The court otherwise denies the motions to dismiss.

Count III is dismissed against all defendants other than Bradley R. Anderson, Russell L. Willingham, Craig Brown, and Clark W. Eichman. Count V is dismissed against all defendants. Count X, on plaintiffs' motion, is dismissed against all defendants as to negligent infliction of emotional distress. Count XI is dismissed against all defendants. Counts VII through XII, on plaintiffs' motion, are dismissed against the City of Chicago. Count VIII is dismissed against all officers other than Sanchez, Miranda and Angel.

16

Plaintiffs are granted leave to file a third amended complaint that revises the assault claims to include the defendant officers. The third amended complaint must be filed on or before October 19, 2020, and conform to the other rulings in this order. Defendants are directed to respond to the complaint by November 16, 2020. The parties are directed to file a joint status report using this court's form on or before November 30, 2020. The court will set a status hearing thereafter. This order is not affected by any General Orders entered by the court.

**ENTER:**      **September 25, 2020**

Robert W. Gettleman
United States District Judge

17