**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| KRYSTAL ARCHIE, for herself and on behalf of her minor children, SAVANNAH BROWN, TELIA BROWN, and JHAIMARION JACKSON, )))))) | |
| Plaintiffs, ) | |
| v. ) | |
| ) | |
| THE CITY OF CHICAGO; Chicago police officers SCOTT P. WESTMAN (star #18472); BRADLEY. R. ANDERSON (#15660); CRAIG BROWN (#14136); DAVID ALVAREZ, JR. (#16131); EMILIO F. DE LEON (#16360); YVETTE CARRANZA (#13435); VICTOR J. GUEBARA (#17147); CORNELIUS BROWN (#2235); STEVEN HOLDEN (#8149); ANTHONY P. BRUNO (#1123); SAMUEL ANGEL (#16501); RUSSEL L. WILLINGHAM (#511); LUCAS K. BOYLE (#12059); SEAN RYAN (#13198); HUGO F. SANCHEZ (#14269); DANIELLE M. CUSIMANO (#16619); BRANDON CAMPBELL (#6278); ANTONIO D. MIRANDA (#8264); CURTIS L. WEATHERSBY (#7866); CRAIG M. HAMMERMEISTER (#4831); ANTHONY V. CUTRONE (#9258); CARL M. WEATHERSPOON (#4630); RAYMOND H. WILKE (#5310); STEVEN G. LEVEILLE (#8637); TIMOTHY J. SCHUMPP (#9207); CHRISTOPHER J. MARAFFINO (#2563); MICHELLE S. FRACTION (#1982); TONITA S. JONES (#15380); and CLARK W. EICHMAN (#1727), | No. 19-cv-04838 <br><br> Judge Robert W. Gettleman <br><br> Magistrate Judge Jeffrey Cummings |
| Defendants. | |

**THIRD AMENDED COMPLAINT**

**INTRODUCTION**

1.     Plaintiffs, by and through their attorney, The Law Offices of Al Hofeld, Jr., LLC, bring this action against defendant City of Chicago and multiple Chicago police officers pursuant to 42 U. S. C. § 1983 for repeatedly traumatizing three young children and their mother with excessive force and otherwise violating their Constitutional rights, and state as follows:

2.     In the space of just five months, defendant officers illegally raided and searched plaintiffs' apartment *three* separate times, each time finding nothing and not arresting or charging plaintiffs and each time violating plaintiffs' Fourth Amendment rights to be secure in their home and free of illegal searches and seizures.

3.     On Friday evening, February 8, 2019, defendant officers chased the target of a search warrant into plaintiffs' apartment, bashing in plaintiffs' front door.  Officers did not have a search warrant or probable cause for plaintiffs' apartment and did not have their consent to conduct a full search of the apartment.  They searched thoroughly anyway, and they did not find any narcotics or other contraband.  They did not arrest or charge any plaintiff.

4.     During the first raid, officers ordered Savannah and Telia Brown (ages 14 and 11, respectively) to the floor and pointed assault rifles at their faces and heads.  They also pointed guns at Jhaimarion Jackson (age 7) and other young children.  Each of the minor plaintiffs was afraid s/he and his/her siblings were going to be shot.  In addition to tossing plaintiffs' entire apartment, officers needlessly damaged plaintiffs' personal property.

5.     On Thursday evening, April 25, 2019, Chicago police officers executed a search warrant for plaintiffs' apartment, the wrong apartment, because they failed to verify information from a confidential informant.  Officers did not knock and announce before entering. Officers tossed and searched plaintiffs' entire apartment. They did not find any contraband.

They did not arrest or charge any plaintiff. They did not find the target of the search warrant in plaintiffs' apartment.

6.      During the second raid, officers cursed at Savannah, Telia and Jhaimarion and ordered them to get down on the floor and pointed assault rifles at their heads and bodies. While Savannah lay face down on the floor, an officer put his foot in the middle of her back and pointed his assault rifle point-blank at the back of her head (and her face, when she turned her head to look). Savannah thought she was going to be killed. Throughout the raid, one officer constantly cracked jokes. As officers were leaving, they told the children, "We'll be right back."

7.      In addition to tossing and searching plaintiffs' entire apartment, officers needlessly damaged plaintiffs' personal property, including equipment essential for Krystal Archie's food preparation business, which she relied on to supplement her single-parent income. Plaintiffs had to literally dig out of the mess that officers created and left behind throughout their apartment.

8.      On Friday afternoon, May 17, 2019, Ms. Archie had just finished cleaning up the monumental mess officers left after the second raid, when officers executed another search warrant for plaintiffs' apartment, the wrong apartment, because officers failed to verify that the target actually resided in or had physical access to plaintiffs' apartment. Officers searched plaintiffs' entire apartment and did not find the narcotics identified in the warrant. Officers did not arrest or charge any plaintiff or anyone connected with plaintiffs; they even told plaintiffs they were not looking for them. Officers did not find the target in plaintiffs' apartment.

9.      Officers did not knock and announce before bashing plaintiffs' back door open.   Officers pointed pistols at Ms. Archie and her friend, shouted profanity at them, ordered them to the floor and kept them handcuffed and confined in the living room for 45-60 minutes.

10. While Ms. Archie was reduced to tears because police were raiding her home for the third time, making her feel violated and powerless to stop it, officers cracked jokes and laughed at her situation.

11. In none of the three raids did Ms. Archie or her children pose any apparent, actual or possible threat to officers. Officers did not explain or apologize for their actions. Their actions were not only the products of avoidable mistakes and sloppy police work, but they displayed force that was excessive, unnecessary, unreasonable, and without lawful justification. And this was not an isolated incident but one undertaken pursuant to polices of the City of Chicago, unofficial policies of 1) failing to corroborate information received from confidential informants and 2) using excessive police force against children, as set forth below.

12. Savannah, Telia and Jhaimarion now suffer serious, emotional and psychological distress and injury, including symptoms of Post-Traumatic Stress Disorder, as a direct result of their exposure to defendant officers' conduct. Their deep distress and related symptoms constitute scars on their young psyches that may never fully heal.

## JURISDICTION AND VENUE

13. This action arises under 42 U. S. C. § 1983 and *Monell v. Department of Social Services of the City of New York*, 436 U. S. 658 (1978). This Court has jurisdiction pursuant to 28 U. S. C. §§ 1331 and 1343. The Court has supplemental jurisdiction of plaintiffs' state law claims.

14. Venue is proper pursuant to 28 U. S. C. § 1391(b). The underlying events occurred within the Northern District of Illinois; defendant City of Chicago is a municipal corporation located within the District; and all parties reside in the District.

## PARTIES

15.     At the time of all relevant events, plaintiff Savannah Brown was a 14-year-old girl residing with her mother at 6832 S. Dorchester, first floor, in Chicago.  She was a freshman in high school.

16.     At the time of all relevant events, plaintiff Telia Brown was an 11-year-old girl residing with her mother at 6832 S. Dorchester, first floor, in Chicago.  She was in 5th grade.

17.     At the time of all relevant events, plaintiff Jhaimarion (or "J.J") Jackson was a 7-year-old boy residing with his mother at 6832 S. Dorchester, first floor, in Chicago.  He was in the second grade.

18.     At the time of all relevant events, plaintiff Krystal Archie ("Ms. Archie") was Savannah, Telia and Jhaimarion's natural mother.  She resided with her children at 6832 S. Dorchester, first floor, in Chicago, where they had lived for approximately one year.  Ms. Archie is a single mother who works evenings as a bartender near her home.  She also runs a small food preparation business out of her home to supplement her income.  For this purpose, her kitchen contains cooking and food packaging equipment.

19.     Ms. Archie is a law-abiding citizen with no history of any drug, weapon or felony arrests or charges.

20.     Plaintiffs are African-American.

21.     Defendant City of Chicago is a municipal corporation under the laws of the State of Illinois.

22.     At the time of all relevant events, defendant Scott P. Westman was a Chicago police officer assigned to the Bureau of Patrol, Third District.  He was the affiant of the complaint for search warrant 19 SW 4872.  He and the following defendant Chicago police

officers entered plaintiffs' home while executing this search warrant on February 8, 2019:  David Alvarez, Jr., Emilio F. De Leon, Yvette Carranza, Victor J. Guebarra, Cornelius R. Brown, Steven Holden, Bradley R. Anderson, Anthony P. Bruno, Samuel Angel, and Russel L. Willingham.  A presently unknown, Chicago police lieutenant approved the complaint for search warrant before it was presented to a judge.

23.     At the time of all relevant events, defendant B. R. Anderson was a Chicago police officer assigned to the Bureau of Patrol, Third District.  He was the affiant of the complaint for search warrant 19 SW 7535.  He and the following defendant Chicago police officers entered plaintiffs' home to execute this search warrant on April 25, 2019:  Lucas K. Boyle, Samuel Angel, Sean Ryan, Hugo F. Sanchez, Danielle M. Cusimano, Brandon Campbell, Antonio D. Miranda, Anthony P. Bruno, and Curtis L. Weathersby.  Officer Anderson was also an arresting officer at plaintiffs' address on February 8, 2019.  On information and belief, defendant officer Russell Willingham approved the complaint for search warrant before it was presented to a judge.

24.     At the time of all relevant events, defendant Craig Brown was a Chicago police officer assigned to the Organized Crime Division, Narcotics Section.  He was the affiant of the complaint for search warrant 19 SW 8070.  He and the following defendant Chicago police officers entered plaintiffs' home to execute this search warrant on May 17, 2019:  Craig M. Hammermeister, Anthony V. Cutrone, Carl M. Weatherspoon, Steven G. Leveille, Christopher J. Maraffino, Michelle S. Fraction, Tonita S. Jones, Raymond H. Wilke, Timothy J. Schumpp, and Clark W. Eichman.  On information and belief, defendant officer Clark Eichman approved the complaint for search warrant 19 SW 8070 before it was presented to a judge.

25.     On information and belief, the vast majority of the other officers who participated in the execution of all three search warrants were Caucasian males.

26.     When Chicago police officers executed the three search warrants at 6832 S. Dorchester in 2019, they were at all times acting under color of law and within the scope of their employment as officers of the Chicago Police Department ("CPD") for the City of Chicago.

### Overview:  CPD's <u>M. O.</u> is to Unnecessarily Use Force Against and in the Presence of Young Children

27.     Chicago police officers have a *de facto* policy, widespread custom or *M. O.* of unnecessarily using force against or in the presence of children (ages 0-14), especially children of color, which traumatizes them.

28.     The 2017 United States Department of Justice investigation of the CPD concluded, among other things, that CPD has a pattern and practice of using less-than-lethal, excessive force against children for non-criminal conduct.  (U. S. Dept. of Justice *Investigation of the Chicago Police Department*, Civil Rights Division and U. S. Attorney's Office for the Northern District of Illinois, Jan. 13, 2017, pp. 34-35).

29.     The 2016 report of the mayoral-appointed Chicago Police Accountability Task Force ("PATF") contained substantially similar conclusions and recommended a number of specific police reforms to improve police-youth interactions and the policing of youth.

30.     None of the reforms that CPD has implemented or announced to date purport to remedy or address the identified problems.

31.     The federal consent decree agreed to by the City of Chicago and the State of Illinois in 2018 does not address them.

32.     CPD's recently revised use of force policy, GO3-02, does not expressly require officers to avoid using unnecessary force against or in the presence of young children

whenever possible and does not require officers to use a trauma-informed approach to the use of force in situations where some police force is necessary. CPD's search warrant policy, SO9-14, was not revised to incorporate these or similar changes.

33.    Unlike other major U.S. metropolitan police departments - such as Cleveland, Indianapolis, Charlotte, Baltimore, San Francisco and others - CPD still does not provide any training or supervision to officers concerning youth brain development or the importance of preventing trauma to young children by utilizing a trauma-sensitive approach to the use-of-force in situations where children are present.

34.    The connection between trauma and child development and between trauma and mental and physical health is well-established.

35.    It is also well-known that many poor children of color have already been subjected to multiple traumas in the neighborhoods and circumstances in which they live and, therefore, police should be mindful that their use of unnecessary force against or in the presence of poor, children of color would compound and deepen their trauma.

## FACTS RELATING TO ALL COUNTS

### Raid #1 of Plaintiffs' Apartment:  February 8, 2019

36.    At approximately 3:12PM on Friday February 8, 2019, defendant officer Westman swore out and obtained search warrant 19 SW 4872 authorizing a search of a "'Lord,' a Male Black, 35 to 40 years old, 6'2" to 6'3" 300 lbs., Long Black Dreadlocks, Brown Eyes, Medium Complexion," and the premises at "6832 S. Dorchester Ave 2nd floor…."  The warrant authorized the seizure of "Heroin… any paraphernalia…money and records" and any residency documents.

8

37.     As is customary in Chicago, the defendant officers, in the course of obtaining and executing this search warrant, took no steps to first determine whether children resided in the building at 6832 S. Dorchester, to avoid executing the search warrant at times when children were likely to be present or to deescalate their tactics when they encountered young children at 6832 S. Dorchester.  As a result, officers injured Savannah, Telia and Jhaimarion.

38.     There are two apartments in plaintiffs' building, one on the first floor and one on the second floor.

39.     At approximately 7:30PM in the evening on February 8, 2019, plain-clothed officers executed the search warrant in the *second*-floor apartment at 6832 S. Dorchester. When they entered the apartment in the rear, approximately five young children ran downstairs and knocked on plaintiffs' door.  Savannah let them in because she heard babies crying, and it sounded like they were in danger.

40.     After letting them in, Savannah went back to her mother's room to check on Telia.  Unbeknownst to her, Tyree Johnson, who lived in the apartment upstairs, and two other men then entered plaintiffs' apartment through the front door, which Savannah had inadvertently left unlocked.

41.     Officers came to the front door of plaintiffs' apartment, began knocking and said they would kick down the door if they didn't open it.  Sergeant Brown made the decision to enter plaintiffs' apartment.  Officers then bashed the door several times, broke it down and entered.  Most of the officers were wearing body cameras and recorded the entry into plaintiffs' apartment and a portion of the search, even if they turned off the cameras prematurely.

42. After the front door was broken in, defendant officers Holden, Guebara, Carranza, Anderson, Westman, Alvarez, Angel, De Leon, and Sergeant Brown entered plaintiffs' apartment in a line, with assault rifles and pistols drawn and with Holden in the lead holding a shield.

43. When officers rushed inside and reached the first bedroom, Savannah's bedroom, where most of the children were gathered, including Jhaimarion, they pointed assault rifles directly at all of the children at close range and told them to put their hands up. In particular, defendant officers Holden, Alvarez, and Angel pointed their guns, which consisted of assault rifles, at the children in Savannah's room, including at Jhaimarion. Jhaimarion was sitting on the floor playing with a tablet. Officers then kept the children herded in Savannah's bedroom.

44. As other officers entered deeper into plaintiffs' apartment, officers Holden, Guebara, De Leon and Anderson pointed their assault rifles directly at Telia and Savannah, who were in the back bedroom, their mother's bedroom, when officers entered the apartment. They pointed assault rifles with scopes point-blank at Savannah's head, face and neck from 2-3 feet away as she lay on the floor of her mom's bedroom. They also pointed guns at Telia from approximately 2-3 feet away. The two girls were lying next to each other on the floor. Terrified, they were soon crying for their mother.

45. Officers quickly located and arrested in the first bedroom and the kitchen the three men who fled into plaintiffs' apartment.

46. After moving Savannah and Telia to the room with the other children, police would not allow Savannah to call her mother. Ms. Archie was working nearby while 14-year-old Savannah watched her younger siblings. Nevertheless, Savannah hid her phone and

snuck a call to her mother at 8:03PM but was unable to speak, so she put another adult on the phone. Ms. Archie rushed home.

47. Police declined to show Ms. Archie a search warrant. In response to officers' statement that they needed to "take a look around," Ms. Archie told officers she was a legal gun owner with a current FOID card and a gun in the house. She led officers to her gun and showed them the FOID card and her driver's license. (Ms. Archie has a gun because she is a petite woman who often comes home from work alone late in the evening. She always stores the magazine in a separate location.)

48. Even though officers verified with radio dispatch that Ms. Archie's FOID card was valid and current, officers confiscated Ms. Archie's gun and did not return it to her. They did not give her an Evidence Recovery Log or other receipt for her gun. The police reports indicate the weapon was taken from plaintiffs' apartment. Ms. Archie subsequently called CPD three or four times and requested that it be returned to her, even speaking with a supervisor. All of her requests were denied.

49. Next, at the direction of Sergeants Brown and Bruno, officers Carranza, Weathersby, Alvarez, Westman, Willingham and others tossed, dumped, and thoroughly searched plaintiffs' entire apartment for approximately 30 minutes. Weathersby and Bruno searched Ms. Archie's bedroom and the kitchen. Alvarez and Bruno searched Savannah's room. On information and belief, Willingham and Weathersby searched JJ's room.

50. Ms. Archie never gave consent for a full search of her apartment, and officers did not have independent probable cause or a second warrant to justify fully searching plaintiffs' apartment. Sergeant Bruno initially told Ms. Archie they needed to "take a look around" because the targets had been in her apartment, and they asked her and her children to

remain in the living room.  The police reports that officer Westman later wrote do not disclose this search.

51.     Officers did not find any narcotics, related paraphernalia, cash or records of transactions in plaintiffs' apartment.  Officers did not arrest or charge any plaintiff.

52.     However, defendant officers did find abundant illegal narcotics and guns in the second-floor apartment and arrested several men and women affiliated with the upstairs neighbors.

53.     Ms. Archie was shocked to see what officers did to her apartment during their search.  In addition to officers breaking down plaintiffs' front door, officers Brown, Bruno, Carranza, Weathersby, Alvarez, Westman and Willingham broke a dresser drawer in Telia's room, damaged the cable box, and left a mess in every room in the apartment.  Clothes were dumped out and strewn about in every bedroom.  They searched through closets, tossed items on dressers and other surfaces onto beds and dumped out bags onto the floor.  The truncated body camera footage does not show the extent of the search that was done.

54.     Officers did not apologize to the children for pointing guns at them.

**Raid #2 of Plaintiffs' Apartment:  April 25, 2019**

55.     Even though defendants had apprehended the target of the first search warrant and had found no contraband in plaintiffs' apartment and nothing suspicious about plaintiffs, defendant sergeant Bruno and others returned with a search warrant for plaintiffs' apartment 6 weeks later.

56.     At approximately 6:39PM on Thursday April 25, 2019, defendant officer Anderson swore out and obtained search warrant 19 SW 7535 authorizing a search of a Ronald Anderson with a nickname of "Peanut," who was "a Male Black, 48 yrs. old, 5'8," 180 lbs., bald,

Brown Eyes, Medium Complexion," and the premises at "6832 S. Dorchester Ave 1st floor…."
The warrant authorized the seizure of "Heroin… any paraphernalia…money and records" and
any residency documents.

57.     No plaintiff knew a male person with this name or who fit this physical
description.  In fact, no male of any kind resided, stayed or spent significant time in plaintiffs'
apartment in April, 2019.

58.     The complaint for search warrant stated, based on information from a John
Doe confidential informant, an admitted narcotics user, that Ronald Anderson was selling
narcotics on the back porch outside plaintiffs' apartment.

59.     Defendant officers simply assumed that Ronald Anderson resided in or
had access to plaintiffs' apartment without independently corroborating this assumption or
without verifying through other sources that Anderson resided or could be found in plaintiffs'
apartment.  In fact, the first-floor back porch is small enough that, if a person walks down the
building's common back stairs and stops on the first level, he is directly in front of the back door
to plaintiffs' apartment.

60.     The facts that a Chicago police officer alleges in a complaint for search
warrant are required to be "credible and reliable."  (CPD SO4-19, VI. B. a.).  To this end, a
Chicago police officer swearing out a search warrant under oath before a judge is required to
"thoroughly conduct[]" the "investigation leading up to the need for a search warrant."  (CPD
SO4-19).

61.     Crucially, CPD requires the affiant of a complaint for search warrant to
independently investigate and verify the information provided by a John Doe confidential
informant, especially the address of the intended target of the search warrant.

13

62.     In other words, as the sworn applicant for the warrant, officer Anderson had a duty to discover, diligently and in good faith, and disclose to the issuing warrant judge whether he had identified the correct apartment or place to be searched and not the residence of an innocent third party.

63.     In direct violation of CPD policy, officer Anderson, any CPD lieutenant who approved the complaint for search warrant, per CPD procedure, and other officers involved in obtaining or approving the warrant performed no independent investigation or surveillance to verify that the John Doe confidential informant had provided current or accurate information regarding where the target resided or could be found.

64.     Defendants could have made any of a number of simple inquiries. As a Chicago police officer, officer Anderson had multiple sources of information available to him. He could have contacted the building's owner. He could have contacted a utility company supplying energy to the building or basement unit. He could have utilized CPD's database, Accurint, which assists officers in identifying persons residing at a given address. He could have run a person search on LexisNexis, using Ronald Anderson's date of birth and last known address. He could have conducted surveillance.

65.     Officer Anderson failed to conduct any investigation or verification, as required by SO4-19 and CPD training. He simply trusted what the John Doe told him about where Ronald Anderson resided.

66.     Consequently, in his complaint for search warrant officer Anderson provided the court with an incorrect address for the target, 6832 S. Dorchester Ave, 1st floor. Officer Anderson did not have probable cause to believe that Ronald Anderson resided or could be found inside plaintiffs' apartment and, therefore, to enter and conduct a search at that address.

67. Because officers failed in their official duty to independently investigate and verify the particular place to be searched, thereby taking the risk of raiding and traumatizing an innocent family, theirs was not a good faith error.

68. Similarly, the CPD lieutenant who approved the complaint for search warrant, believed to be Lt. Russell Willingham, simply gave rubberstamp approval to officer Anderson's application for search warrant, without taking any steps to ensure that he or other officers had performed the due diligence required by CPD Special Order S04-19. Taking such vital steps was something he was officially required to do.

69. On April 25, 2019, defendant officers reasonably knew or should have known that it was highly unlikely that the intended target of the warrant resided or could be found in plaintiffs' apartment.

70. Moreover, as is customary in Chicago, the defendant officers, in the course of obtaining and executing this search warrant, took no steps to first determine whether children resided in the first floor apartment, to avoid entering at times when children were likely to be present, or to deescalate their tactics when they unexpectedly encountered young children at 6832 S. Dorchester, 1st floor. As a result, officers injured Savannah, Telia and Jhaimarion.

71. At approximately 8:30PM on the evening of April 25, 2019, several plain-clothed and uniformed Chicago police officers executed the search warrant at plaintiffs' apartment. The children's uncle, Ms. Archie's brother, had been babysitting the children and had just left five minutes earlier. Ms. Archie would soon be home from work.

72. Defendant officers Anderson, Sanchez, Angel, Miranda, Boyle, Cusimano, Campbell, Ryan, McClelland, and Weathersby breached and entered plaintiffs apartment

initially, all of them with their firearms drawn.  Sergeant Bruno was in charge of the operation

and entered later.  Some of these officers had been at plaintiffs' apartment in the first raid.

73.     Officers Sanchez, Angel and others who breached and were among the

first to enter did not "knock and announce" first; they simply bashed the building front door and

plaintiffs' apartment front door once, broke them open, and went inside.

74.     Once officers were inside, Savannah heard shouts to the effect of

"SEARCH WARRANT" and "HANDS UP… GET THE DOWN ON THE FLOOR."

75.     As officers entered, defendant officers Anderson, Campbell, Ryan and

Cusimano pointed their assault rifles and pistols directly at Savannah, Telia, and JJ at close range

and ordered them to lie down on the floor.  This is captured on body camera video.  They told

Savannah to "shut up."  Savannah, shaking and in shock, pleaded with officers not to shoot her

while JJ looked on, terrified for his sister.  Savannah and Telia were soon crying for their mother.

76.     Officers' initial entry is captured on some of the officers' body cameras

(though plaintiffs have not been provided with all officers' body cameras), but their subsequent

search is not because they turned off their cameras prematurely after approximately 5 minutes.

77.     At the moment officers entered, Savannah and JJ were in Savanah's

bedroom, the first bedroom, and Telia was in JJ's room, the next bedroom back.

78.     Officer Anderson, Campbell and Ryan are the officers who pointed their

firearms directly at Savannah and JJ in Savannah's bedroom while ordering them to the floor.

Their guns, including an assault rifle, were approximately six inches from her head when pointed

at her.

79.     While Savannah was lying face down on the floor in her bedroom, an

Hispanic male officer, believe to be Sanchez, Miranda or Angel, put his foot on top of the middle

of her back and pointed his long, assault rifle at the back of her head and at her face at point-blank range.  The officer then started handcuffing her and stopped only when she protested that she was only 14 years-old.

80.     It was officers Boyle and Cusimano who pointed guns at Telia when she was on the floor.  The guns were pointed at her head.

81.     After herding the children into the living room and detaining them there for the duration, officers Sanchez, Angel, Miranda, Campbell or Ryan, and Sergeant Bruno interrogated the children about the whereabouts of drugs and other topics.  Only a portion of this interrogation is caught on body cameras because officers turned their body cameras off prematurely.  Next, they brought the adolescent and two toddlers from the upstairs apartment downstairs into the living room of plaintiffs' apartment.

82.     Within minutes, defendants knew the target was not in the apartment and were aware that there were no signs of him, such as mail addressed to him, financial or legal papers with his name on them, men's clothing, etc.  Nevertheless, defendants did not leave.

83.     Savannah asked twice to see the search warrant, but officers refused to show it to her.  Officers also refused to allow the children to call their mother to tell her what was going on.

84.     Telia asked an officer why her family was getting in trouble, and he (falsely) accused her family of selling drugs in their apartment.

85.     Officers were cracking jokes the entire time they were in plaintiffs' apartment.  When Savannah asked, "Who are you looking for?" an officer chuckled and said, "Your uncle."  The same officer also joked about the children's shock and fear, saying, "the next

time we come back, we'll give you a call." Sergeant Bruno sat next to the children on the couch, vaping.

86. Plaintiffs noticed some of the officers were wearing body cameras that did not appear to be on and recording.

87. While the children were confined on the living room couch, officers tossed and searched plaintiffs' entire apartment, unnecessarily making a huge mess in every room and damaging and destroying plaintiffs' personal property. They searched for approximately 45-60 minutes. On information and belief, officers' body cameras were off at this time.

88. On information and belief, officers who searched included Anderson, Boyle, Angel, Ryan, Sanchez, Cusimano, Campbell, Miranda, Weathersby, and Bruno. Sergeant Bruno searched in the living room, among other places.

89. Officers did not find any narcotics, related paraphernalia, cash or records of transactions in plaintiffs' apartment. Officers did not arrest or charge any plaintiff or any person connected with any plaintiff. They did not find the intended target of the search warrant in plaintiffs' apartment.

90. During the course of the search, on information and belief officers Anderson, Boyle, Angel, Ryan, Sanchez, Cusimano, Campbell, Miranda, Weathersby, and Bruno dumped all the family's belongings that were neatly stored in totes and boxes – papers, receipts, hair rollers, keepsakes, etc. They unnecessarily dumped out approximately 15-20 bottles of Ms. Archie's cooking spices and seasonings, and they took sausage, shrimp and other meat out of the freezer and left them out; Ms. Archie had to throw them away. Baking powder was all over the kitchen. Ms. Archie has a small, home food preparation business that helps her earn additional

income on the side.  Officers' cruel actions caused her to lose several hundred dollars' worth of materials for her business and prevented her from earning income for several weeks.

91.     On information and belief, officers Anderson, Boyle, Angel, Ryan, Sanchez, Cusimano, Campbell, Miranda, Weathersby, and Bruno also took out and tossed around plaintiffs' furniture and personal belongings, including a new nightstand and a bathroom drawer.  Both the front and back doors were damaged.  Officers unnecessarily broke even the plates of light switches on the wall.  They left the TV on a bed.  They dumped out the dirty clothes bag, seasonal clothes bags, and took clean clothes out of drawers and threw them all over the bedrooms.  They broke Telia's dresser drawer again.  They threw items from the kitchen onto the interior back porch.  They opened Ms. Archie's toolkits and dumped the pieces all over the floor, and now she's missing several pieces.

92.     When officers were done searching, they took off their search gloves and threw them down on the floor in plaintiffs' apartment, like they were discarding trash on the street.

93.     When officers left, everything was in disarray.  Plaintiffs could not even walk to parts of their apartment, including the back door.  Ms. Archie had to dig to get to her clothes.  It took Ms. Archie weeks to clean up and restore order.

94.     Before officers left, they told Savannah, Telia and Jhaimarion, "we're coming back next week."

95.     Officers never apologized to the children for pointing guns at them.

96.     Later that evening, Ms. Archie contacted the police and requested that a supervisor come to her home so that she could make a complaint.  Sergeant Bruno then drove up in front of her house, and she went out to speak with him.  Ms. Archie complained that this was

the second time officers broke down her door and searched her house for nothing. She said there is nothing illegal going on in her apartment, that she does not have drug traffic in her apartment, and that every adult who comes to her apartment has a job. She told him she did not understand why police had a search warrant for her apartment because she is not involved in anything illegal.

97. In response, sergeant Bruno told her that she needed to figure out what was going on with her neighbors, pressed her for information about them, and threatened to take legal action against her if she filed a complaint about officers. He implied CPD was targeting her house because she had a nefarious connection to her second-floor neighbors, which she did not.

### Raid #3 of Plaintiffs' Apartment: May 17, 2019

98. Despite raiding plaintiffs' apartment twice in the previous three months and finding no target, no signs of the target, and no heroin or other contraband, Chicago police decided to raid plaintiffs' apartment a third time.

99. At approximately11:23AM on Friday May 17, 2019, defendant officer Craig Brown swore out and obtained search warrant 19 SW 8090 authorizing a search of an "Unknown male black, known as aka 'Lord T' who is approximately 40-45 years old, 5'10"-6'00" in height, 220-225 lbs., with a medium complexion," and the premises at "6832 S. Dorchester Ave 1st floor…." The warrant authorized the seizure of "Heroin… any paraphernalia…money and records" and any residency documents.

100. No plaintiff knew a male person with this name or who fit this physical description. In fact, no male of any kind resided, stayed or spent time in plaintiffs' apartment in May, 2019.

101.     Officer C. Brown's complaint for search warrant stated, based on officer surveillance of a controlled narcotics purchase by the RCI on May 14, that the RCI walked inside the rear door of the first-floor apartment and emerged again less than one minute later after purchasing narcotics.

102.     No such person entered plaintiffs' apartment, and no person fitting the description of "Lord T" was inside plaintiffs' apartment.  It is possible that Ms. Archie's children left the security gate unlocked on May 14, as they sometimes do, and that the RCI met someone who had entered that area, which is not the inside of plaintiffs' apartment.

103.     Moreover, during the raid, officers told Ms. Archie that the informant entered her *front* door, not the *back* door.  The building's front door is a common door leading to a vestibule; it does not lead directly into plaintiffs' apartment.

104.     As with the second search warrant, defendant officers failed to corroborate or verify through other sources available to them any suspicion they had or any representation that the RCI made to them that someone fitting the description of "Lord T" resided in or had physical access to plaintiffs' apartment.  Officer Brown simply trusted what the RCI told him about where "Lord T" resided.  He did not have probable cause to believe that he resided or could be found inside plaintiffs' apartment and, therefore, to enter and conduct a search at that address.

105.     Defendants could have made any of a number of simple inquiries.  Officer Brown could have contacted the building's owner.  He could have contacted a utility company supplying energy to the building or basement unit.  He could have utilized CPD's database, Accurint, which assists officers in identifying persons residing at a given address.  He could have

run a person search on LexisNexis, using Lord T's date of birth and last known address. He could have conducted surveillance.

106.     Because officers failed in their official duty to independently investigate and verify the particular place to be searched, thereby taking the risk of raiding and traumatizing an innocent family, theirs was not a good faith error.

107.     Similarly, the CPD lieutenant who approved officer Brown's complaint for search warrant, believed to be defendant officer Eichman, simply gave rubberstamp approval, without taking any steps to ensure that he or other officers had performed the due diligence required by CPD Special Order S04-19. Taking such vital steps was something he was officially required to do.

108.     On May 16, 2019, defendant officers reasonably knew or should have known that the intended target of the warrant did not reside and could not be found in plaintiffs' apartment.

109.     Moreover, as is customary in Chicago, the defendant officers, in the course of obtaining and executing this search warrant, took no steps to first determine whether children resided in the first-floor apartment, to avoid entering at times when children were likely to be present, or to deescalate their tactics when they unexpectedly encountered young children at 6832 S. Dorchester, 1st floor. As a result, officers injured Savannah, Telia and Jhaimarion.

110.     Between approximately 1:00 and 1:15PM on Friday, May 17, 2019, defendants executed search warrant 19 SW 8090 in plaintiffs' apartment. Officers did not "knock and announce"; they simply broke open the back doors to the apartment with 3-6 big blows. On information and belief, officers were not wearing body cameras. Some of the same officers were at plaintiffs' apartment during the first and second raids.

111.     Officers C. Brown, Hammermeister, Cutrone, Weatherspoon, Wilke, Leveille, Schumpp, Maraffino, Fraction, Jones, and Eichman breached and entered plaintiffs' apartment and entered with their guns drawn.  Sergeant Eichman was in charge of the operation. Defendant officers C. Brown and Weatherspoon rushed in first, reached the front of the apartment first, and pointed large pistols directly at Ms. Archie in the hallway.  The guns were 2-3 feet from Ms. Archie's body.  Ms. Archie and her female friend had been sitting and talking in the living room when she heard sounds coming from the back of the apartment and got up to investigate.

112.     As officers streamed in, they shouted, "SHUT THE FUCK UP!" and "GET THE FUCK DOWN ON THE FLOOR!"

113.     Officers then handcuffed Ms. Archie and her friend and confined them to the living room couch for the duration.  On information and belief, defendant officer Fraction or Jones handcuffed Ms. Archie.  Officer Fraction patted her down.  Ms. Archie and her friend were kept in handcuffs for approximately 45-60 minutes.

114.     In tears, Ms. Archie asked officers why they had come to her house a third time when she does not know the people they are looking for.  An officer replied, "SHUT THE FUCK UP!"

115.     Ms. Archie felt completely violated, powerless and in despair because this was happening to her and her family's home yet again.

116.     Within minutes, officers knew that the target was not in the apartment and that there were no signs of him ever being there, such as mail addressed to him, legal and financial papers with his name on them, male clothes, etc.

117.    Nevertheless, instead of promptly leaving, officers began tearing apart and searching plaintiffs' entire apartment for the third time.  Ms. Archie had just, days earlier, finished getting her apartment back in order before the third raid took place.

118.    Crying, Ms. Archie told officers it was not right for them to be back in her apartment again.  In response, officers just laughed and joked, especially defendant officer Leveille.  While Ms. Archie cried during the entire raid, he and officers joked and laughed the whole time they were in her apartment.

119.    For example, when Ms. Archie mentioned this was the third raid in a short time, defendant officer Leveille quipped, "Well, you can see that these are not the same officers."  As another example, when Ms. Archie's friend told officers that Ms. Archie cooks, officer Leveille cracked, "What does she cook, heroin?"  And when Ms. Archie kept telling officers that it was not right for them to keep coming back, that no one else besides she and her kids live in the apartment, that they have to be looking for someone in particular, and asked if they have a photo of who they are looking for, officer Leveille took out his cell phone and showed her a photo of himself.

120.    Other defendant officers were rude and demeaning, including officers Brown and Weatherspoon.

121.    In the meantime, Ms. Archie could hear her family's belongings being thrown around and shattered while she sobbed.  On information and belief, officers Craig Brown, Hammermeister, Cutrone, Weatherspoon, Schumpp, Wilke, Leveille, Maraffino, Fraction, Jones and Eichman participated in the third search of plaintiffs' apartment.  Defendants Cutrone, Hammermeister and Maraffino are believed to have searched in the living room.  The remainder searched in the other rooms of the apartment.

122.     Officers did not find heroin, related paraphernalia, cash or records of transactions in plaintiffs' apartment.  Officers did not arrest or charge Ms. Archie or her friend.

123.     They did not find the intended target of the search warrant in plaintiffs' apartment.

124.     In fact, officers told Ms. Archie they knew they were not looking for her or her children.  They said, "We know it's not you," and "it's not your kids."  But they had gotten a warrant for plaintiffs' apartment.  They would not tell her why they were in her apartment.

125.     When officers were on their way out of her apartment, officer Craig Brown or Weatherspoon told Ms. Archie, "Tell Lord T, I'll be back."

126.     They left the broken doors wide open.  They did not tell her how to get anything repaired.  They did not apologize for anything.

### Officers' Uses of Force Against Savannah, Telia, JJ and Their Mother Was Totally Unnecessary

127.     Plaintiffs presented absolutely no threat, real or apparent, to the police officers entering into and searching their home.

128.     Even though they presented no threat, officers repeatedly pointed their guns directly at them and/or handcuffed them, and other officers did not ask their fellow officers to stop pointing guns at them or to remove the handcuffs.

129.     Moreover, plaintiffs posed no threat to officers after they quickly discovered that the intended target of the warrants was not inside plaintiffs' apartment.

130.     Plaintiffs have been harmed by officers' repeated unnecessary pointing of guns, unlawful detention, unlawful search of their persons and home, and destruction of their property.

### *Officers' Unnecessary Uses of Force Traumatized Plaintiffs, Especially the Children*

131.     Chicago police officers' terrorizing conduct toward Savannah, Telia, JJ Ms. Archie, incldunig pointing firearms directly at them, caused them immediate, severe and lasting emotional and psychological distress and injury.

132.     In addition to witnessing uses of force and threats of imminent violence against themselves, the children were also subject to officers breaking down doors, shouting commands, cruelly cracking jokes during their distress, and promising to return.  This made for unforgettable scenes of totally unnecessary terror.

133.     Prior to February 8, 2019, Savannah, Telia and JJ were happy, healthy children in a close, loving family.  Prior to this date, they had suffered no emotional or psychological trauma of any kind in their lives.  That changed on February 8 and again on April 25, 2019 with defendants' actions.

134.     Throughout their encounters with police, Savannah, Telia and JJ were terrified and crying.  Based upon what they witnessed, each child was afraid he/she and his or her siblings were going to be shot.  Savannah thought she was going to be killed.

135.     Ever since the incident, the children have continued to re-live, in various ways, how terrified they were that day.  They feel generally scared, nervous, anxious.  They are "on edge" and "jumpy."  They don't want to be alone.  They are hypervigilant.  They think about the incidents when they are at school.  They expect the police to raid their home again.  JJ feels like the police are under his bed.

136.     Savannah has trouble falling asleep. She wakes up anxious in the middle of the night thinking about the police.  She gets a glass of water to calm down and checks on her

brother and sister.  Savannah has not been able to focus very well at school.  She suddenly feels angry "out of nowhere."

137.    Telia has been having trouble focusing at school.  She gets distracted and stares into space and starts thinking about what is going on at home or with her mom.  She is now afraid of the police and, after seeing officers point guns at her siblings, believes there is no one left to protect her family.

138.    JJ is having trouble focusing and falling asleep.  He's afraid before he falls asleep that something is going to happen to his mother and sisters.  He has bad dreams that the police are coming back to get his sisters. He sleeps with his sisters when he's feeling especially scared.  JJ used to want to be a police officer.  He no longer wants to live in his apartment.

139.    The children now continue to experience and exhibit, unabated, these and other signs of severe emotional and psychological trauma and distress.

140.    On information and belief, the children have, or have many of the symptoms of, severe Post-Traumatic Stress Disorder.

141.    As a direct result of officers' conduct, the children are now being medically assessed for trauma inflicted by the Chicago police.

142.    On information and belief, they now require high quality, long-term, costly, psychological care and counseling in order to cope with the long-term, psychological injuries caused by defendants' terrorizing display of unnecessary force.

143.    Ms. Archie is also suffering mental distress as a result of officers' conduct.  She was unable to return to work for at least one week following the May 17 raid.

144.    She has also suffered financial distress, due to her inability to work and the destruction of her cooking spices.  She has been unable to use her kitchen to supplement her income.

145.    Officers' shocking actions of repeatedly pointing and training loaded guns at close range on young children constituted serious abuses of power and authority.

146.    Officers' actions – including their inaction in the form of failing to intervene to request that fellow officers stop using excessive force - were directed towards *seven-, twelve- and fourteen-year-old children.*  The children's sensitivity and vulnerability to such trauma-inducing violence was or should have been known to officers.

147.    Officers' conduct was undertaken pursuant to and is part of a long-standing and widespread pattern and practice, *de facto* policy or *MO* of Chicago police officer use of excessive force that includes the use of unnecessary force against and/or in the presence of children, especially minority children.

148.    Plaintiffs are highly likely to be the victims of unlawful or unreasonable home entry and search and excessive force by Chicago police again in the near future.

149.    Police have unlawfully and unreasonably entered and searched plaintiffs' home and directed unreasonable force against plaintiffs three times in the last six months.  In the weeks since the last raid in May, 2019, Chicago police have returned to plaintiffs' block several times.  Officers were at plaintiffs' building as recently as July 8, 2019, and made an arrest of a neighbor at that time.

150.    Plaintiffs are under and bound by a lease for their apartment.  They cannot easily move to another apartment in another location.  Plaintiffs are a low-income family that

lives in a neighborhood where significant drug and gang activity is a fact of life. Whether plaintiffs could easily find another apartment that they can afford is speculative.

151.    Savannah, Telia and JJ are children who have now been traumatized by Chicago police three separate times in a short period.

152.    For people - especially children – exposed to violent trauma, re-exposure to additional violent trauma can be permanently debilitating and is likely to result in permanent PTSD. If plaintiffs – especially the children - are re-traumatized by further incidents of excessive force, they may never recover.

153.    Given recent, repeated police misconduct against plaintiffs, their re-exposure to violent trauma is highly likely and, therefore, plaintiffs seek an injunction against all further and similar conduct by Chicago police.

### COUNT I – 42 U. S. C. § 1983 *MONELL* POLICY CLAIM
### AGAINST THE CITY OF CHICAGO
**(Minor Plaintiffs Savanna Brown, Telia Brown and Jhaimarion Jackson only)**

154.    Plaintiffs Savannah Brown, Telia Brown and Jhaimarion Jackson re-allege all paragraphs 1-97 and 127-153 above and 191-205 below and incorporate them into this count, including the *Monell*-related allegations of paragraphs 11, 27-35, 37, 70, 109 and 147. They assert this claim against defendant City of Chicago.

155.    Defendant officers' use of excessive force against and in the presence of Savannah, Telia and JJ was directly and proximately caused by one or more of the following four, specific, long-standing, interrelated, *failures* of official policy, *lack* of official policy, *de facto* policies, widespread practices, and/or customs of the City of Chicago: 1) a pattern and practice of using unnecessary or excessive force against children (ages 0-14); 2) a systemic failure to investigate and discipline and/or otherwise correct allegations/incidents of officer

excessive force against children; 3) an absence of official policy and training to avoid the unnecessary or excessive use of force against and in the presence of children; and 4) a pattern of executing search warrants in the wrong residences, which traumatizes innocent children. Each of these policies existed for more than six years prior to May 17, 2019 ("the *Monell* period").

156.    First, defendant City of Chicago has a long-standing, pervasive practice and custom of failing to adequately investigate, intervene with and discipline or otherwise correct officers for the use of excessive force involving children (ages 0-14), including unnecessary force directed at children and/or at adult family members in the presence of children.

157.    This set of City's widespread practices or customs directly encouraged, authorized and caused officers' conduct toward Savannah, Telia and JJ. The City's historical failure, leading up to May 17, 2019, to properly intervene in, investigate and discipline officer excessive force, especially excessive force against or in the presence of young children, caused officers to act without appropriate restraints in the presence of Savannah, Telia and JJ.

158.    This was facilitated by unjustified exemptions from the bodycam mandate and a complete lack of official disciplinary consequences for officers who do not wear or do not turn on their bodycams.

159.    The City was on notice of each of these failures of official policy from the specific conclusions reached by and the data contained in the 2017 U. S. Department of Justice investigative and the PATF reports (citations above).

160.    Second, defendant officers' conduct towards and in the presence of Savannah, Telia and JJ was undertaken as a direct consequence of defendant City of Chicago's long-standing failure to have *any* affirmative, official policies and/or training explicitly requiring

officers to avoid using unnecessary or excessive force against children or against their adult relatives in the children's presence whenever possible.

161.   Even after the findings of the U. S. Department of Justice investigation and the Mayor's PATF were known to City policy makers, the City failed to implement or announce implementation of any reforms that purported to remedy the pattern and practice of unnecessary use of force against and/or in the presence of children, a failure which amounted to a deliberate choice not to take action to prevent the violation of plaintiffs' constitutional rights. City and CPD's failure to implement these explicit policies, reforms and priorities was a cause of the injuries to Savannah, Telia and JJ.    Specifically, this lack of official policies, training, and reforms includes:

a.   The continued absence of any provision in CPD's official use of force policy that would explicitly guide or require officers to avoid using force against or in the presence of children, or to use a trauma-informed approach to the use of force in situations where children are present, and some force may necessary;

b.   CPD's continued failure to add, in its official use-of-force training curriculum and/or its on-the-job training and supervision of officers, any explicit guidance or requirement that officers should avoid using force against or in the presence of children, or to use a trauma-informed approach to the use of force in situations where children are present and some force may be necessary;

c.   CPD's continued failure to require officers seeking residential search warrants to make reasonable efforts before obtaining and/or executing the warrant to determine, through investigation and surveillance, (i) whether children reside in the residence, (ii) to avoid entry and search at times when children are likely to be present (iii) to de-escalate

themselves or change tactics when they unexpectedly encounter young children, and/or (iv) to take other precautions to avoid traumatizing children, such as avoiding placing parents and grandparents in handcuffs in the children's presence;

        d.     CPD's rebuff, both before and since the U. S. Department of Justice and PATF reports were released, of national and local legal and/or community organizations that have offered to provide training on trauma-informed policing with children and/or offered model use-of-force policies that included explicit provision for avoiding the unnecessary use of force against and in the presence of children; and

        e.     City's and CPD's refusal or failure to propose or agree to any explicit protections for children from excessive force or any provisions requiring a trauma-informed approach to policing children in the federal consent decree it negotiated with the State of Illinois.

        162.    Third, the City's lack of official policies to protect children from unnecessary officer use of force, combined with its failure to hold accountable officers who use unnecessary force involving children, have resulted in a *de facto* City policy and practice of using unnecessary or unreasonable force against young children and/or in their presence, as concluded by the U. S. Department of Justice investigation into the Chicago Police Department and the PATF. The excessive force used against or in the presence of Savannah, Telia and JJ was an example of and the result of this *de facto* policy.

        163.    Fourth, CPD has a *de facto* policy of applying for and executing residential search warrants based on inaccurate, unreliable and unverified information, with the consequence that the overwhelming majority of warrants executed are "negative," i.e., they result

in no arrest. But they consistently result in excessive force, terror and lasting trauma to innocent residents, including young children.

164.    CPD fails to investigate, discipline and otherwise hold accountable officers who apply for and execute residential search warrants based on inaccurate, unreliable and unverified information.

165.    Nor does CPD audit, monitor or track residential search warrants in the aggregate, even on a sample basis, in order to identify police practice issues (such as whether officers are doing enough to verify the current or correct address for the target) and improve practices, including investigative and use of force practices, despite the fact that such measures could boost "positive" warrant results and inflict less trauma on innocent bystanders, including young children.

166.    Through their combined failures, before and after notice, to enact official policies that protect children from unnecessary force and to hold accountable officers who use excessive force against children, the City has led police officers to be confident that such actions are acceptable and will not be challenged, investigated or disciplined by CPD, CPD's Bureau of Internal Affairs ("BIA"), the Chicago Police Board, the Independent Police Review Authority ("IPRA"), the Civilian Office of Police Accountability ("COPA") or the Chicago Inspector General ("IG"). These past failures directly authorized, encouraged and emboldened defendant officers' conduct against and in the presence of Savannah, Telia and JJ, providing them a general license to use excessive force involving children whenever it suits them.

167.    Moreover, through their combined failures, before and after notice, to enact official policies protecting children from unnecessary force and to hold accountable officers who use excessive force against children, final City of Chicago policy-makers –

including the Superintendent of police, the Administrator of IPRA (now COPA), the head of

CPD's BIA, the Mayor, and the Chicago City Council – condoned, approved, facilitated,

encouraged and perpetuated a *de facto* City policy and practice of unnecessary or excessive force

against or in the presence of young children.

168.    During all times relevant to the incident involving Savannah, Telia and JJ,

a "code of silence" pervaded the police accountability system in Chicago, including CPD's BIA,

the Chicago Police Board, IPRA, COPA and the IG, contributing to these agencies' collective

failure to properly investigate and discipline officer excessive force, including excessive force

against children.  Unjustified exemptions from the bodycam mandate and a complete lack of

official discipline and accountability for officers who do not wear or do not turn on their

bodycams reinforce the code of silence.  Defendant officers' conduct toward Savannah, Telia

and JJ, including their failure to intervene and failure to report the actions of their colleagues,

was the direct result of the long-standing and systematic code of silence at work in the City's

police investigative and disciplinary systems.

169.    By means of its pervasive customs and practices above and its failures,

after notice, to remedy officers' use of unnecessary force against and/or in the presence of young

children, defendant City of Chicago has manifested and manifests deliberate indifference to the

deprivation of Savannah, Telia and JJ's constitutional rights.

170.    One or more of these three polices, practices and customs collectively,

directly and proximately caused the violations of Savannah, Telia and JJ's constitutional rights

set forth above and below and the resulting injuries, such that the City of Chicago is liable for

officers' use of excessive force against them and/or in their presence.

***The City of Chicago's <u>De Facto</u> Policies Resulted in Violations of Savannah, Telia and JJ's
Constitutional Right to be Free of Unnecessary or Excessive Force and Illegal Search***

171.    Officers' conduct toward each Savannah, Telia and JJ constituted excessive force and illegal search, in violation of their rights under the Fourth and Fourteenth Amendments to the U. S. Constitution.

172.    Under the circumstances, officers' displays of force against and in the presence of young children was totally unnecessary, unreasonable and unjustifiable.

173.    Officers failed to intervene to stop any use of force.

174.    Officers' misconduct was objectively unreasonable and was undertaken intentionally with willful indifference to Savannah, Telia and JJ's constitutional rights.

175.    Officers' misconduct was undertaken with malice, willfulness, and recklessness indifference to the rights of others.

176.    The officers' misconduct was undertaken pursuant to and as the direct and proximate result of the Defendant City of Chicago's *de facto* policy, failures of official policy, absences of affirmative policy, and pervasive, long-standing practices and customs, as set forth above, such that defendant City of Chicago is liable for officers' use of unnecessary force against and in the presence of Savannah, Telia and JJ.

177.    As the direct and proximate result of officers' misconduct, plaintiffs Savannah, Telia and JJ have suffered and continue to suffer severe, long-term emotional and mental distress and trauma, including lasting or permanent psychological injury.

178.    One or more officers had a reasonable opportunity to prevent or stop the violations of Savannah, Telia and JJ's constitutional rights but stood by and failed to take any action.

179. Officers' inactions in this respect were objectively unreasonable and undertaken intentionally, with malice and reckless indifference to Savannah, Telia and JJ's constitutional rights.

180. As set forth above, the officer misconduct was undertaken pursuant to the *de facto* policies, long-standing and pervasive practices and customs of defendant City of Chicago, such that the City of Chicago is also liable for officers' failure to intervene.

181. As the direct and proximate result of officers' misconduct, Savannah, Telia and JJ suffered and continue to suffer injury and harm.

## COUNT II – UNLAWFUL SEARCH WITHOUT CONSENT – 42 U. S. C. § 1983
### (All Plaintiffs)

182. Plaintiffs Savannah Brown, Telia Brown, JJ Jackson, and Krystal Archie re-allege paragraphs 1 – 54 above and incorporate them into this count. They assert this claim against all defendant officers who entered and searched their apartment on February 8, 2019.

183. As set forth above, on this date defendants thoroughly searched plaintiffs' apartment, damaging their personal property.

184. Defendants did not have a search warrant for plaintiffs' apartment on February 8, did not have probable cause, plaintiffs did not give their consent for officers to search their entire apartment, and defendants did not conduct their search pursuant to any exigent circumstances. Defendants searched the entire apartment, well beyond the area(s) where they quickly made arrests after suspects fled into plaintiffs' apartment.

185. Under the circumstances, defendants' search of plaintiffs' apartment was unlawful, unreasonable, and violated plaintiffs' sacred Fourth Amendment right to be secure in their home and free of unlawful searches of their home.

186.    Officers' actions in these respects were objectively unreasonable and were undertaken intentionally, with malice and reckless indifference to plaintiffs' constitutional rights.

187.    As the direct and proximate result of officers' misconduct, plaintiffs suffered and continue to suffer injury and harm.

### *Defendant Officers' Conduct Was Willful and Wanton or Grossly Negligent*

188.    Defendant officers' conduct in this count merits an award of punitive damages to plaintiffs.  Defendant officers' shocking actions of conducting a search of plaintiffs' apartment without their consent or other legal basis constituted an abuse of power and authority. Defendant officers' actions were directed towards honest, hard-working citizens who were totally innocent of all criminal conduct.

189.    Defendant officers' conduct toward plaintiffs was undertaken with willful and wanton disregard for the rights of others.  Officers acted with actual intention or with a conscious disregard or indifference for the consequences when the known safety and health of plaintiffs was involved.  Defendant officers acted with actual malice, with deliberate violence, willfully or with such gross negligence as to indicate a wanton disregard of the rights of others.

190.    In light of the character of defendant officers' actions toward plaintiffs and the lasting or permanent psychological injury that defendants' conduct has caused plaintiffs, especially Savannah Brown, Telia Brown, and JJ Jackson, defendants' conduct merits an award of punitive damages.

## COUNT III - UNLAWFUL SEARCH – INVALID WARRANTS - 42 U. S. C. § 1983[1]
### (All Plaintiffs)

---

[1] The Court previously dismissed this count as to all defendant officers other than officers Anderson, Willingham, Craig Brown, and Eichman.

191.    Plaintiffs Savannah Brown, Telia Brown, JJ Jackson, and Krystal Archie re-allege paragraphs 1 – 35 and 55-153 above and incorporate them into this count.  They assert this claim against defendant officers who entered and searched their apartment on April 25 and May 17, 2019.

192.    Defendant officers unreasonably approved and/or obtained search warrants for plaintiffs' apartment, the wrong location for the target, a fact which invalidated the warrants from the start, prior to execution.

193.    Officers' subsequent unauthorized entry and search of plaintiffs' apartment violated plaintiffs' Fourth Amendment right to be free from unreasonable searches of their persons and homes.

194.    As the sworn applicants for the warrants, defendant officers Anderson and Brown each had an official duty to discover and disclose to the issuing magistrate whether he had identified the correct address or place to be searched and not the residence of an innocent third party.

195.    Defendant officers reasonably knew or should have known that the intended target(s) of the warrants did not reside in plaintiffs' apartment or have physical access to plaintiffs' apartment such that he could be found there.

196.    Defendant officers had an official duty to reasonably investigate and verify information they received from the John Doe CI and the RCI about where the target(s) resided or could be found.

197.    Such an inquiry was easy to make.  Officers had multiple sources of information available to them at the time, had they bothered to use them.  They could have contacted the building's owner.  They could have contacted a utility company supplying energy

to the building. They could have utilized CPD's own information sources, such as Accurint, which assists officers in identifying apartments and the persons residing in them. They could have conducted a LexisNexis search.

198.    However, on information and belief, officers did not conduct any investigation or verification and/or failed to conduct a reasonable one.

199.    Consequently, in their complaints for search warrant defendant officers identified the wrong address, plaintiffs' address, a place they never had probable cause to enter and search. Because officers utterly failed to independently investigate and verify the place to be searched, theirs was not a good faith error.

200.    CPD Lieutenants approved defendant officers' applications for search warrant without ensuring that they had performed the due diligence required by CPD Special Order S04-19.

201.    Officers' actions in these respects were objectively unreasonable and were undertaken intentionally, with malice and reckless indifference to plaintiffs' constitutional rights.

202.    As the direct and proximate result of officers' misconduct, plaintiffs suffered and continue to suffer injury and harm.

### *Defendant Officers' Conduct Was Willful and Wanton or Grossly Negligent*

203.    Defendant officers' conduct under this count merits an award of punitive damages to plaintiffs. Defendant officers' shocking inaction in failing to perform required and basic reasonable due diligence to verify the correct location for search warrants before raiding and searching citizens' residence constituted an abuse of power and authority. Defendant officers' actions – of relying solely on location information provided by a John Doe CI and an

RCI - were directed towards honest, hard-working citizens who were totally innocent of all criminal conduct.

204.    Defendant officers' conduct toward plaintiffs was undertaken with willful and wanton disregard for the rights of others.  Officers acted with actual intention or with a conscious disregard or indifference for the consequences when the known safety and health of plaintiffs was involved.  Defendant officers acted with actual malice, with deliberate violence, willfully or with such gross negligence as to indicate a wanton disregard of the rights of others.

205.    In light of the character of defendant officers' actions toward plaintiffs and the lasting or permanent psychological injury that defendants' conduct has caused plaintiffs, especially Savannah Brown, Telia Brown, and JJ Jackson, defendants' conduct merits an award of punitive damages.

**COUNT IV – UNLAWFUL SEARCH – UNREASONABLE**
**MANNER OF ENTRY AND SEARCH – 42 U. S. C. § 1983**
**(Plaintiff Krystal Archie)**

206.    Plaintiff Archie re-alleges paragraphs 1 – 153 above and incorporate them into this count.  She asserts this claim against all defendant officers who entered and/or searched her apartment on February 8, April 25, and May 17, 2019.

207.    The ways in which officers conducted their entry into and search of plaintiff's apartment were objectively unreasonable, in violation of Plaintiff's Fourth Amendment rights.

208.    For example, when these officers entered plaintiffs' apartment, they did not knock or announce themselves or their office in circumstances where it was required; they repeatedly pointed guns at plaintiff; they handcuffed plaintiff without security concerns and for a

unreasonably long period; they cursed and insulted and humiliated plaintiff; and they intentionally damaged or destroyed plaintiff's personal property.

209.    Officers' manner of entry and search was objectively unreasonable in these and other ways and was undertaken intentionally, with malice and reckless indifference to plaintiff's constitutional rights.

210.    Under the circumstances, officers had reasonable alternative law enforcement techniques available to them for effective entry and search.

211.    As the direct and proximate result of officers' misconduct, plaintiff suffered and continues to suffer injury and harm.

### *Defendant Officers' Conduct Was Willful and Wanton or Grossly Negligent*

212.    Defendant officers' conduct under this count merits an award of punitive damages against totally harmless children constituted an abuse of power and authority. Defendant officers' actions set forth above were directed towards an unarmed citizen who was fully compliant and cooperative and innocent of all criminal conduct.

213.    Defendant officers' conduct toward plaintiff was undertaken with willful and wanton disregard for the rights of plaintiff.  Officers acted with actual intention or with a conscious disregard or indifference for the consequences when the known safety and health of plaintiff was involved.  Defendant officers acted with actual malice, with deliberate violence, willfully or with such gross negligence as to indicate a wanton disregard of the rights of others.

214.    In light of the character of defendant officers' actions toward plaintiffs and the lasting or permanent psychological injury that defendants' conduct has caused Ms. Archie, defendants' conduct merits an award of punitive damages.

## COUNT V – FALSE ARREST AND FALSE IMPRISONMENT – 42 U. S. C. § 1983[2]
### (Plaintiff Krystal Archie)

215.    Plaintiff Krystal Archie re-alleges paragraphs 1 – 26 and 98-153 above and incorporates them into this count.  She asserts this claim against all defendant officers who entered her apartment on May 17, 2019 and handcuffed her.

216.    Officers arrested and imprisoned plaintiff when, (a) without a warrant for her arrest and without probable cause to arrest her, they handcuffed and/or confined Ms. Archie for a prolonged period when she did not present any security concern.

217.    Officers' actions constituted a violation of plaintiff's Fourth Amendment right to be free from unreasonable searches and seizures.

218.    When officers handcuffed and/or confined plaintiff for an unreasonably long period, they unlawfully deprived her of their liberty to move about, despite the facts that she had not done nothing illegal and that officers had no probable cause for her arrest and imprisonment or reasonable concern about security.  This violated plaintiffs' rights under the Fourth and Fourteenth Amendments to the U. S. Constitution.

219.    One or more officers had a reasonable opportunity to prevent or stop the violations of plaintiff's constitutional rights but stood by and failed to take any action.

220.    Through physical force and the invalid use of legal authority, officers acted to arrest, restrain and confine plaintiff to a bounded area.

221.    Plaintiff was acutely aware of and was harmed by officers' confinement, as detailed above.

---

[2] The Court previously dismissed this count as to all defendants.  Plaintiffs re-plead it only for the purpose of preserving their rights on appeal.

222.     Officers' actions in this respect were objectively unreasonable and undertaken intentionally, with malice and reckless indifference to plaintiff's constitutional rights.

223.     As the direct and proximate result of officers' misconduct, plaintiff suffered and continues to suffer injury and harm.

### *Defendant Officers' Conduct Was Willful and Wanton or Grossly Negligent*

224.     Defendant officers' conduct under this count merits an award of punitive damages to plaintiff.  Defendant officers' shocking displays of force constituted an abuse of power and authority.  Defendant officers' actions set forth above were directed towards citizens who were fully compliant and cooperative and innocent of all criminal conduct.

225.     Defendant officers' conduct toward plaintiffs was undertaken with willful and wanton disregard for the rights of others.  Officers acted with actual intention or with a conscious disregard or indifference for the consequences when the known safety and health of plaintiff was involved.  Defendant officers acted with actual malice, with deliberate violence, willfully or with such gross negligence as to indicate a wanton disregard of the rights of others.

226.     In light of the character of defendant officers' actions toward plaintiff and the lasting or permanent psychological injury that defendants' conduct has caused plaintiff, defendants' conduct merits an award of punitive damages.

### COUNT VI – UNCONSTITUTIONAL SEIZURE OF PROPERTY - 42 U. S. C. § 1983
### (All Plaintiffs)

227.     Plaintiffs Savannah Brown, Telia Brown, JJ Jackson, and Krystal Archie incorporate paragraphs 1 – 153 above and assert this claim against all defendant officers entered and searched plaintiffs' residence on February 8, April 25, and May 17, 2019.

228.     As set forth above, defendants officer unnecessarily and willfully converted, damaged or destroyed plaintiffs' personal property during the course of their searches.

Defendant officers took these actions without any lawful basis and without ever returning plaintiffs' property to them or paying them compensation for a taking/loss, damage or destruction they caused. Defendant officers also intentionally damaged or destroyed plaintiffs' property out of spite.

229.    Defendant officers' actions constituted an unreasonable seizure of plaintiffs' property, in violation of their rights under the Fourth Amendment and Fourteenth Amendments to the U. S. Constitution, as well as a deprivation of property without due process of law, in violation of their rights under the Fourteenth Amendment.

230.    Defendants' misconduct was objectively unreasonable and was undertaken intentionally with willful, malicious and reckless indifference to plaintiffs' constitutional rights.

231.    Defendants' misconduct was undertaken with malice, willfulness, and recklessness indifference to the rights of others.

232.    As a result of defendant officers' misconduct described in this Count, plaintiffs have suffered injury, including emotional distress and financial harm.

## COUNT VII – ASSAULT – STATE LAW[3]
### (All Plaintiffs)

233.    Plaintiffs Savannah Brown, Telia Brown, JJ Jackson, and Krystal Archie re-allege and incorporate paragraphs 1 – 153 above in this count. They assert this claim against defendant officers Holden, Alvarez, Angel, Guebara, De Leon, Anderson (first raid), Anderson, Campbell, Ryan, Cusimano, Sanchez, Miranda, Angel (second raid), and C. Brown and Weatherspoon (third raid).

---

[3] Plaintiffs previously voluntarily dismissed, and have stricken, the portion of this count containing allegations against defendant City of Chicago.

234.     As set forth above, these defendant officers' actions, including pointing and training assault rifles and pistols at close range on plaintiffs, created reasonable apprehensions in plaintiffs of immediate harmful contact to their persons.

235.     These actions exceeded defendants' lawful authority under the circumstances because a) when they seized plaintiffs in this manner, they were executing search warrants that they knew or should have known were invalid *ab initio* for lack of probable cause and b) pointing and training firearms on plaintiffs, especially the children, when they were totally compliant and did not pose any threat to officer safety constituted unreasonable or excessive force.  None of the search warrants were for firearms.

236.     The officers intended to bring about apprehensions of immediate harmful contact in plaintiffs or knew that their actions would bring about such apprehensions.

237.     In the alternative, the conduct of defendant was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

238.     The conduct of defendant in entering and executing a residential search warrant and pointing and training loaded firearms at people, including children, are generally associated with a risk of serious injuries.  Numerous prior injuries have occurred to civilians in this context.  Defendant officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

239.     Defendant officers' actions were the direct and proximate cause of plaintiffs' apprehensions.

240.     As set forth above, plaintiffs have been seriously harmed by officers' actions.

## COUNT VIII – BATTERY – STATE LAW[4]
### (Plaintiffs Krystal Archie and Savannah Brown)

241.     Plaintiffs Krystal Archie and Savannah Brown re-allege and incorporate paragraphs 1 – 153 above into this count.  They assert this claim against defendant officers identified above.

242.     The actions of defendant officers set forth above, including handcuffing Ms. Archie and placing a foot on Ms. Brown's back and grabbing her wrist to handcuff her, who was a minor and not a threat or a target of the search warrant, brought about harmful and offensive physical contacts to plaintiffs' persons.

243.     The officers intended to bring about harmful and offensive physical contact to plaintiffs' persons.

244.     In the alternative, the conduct of defendant was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

245.     The conduct of defendants in entering and executing a residential search warrant are generally associated with a risk of serious injuries.  Numerous prior injuries have occurred to civilians in this context.  Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

---

[4] The Court previously dismissed this count as to all defendant officers other than officers Miranda, Sanchez and Angel.  In addition, plaintiffs previously voluntarily dismissed, and have stricken, the portion of this count containing allegations against defendant City of Chicago.

246.     The officers' actions were the direct and proximate cause of harmful and offensive physical contact to plaintiffs' persons.

247.     Plaintiffs were seriously harmed by officers' actions.

## COUNT IX – FALSE ARREST AND FALSE IMPRISONMENT– STATE LAW[5]
### (Plaintiff Krystal Archie)

248.     Plaintiff Krystal Archie re-alleges paragraphs 1 – 153 above and incorporates them into this count.  Plaintiff asserts this claim against defendant officers identified above.

249.     Officers arrested and imprisoned plaintiff when, (a) without a warrant for her arrest and without probable cause to arrest her or a security concern to detain her for a prolonged period, they (a) handcuffed and/or confined Ms. Archie in the living room for approximately 45-60 minutes.

250.     Officers' actions restrained plaintiff and confined her to bounded areas.

251.     Officers intended to restrain and confine plaintiff to bounded areas within or outside the house.

252.     In the alternative, the conduct of defendants was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

253.     The conduct of defendant officers in entering and executing a residential search warrant are generally associated with a risk of serious injuries.  Numerous prior injuries

---

[5] The Court previously dismissed this count as to all defendants.  Plaintiffs re-plead it only for the purpose of preserving their rights on appeal.  In addition, plaintiffs previously voluntarily dismissed, and have stricken, the portion of this count containing allegations against defendant City of Chicago.

have occurred to civilians in this context.  Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiff.

254.    Officers' actions caused the restraint and confinement of plaintiff to bounded areas within the house.

255.    Plaintiff was harmed by officers' actions in restraining and confining her, as detailed above.

## COUNT X - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS – STATE LAW[6]
### (All Plaintiffs)

256.    Plaintiffs Savannah Brown, Telia Brown, JJ Jackson, and Krystal Archie and incorporate paragraphs 1 – 153 above in this count and assert this claim against defendant officers identified above.

257.    The actions, omissions and conduct of officers set forth above were extreme and outrageous and exceeded all bounds of human decency.

258.    Officers' actions, omissions and conduct above were undertaken with the intent to inflict and cause severe emotional distress to plaintiffs, with the knowledge of the high probability that their conduct would cause such distress, or in reckless disregard of the probability that their actions would cause such distress.

259.    Officers, who occupied positions of special trust and authority, knew, had reason to know or believed that plaintiffs, who were young children, were especially vulnerable and fragile.

---

[6] Plaintiffs previously voluntarily dismissed and have stricken the portion of this count containing allegations of negligent infliction of emotional distress.  Additonally, plaintiffs previously voluntarily dismissed, and have stricken, the portion of this count containing allegations against defendant City of Chicago.

260.     As a direct and proximate result of officers' extreme and outrageous conduct, plaintiffs suffered and continue to suffer long-term, severe emotional distress and trauma.

261.     In the alternative, the conduct of defendants was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

262.     The conduct of defendants in entering and executing a residential search warrant are generally associated with a risk of serious injuries.  Numerous prior injuries have occurred to civilians in this context.  Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

263.     Officers' conduct was a proximate cause of plaintiffs' injuries and their extreme, severe, long-term emotional distress and trauma.

## COUNT XI - TRESPASS – STATE LAW[7]
### (All Plaintiffs)

264.     Plaintiffs Savannah Brown, Telia Brown, JJ Jackson, and Krystal Archie re-allege paragraphs 1 – 153 above and incorporate them in this count.  Plaintiffs assert this claim against defendant officers identified above.

265.     By obtaining and executing the search warrants when officers did not have probable cause to believe that the target resided at the address given them by the informants or

---

[7] The Court previously dismissed this count as to all defendants.  Plaintiffs re-plead it only for the purpose of preserving their rights on appeal.  Plaintiffs also previously voluntarily dismissed, and have stricken, the portion of this count containing allegations against defendant City of Chicago.

consent to search, officers physically invaded plaintiffs' right to and enjoyment of exclusive possession of their residence.

266.    In the alternative, the conduct of officers was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

267.    The conduct of officers in entering and executing a residential search warrant are generally associated with a risk of serious injuries.  Numerous prior injuries have occurred to civilians in this context.  Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

268.    Officers' actions caused a physical invasion of plaintiffs' residence.

269.    Plaintiffs were harmed by officers' physical invasion of their residence.

## COUNT XII – CONVERSION[8]

270.    Plaintiffs Savannah Brown, Telia Brown, JJ Jackson, and Krystal Archie incorporate paragraphs 1 – 153 above and assert this claim against defendant officers.

271.    As set forth above, defendant officers unnecessarily or willfully damaged, destroyed, converted and confiscated plaintiffs' personal property during the course of their searches.  They damaged or destroyed Ms. Archie's cooking ingredients.  They took Ms. Archie's lawfully owned gun.  Defendant officers wrongfully and without authorization assumed control, dominion, and/or ownership of plaintiffs' personal property and did not pay any compensation for their theft, damage or destruction.

---

[8] Plaintiffs previously voluntarily dismissed, and have stricken, the portion of this count containing allegations against defendant City of Chicago.

272.     Plaintiffs, a poor family, had and have a right to their personal property. They had and have an absolute, unconditional right to the immediate possession of that property.

273.     In connection with the filing of this lawsuit, plaintiffs made a demand to the defendant officers for the possession of their personal property.

274.     The conduct of defendants in converting the personal property of plaintiffs, obviously a poor family, was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

275.     As a direct and proximate result of defendants' misconduct described in this Count, plaintiffs have suffered injury, including emotional distress and financial harm.

## COUNT XIII – *RESPONDEAT SUPERIOR* – STATE LAW *(All Plaintiffs)*

276.     Plaintiffs re-allege paragraphs 1-153 and 233 – 275 above and incorporate them into this count.  Plaintiffs assert this claim against defendant City of Chicago.

277.     In committing the acts and omissions alleged above, officers were at all times members and agents of CPD and the City of Chicago and were acting within the scope of their employment at all relevant times.

278.     Defendant City of Chicago is, therefore, liable as principal for all common law torts committed by its agents within the scope of their employment.

## COUNT XIV – INDEMNIFICATION – STATE LAW (All Plaintiffs)

279.     Plaintiffs re-allege and incorporate paragraphs 1-153 and 233 – 275 above. Plaintiffs assert this count against defendant City of Chicago.

280.    Illinois law, 745 ILCS 10/9-102, directs public entities to pay any common law tort judgment for compensatory damages for which employees are held liable within the scope of their employment activities.

281.    Involved officers were and are employees of the City of Chicago who at all relevant times acted within the scope of their employment when committing the actions and omissions detailed above.

### **PRAYER FOR RELIEF (ALL COUNTS)**

WHEREFORE, plaintiffs respectfully request that the Court enter judgment in their favor and against defendant on each count for:

a.    Compensatory damages;

b.    Temporary and/or permanent injunctive relief;

c.    Punitive damages on counts II-XII;

d.    Reasonable attorney's fees and litigation costs and expenses; and

d.    Such other or further relief as the Court deems just.


Respectfully submitted,



s/Al Hofeld, Jr.
Al Hofeld, Jr.

Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
30 N. LaSalle Street, Suite #3120
Chicago, Illinois 60602
(773) 241-5844
Fax - 312-372-1766
al@alhofeldlaw.com
www.alhofeldlaw.com

## JURY DEMAND

Plaintiffs demand trial by jury.

s/Al Hofeld, Jr.
Al Hofeld, Jr.

## NOTICE OF LIEN

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards.

s/Al Hofeld, Jr.
Al Hofeld, Jr.

## NOTICE OF FILING AND CERTIFICATE OF SERVICE BY ELECTRONIC MEANS

I, Al Hofeld, Jr., an attorney for plaintiffs, hereby certify that on October 19, 2020, filing and service of the foregoing *Third Amended Complaint* was accomplished pursuant to ECF as to Filing Users, and I shall comply with LR 5.5 and the Federal Rules of Civil Procedure as to service on any party who is not a Filing User or represented by a Filing User.

s/Al Hofeld, Jr.
Al Hofeld, Jr.

Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
30 N. LaSalle Street, Suite #3120
Chicago, Illinois 60602
(773) 241-5844
Fax - 312-372-1766

al@alhofeldlaw.com