IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KRYSTAL ARCHIE, for herself and on behalf of her minor children, SAVANNAH BROWN, TELIA BROWN, and JHAIMARION JACKSON, <br><br> Plaintiffs, <br><br> v. <br><br> THE CITY OF CHICAGO, et al. <br><br> Defendants. | Case No. 19 C 4838 <br><br> Judge Gettleman <br><br> Magistrate Judge Cummings |

# DEFENDANTS' JOINT RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO REASSIGN

Defendants, the CITY OF CHICAGO ("City"), by and through its attorneys, KLEIN, THORPE AND JENKINS, LTD., and Defendant Officers, by and through its attorneys, QUERREY & HARROW, LTD., hereby submit their Response in Opposition to Plaintiffs' Motion to Reassign. In support thereof, Defendants state as follows:

## Introduction

Plaintiffs seek to have four cases reassigned to this Court for all purposes. This request seeks to consolidate the factual and legal claims of 21 Plaintiffs and 81 Defendants across 7 distinct search warrants. The individual search warrants concern widely varying facts. Moreover, the *Monell* claims concern differing directives, training, policymakers, civilian complaint data, and police department reforms from 2009 to 2020. These cases are utterly incapable of being disposed of in a single proceeding, and would lead to unfair prejudice to all parties.

## Factual Background

### Archie v. City of Chicago, et al. 19 CV 4838

In the instant case, 4 Plaintiffs sued 24 officers and the City for the following claims arising out of 3 separate search warrants: Unlawful Search, Invalid Warrant, Unreasonable Manner of Entry, False Arrest, Unconstitutional Seizure of Property, Assault, Battery, False Imprisonment, Intentional Infliction of Emotional Distress, and a *Monell* claim.

The *Monell* claim alleges that from **May 2013 to May 2019**, the City: (1) had a custom of using excessive force against children "ages 0-14"; (2) failed to investigate and discipline complaints of excessive force against children; (3) did not have policy or training "to avoid" excessive force against children; and (4) had a pattern of executing search warrants in the wrong residences.

On September 25, 2020, the Court granted and denied in part Defendants' motions to dismiss. The parties have made their Rule 26(a) disclosures and have exchanged written discovery. On January 29, 2021, Defendants filed a Joint Motion to Bifurcate.

### Blassingame v. City of Chicago, et al. 19 CV 7287

In *Blassingame*, 6 Plaintiffs sued 17 officers and the City for the following claims arising out of one search warrant: Invalid Warrant, False Arrest, Unconstitutional Seizure of Property, Assault, False Imprisonment, Intentional Infliction of Emotional Distress, Trespass, Conversion, and a *Monell* claim. *Blassingame v. City of Chicago, et al.*, 19 CV 7287, ECF No. 67.

The *Monell* claim alleges that from **January 2009 to January 29, 2015**, the City: (1) had a custom of using excessive force "against citizens, including children and youth"; (2) failed to have a policy about when officers can point their guns; (3) failed to investigate and discipline complaints of excessive force "against citizens, including children" and their relatives; and (4) did not have policy or training for officers "to refrain" from pointing guns at children. *Id.* at p. 27.

2

Defendants have each filed separate motions to dismiss, which are fully briefed before Judge Kness. The arguments made in the motions to dismiss are different than *Lyons* and *Vale*, discussed *infra*.

### Tate/Harbin v. City of Chicago, et al. 19 CV 7506

In *Tate/Harbin*, 4 Plaintiffs sued 14 officers and the City for the following claims arising out of one search warrant: Invalid Warrant, Unreasonable Manner of Entry, False Arrest, Unconstitutional Seizure of Property, Assault, False Imprisonment, Intentional Infliction of Emotion Distress, Trespass, and a *Monell* claim.

The *Monell* claim alleges that from **August 2013 to August 5, 2019**, the City: (1) had a custom of using excessive force against African American citizens, including youth and children; (2) failed to have a policy about when officers can point their guns; (3) failed to investigate and discipline complaints of excessive force "against African-American citizens, including minors and/or their close relatives"; and (4) did not have policy or training for officers "to refrain" from pointing guns at children.

On November 16, 2020, the Judge Durkin denied Defendants' Motions to Dismiss. The City's motion to dismiss focused on the failure to plead an underlying constitutional violation based on body worn camera footage, which was an argument unique to that case. MIDP disclosures were due on January 20, 2021. The parties issued written discovery on February 3, 2021. The City plans to file a motion to bifurcate.

### Lyons v. City of Chicago, et al. 20 CV 3412

In *Lyons*, 4 Plaintiffs sued 12 officers for the following claims arising out of one search warrant: Invalid Warrant, Unreasonable Manner of Entry, False Arrest, Unconstitutional Seizure of Property, Assault, False Imprisonment, Intentional Infliction of Emotional Distress, Trespass, and a *Monell* claim.

The *Monell* claim alleges that from **February 2014 to February 26, 2020**, the City: (1) had a custom of using excessive force "against citizens, including children and youth"; (2) failed to have a policy about when officers can point their guns; (3) failed to investigate and discipline complaints of excessive force "against citizens, including children"; and (4) did not have policy or training for officers "to refrain" from pointing guns at children.

Defendant City and Defendant Officers filed separate motions to dismiss, which have been fully briefed before Judge Kness. Defendant City's motion to dismiss is different from pre-2020 cases in several ways, but most predominantly because there are distinct arguments about the 2019 Consent Decree and 2020 Search Warrant policy changes. Defendant Officers' motion concerns the distinct facts related to the particular search warrant investigation in this case.

### Vale v. City of Chicago, et al. 20 CV 5037

In *Vale*, 4 Plaintiffs sued 13 officers and the City for the following claims arising out of one search warrant: Invalid Warrant, Unreasonable Manner of Entry, False Arrest, Unconstitutional Seizure of Property, Assault, False Imprisonment, Intentional Infliction of Emotional Distress Trespass, and a *Monell* claim.

The *Monell* claim alleges that from **February 2014 to February 27, 2020**, the City: (1) had a custom of using excessive force "against citizens, including children and youth"; (2) failed to have a policy about when officers can point their guns; (3) failed to investigate and discipline complaints of excessive force "against citizens, including children"; and (4) did not have policy or training for officers "to refrain" from pointing guns at children.

Defendant City and Defendant Officers have filed separate partial motions to dismiss, which will be fully briefed in March before Judge Pacold. The City's motion to dismiss is different from pre-2020 cases in several ways, but most predominantly because there are distinct arguments about

4

the 2019 Consent Decree and 2020 Search Warrant policy changes. Defendant Officers' motion concerns the distinct facts related to the particular search warrant investigation in this case.

## Additional Background

In addition to the above summarized cases, Plaintiffs' counsel represents adult and minor plaintiffs in *Mendez v. City of Chicago, et al.* 18 CV 5560, and *Tate v. City of Chicago, et al*, 18 CV 7439. Fact discovery is closed in the former, and fact discovery is nearing completion in the latter. Since 2014, Plaintiffs' counsel has also represented other families in search warrant cases. *See Simmons v. City of Chicago, et al.* 14 CV 9042 (settled), *Bures v. City of Chicago*, 19 CV 2040 (settled), and *Wilson v. City of Chicago*, 19 CV 3350 (re-filed in state court). And as Plaintiffs' motion makes clear, he has been retained for "highly similar" cases that have yet to be filed. (*Pl. Mot.*, p. 3).

In October 2019, the City filed a motion for a coordinated pretrial proceeding in *Mendez v. City of Chicago*, 18 CV 5560, seeking to have *Archie*, *Mendez,* and *Tate* consolidated for purposes of discovery only, which Plaintiffs opposed. *See Mendez*, 18 CV 5560, ECF No. 123. Defendants have never sought to have any of these cases consolidated for all purposes. At that time, Counsel for the City determined, as they do here, that those cases could not be disposed of in a single proceeding. Counsel did believe, however, that consolidation for discovery made sense for those cases at that time. Plaintiffs were opposed, and Judge Lee denied the motion because the cases were at different stages of discovery at the time.

In September 2019, in opposing *even consolidation for discovery*, Plaintiffs' counsel stated the following:

> "I know that you think efficiency (and uniformity) would be gained by having one judge decide *Monell*-related discovery disputes in all the cases, but since these cases will not be tried together (**they don't meet the criteria**), minor differences in the scope or type of discovery in each case will not ultimately make a difference to anything anyway."

(Hofeld E-mail, September 5, 2019, Attached as Exhibit A)(Emphasis added).

5

It is puzzling why Plaintiffs' counsel has now determined that what he said was not possible in the Fall of 2019 is now possible. Plaintiffs' request becomes even more curious when considering that Plaintiffs have specifically requested stays on rulings on pending motions to dismiss before Judges Kness and Pacold. *See Vale v. City of Chicago*, 20 CV 5037, ECF No. 47, p. 4.

## I. Legal Standard

Pursuant to Local Rule 40.4(b), a case may be reassigned to the calendar of another judge if it is found to be related to an earlier-numbered case assigned to that judge and if certain criteria is met. Specifically, the following criteria must be satisfied:

> (1) both cases are pending in this Court;
> (2) the handling of both cases by the same judge is likely to result in a substantial saving of judicial time and effort;
> (3) the earlier case has not progressed to the point where designating a later filed case as related would be likely to delay the proceedings in the earlier case substantially; **and**
> (4) the cases are susceptible of disposition in a single proceeding.

L.R. 40.4(b) (emphasis added).

## II. The cases are not susceptible of disposition in a single proceeding

Preliminarily, Plaintiffs seem to concede that not all claims can be disposed of in a single proceeding. (*Pl. Mot.*, pp. 14-15). Rather, Plaintiffs argue that all *Monell* claims can be disposed of in a single proceeding through summary judgment or a bifurcated trial. (*Id.*) Plaintiffs have not filed a motion to bifurcate, and oppose Defendants' Motion to Bifurcate in this case. More importantly, Local Rule 40.4 speaks to whether *cases* can be disposed of in a single proceeding, not individual claims within a particular case. The common sense reading of the rule is that whether the cases can be disposed of in a single proceeding hinges on whether *all of the claims* in the cases can be disposed of in a single proceeding. For the reasons set forth below, both the cases and even the individual *Monell* claims are not susceptible to disposition in a single proceeding.

### A. The factual differences as to the claims against the officers in each case are numerous

Tellingly, Plaintiffs spend no time discussing the individual claims against the various Defendant Officers, careful to avoid the vast factual differences in each case. While true that these cases all involve the execution of search warrants, each case is factually distinct from the others. Further, each case's individual factual nuances must be considered under the totality of the circumstances confronting the respective Officers when deciding the § 1983 Fourth Amendment claims. There is simply no conceivable way that the various individual claims could ever be capable of "disposition in a single proceeding" under Rule 40.4(b). The significant factual differences amongst these cases firmly establish that they cannot be properly adjudicated in a single proceeding.

### 1. *Archie*

*Archie* is completely different factually from the other cases in that there are three separate underlying incidents, the target of the first search warrant was actually found inside Plaintiffs' residence, and the first two incidents were recorded on body worn cameras ('BWCs"). First, on February 8, 2019, officers from the district and a tactical team executed a search warrant for heroin at the second-floor apartment at 6832 S. Dorchester. When Officers made entry into the second-floor apartment through the rear door, the target of the search warrant, along with two other men, a woman, and multiple children ran downstairs into Plaintiffs' first floor residence. After spending over a minute trying to get the occupants to open the door to Plaintiffs' residence, Officers made forced entry due to the exigent circumstances. Officers quickly cleared the residence with firearms drawn while quickly moving through the residence. Of note, the BWCs refute claims that the Officers pointed firearms directly at the minor Plaintiffs' heads and bodies. The Officers quickly detained the target of the search warrant and two other men. Once Krystal Archie returned home, Officers explained to her that they had to enter because the target of the search warrant and others had run into her residence. They also explained that they needed to search the residence to ensure that the men did not hide contraband.

Ms. Archie then led officers to a firearm on the hallway floor under a plastic bag. After Officers stated they found a magazine that fits the gun in the second floor apartment, she admitted that she was missing the magazine for her gun. Officers also found, but did not recover, a small amount of cannabis. Of note, Officers recovered a substantial amount of contraband, including narcotics, from the second floor residence. Thus, an analysis of the exigent circumstances that existed as to Plaintiff's apartment needs to occur in the first incident.

The second search warrant in *Archie* is also unique in that Officer Anderson obtained the April 25, 2019 search warrant after he received information from another officer that drugs were still being sold from 6832 S. Dorchester. After speaking with his informant, Officer Anderson parked behind the residence and observed the J. Doe engage in a narcotics transaction with a man matching the target's description on the first floor back porch. Officer Anderson later conducted additional surveillance during which he observed heavy foot traffic indicative of drug sales. He then searched the CLEAR Data Warehouse database, determined the target's real name, and pulled his criminal history. The J. Doe positively identified the target from his booking photo. Officer Anderson also searched the Cook County and Illinois Department of Corrections websites to ensure the target was not incarcerated. This investigative step differs from other cases, especially *Blassingame*, in which Plaintiffs are extremely critical of the fact that the officers did not search for the target in those databases. When Officers executed the April 25, 2019 search warrant, the three minor Plaintiffs were home alone. Plaintiffs allege that an Officer pointed his rifle point blank at the back of Savannah's head and her face. The BWC videos, however, show that Officers did not point firearms directly at any of the Plaintiffs. After having the children sit in the front room, Officers conducted a systematic search of the residence pursuant to the search warrant. Officers did not recover any contraband and the target was not in Plaintiffs' residence.

8

Finally, Officer Brown, who was assigned to the Narcotics Unit and was thus not working with the officers from the first two warrants, obtained a search warrant based on information he received from an RCI who has provided him with reliable and credible information many times. As of the time Officer Brown met with the RCI with respect to this search warrant, the RCI had conducted three controlled buys for heroin at the first and second floor apartments at 6832 S. Dorchester. Of note, the RCI told him that heroin was being sold from the first floor apartment at 6832 S. Dorchester. Officer Brown had the RCI conduct a controlled buy with prerecorded funds while Officers from the Narcotics Unit performed surveillance. Officers observed the RCI enter the first floor residence at 6832 S. Dorchester through the rear door where the RCI purchased heroin. The RCI returned to Officer Brown's covert vehicle where the RCI gave him the heroin that had been purchased. The RCI described the narcotics transaction with the target and further stated that the target told the RCI that he had heroin and cocaine.

Officers executed the third search warrant on May 17, 2019. After knocking and announcing and receiving no answer, the Officers made forced entry into the residence through the rear door. Officers encountered Plaintiff Krystal Archie and her friend in the front room. No children were present. The adults were detained while Officers conducted a systematic search during which they recovered one pill of ecstasy along with cannabis. The Officers who executed the May 2019 search warrant were not equipped with body worn cameras.

    2.    ***Toni Tate***

The investigation in the *Toni Tate* case differs from that in other cases as the affiant officer, Officer Niemoth, worked together with her sergeant to procure the search warrant. The J. Doe informed them that he purchased two bags of heroin from the target at the Plaintiffs' residence on August 4, 2019, and that he had also purchased heroin from him at that address several times in the couple of months preceding August 2019. Officer Niemoth brought the J. Doe to the residence at

9

which time the J. Doe pointed to the second floor south apartment. Officer Niemoth pulled Andre King's ICLEAR photo and the J. Doe positively identified him. Additionally, Officers Cusimano and Hegewald, under Sgt. Bruno's supervision, used the J. Doe to conduct a controlled buy at Plaintiffs' residence on August 4, 2019, after which he tendered two zip-locked bags of heroin to the Officers. The heroin was inventoried and a separate case report regarding the controlled buy was created.

The execution of this search warrant is unique because Officers observed two individuals sitting on the second floor's front balcony when they arrived at 6134 S. Vernon to execute the search warrant. One of the individuals entered the residence after observing the police. Believing that the target and occupants of the target residence were aware of their presence, Officers quickly entered the vestibule area and waited approximately 6 seconds after knocking and announcing their office before making forced entry into the residence. Officers encountered Christopher Harbin in the living room, Toni Tate in the hallway, and Cierra Harbin, who was holding Cali McCuller, in the back bedroom. Plaintiffs allege that Officer Miranda pointed his rifle directly at Christopher Harbin and at Cierra and Cali. The Officers' BWC videos support Defendant Officers' claims that Officers did not point any firearms directly at any of the Plaintiffs, including Cali. Plaintiffs were brought to the living room where they were allowed to sit on the couch and chair. Toni Tate and Christopher Harbin were handcuffed, and Officer Niemoth can be seen on the video checking Toni Tate's handcuffs after she complained about them being too tight. Ms. Tate's handcuffs were later removed so she could hold Cali, at which time Plaintiffs claim that an Officer handcuffed Cierra Harbin. While conducting a systematic search, Officers only found a small amount of cannabis. Officers did not recover any heroin or the target of the search warrant.

   3. ***Blassingame***

*Blassingame* differs significantly from the other cases in that a SWAT team assisted with the execution of the search warrant after it was determined that the search warrant was high-risk and

10

because Officers actually recovered heroin and firearms from the residence. Officer Padalino, the affiant officer, obtained the search warrant after a J. Doe informant informed him that Derec Bell was selling heroin from the second-floor apartment at 1856 S. Lawndale. The J. Doe told Officer Padalino that the J. Doe would purchase a jab (about 12 Ziplock baggies) of heroin from the target at that residence which the J. Doe then used and sold. The J. Doe last bought a jab of heroin there on January 29, 2015. Officer Padalino and Officer Sellers drove the J. Doe past the residence at which time he/she identified the second floor apartment and described the narcotics transactions. Officer Kroski assisted by searching the target address on CPD's Data Warehouse database which resulted in a photo of Derec Bell. The J. Doe positively identified the Derec Bell when shown his photo. Officer Meagher then verified the address on the Cook County Assessor's website. The J. Doe, his/her criminal history, and pending cases, if any, were made available to the Judge.

When executing the search warrant, a SWAT officer knocked and announced their office on the door while another officer announced their office over the Bearcat's PA system. After waiting a reasonable amount of time, the SWAT team entered the residence. An issue unique to this case will be whether the SWAT team deployed a flash bang device inside of Plaintiffs' residence. While Plaintiffs claim that flashbang devices were deployed inside of their residence, the SWAT report states that a noise flash distraction device was deployed only on the pavement outside of the residence after a SWAT Officer observed an aggressive dog on the front porch beginning to move toward him. Inside of the residence, Officers immediately encountered Plaintiffs and moved them from the living room to the kitchen where they obtained their contact information. *Id.* Plaintiffs claim Officer pointed guns point blank at them and continued pointing guns at them for an extended period of time. Plaintiffs claim their detention was unreasonable because they were forced to sit on the kitchen floor while officers continued pointing firearms at them.

11

The target of the search warrant, Derec Bell, was not present when the search warrant was executed because he was incarcerated in the Hill Correctional Center in Galesburg, Illinois. Although the target was incarcerated, Officers still recovered suspect heroin, two loaded semi-automatic firearms, and drug paraphernalia (e.g., electric grinder, digital scales, and money counter) from inside the residence that reportedly belonged to the minor Plaintiffs' father, Jeremy Harris.

   4.   **Lyons**

*Lyons* differs from the other cases in that the affiant Officer procured two separate search warrants for the same building—one for the first-floor apartment and one for Plaintiffs' second floor apartment. The search warrants were executed nearly simultaneously. Officer Hammermeister received information from an RCI, who had previously provided him with credible and accurate information, that a black transgendered woman named "Blondie" was selling crack cocaine from the first floor apartment and heroin from the second floor apartment. The RCI explained that he/she was in the first floor apartment when he/she saw Blondie selling crack cocaine from the residence. The RCI then relocated to the second-floor apartment (Plaintiffs' residence) with Blondie after someone asked for heroin at which time the RCI observed Blondie use keys to enter the second-floor residence and retrieve heroin from a kitchen cabinet drawer. Officers conducted a controlled buy for crack cocaine in the rear of the building in order to corroborate the RCI's information.

The search warrants were executed during the evening hours of February 26, 2020. Officers first made entry into the first-floor apartment. As they were clearing the first-floor apartment, officers could hear running and yelling coming from the second floor apartment. Officer Hammermeister, who was on the back enclosed porch, encountered Terry Julius who ran out of the second-floor rear door. Officers then quickly made entry into Plaintiffs' residence where they detained four men, one of whom was on electronic monitoring, and Sharon Lyons. The men were handcuffed in the front room, whereas Sharon Lyons was allowed to remain seated at the kitchen table. Plaintiff Lillie Savage

was also in the apartment. Plaintiffs claim that Lillie Savage was left for an extended period of time screaming and crying alone in a bedroom. This claim is refuted by BWC videos which show Lillie Savage, who was not screaming or audibly crying, in the kitchen of the residence early on. Moreover, the BWC video shows that everything was calm within minutes of entry. Officers conducted a systematic search during which they did not recover heroin or the target. Only a short portion of the incident was captured by BWCs because the narcotics unit was not equipped with BWCs. Plaintiffs claim that some property (i.e., doors and a microwave that fell over) was damaged when Officers initially made entry into the residence.

    5. *Vale*

*Vale* is unique from the other cases due in large part to the target, Jesse Lazar's connections to the target residence and because the search warrant was for a firearm and not narcotics. The affiant Officer, Officer Tellez, received information from a J. Doe informant who told him that the J. Doe had gone to the basement apartment at 1529 W. Pratt to smoke cannabis with Jesse ("J") in the 48 hours preceding his/her conversation with Officer Tellez at which time the J. Doe observed a black 9mm semiautomatic handgun protruding from Jesse's waistband. The J. Doe also described Jesse's physical characteristics and how they entered the residence. When Officer Tellez drove the J. Doe past the building located at 1529 W. Pratt, the J. Doe pointed to the garden apartment as the location where the J. Doe had observed Jesse with the handgun. Officer Tellez then searched the Data Warehouse computer system using the physical descriptions provided by the J. Doe and the name Jesse (a/k/a "J"), and found Jesse Lazar. The J. Doe positively identified Jesse Lazar from his booking photo. By searching the LEADs system, Officer Tellez determined that Jesse Lazar was not eligible for and did not possess a valid FOID card or Concealed Carry License.

    Significantly, Officer Tellez's investigation is particularly distinct from the other cases as he conducted a search in the Accurint database which matched Jesse Lazar to the building located at

13

1527-1529 W. Pratt.[1] The *Archie*, *Tate/Harbin*, *Lyons*, and *Blassingame* Plaintiffs are all very critical of the fact that the affiant officers in those cases did not conduct Accurint searches.

Plaintiffs allege that Officers made forced entry into the apartment with their guns drawn without knocking or announcing their office. Plaintiffs' claim that Officers pointed guns directly at Khamme and Leyalina, who Khamme was holding causing Khamme to urinate in her pants. Jasmine Vale, who had been in the back of the apartment, began walking down the hallway at which time an officer allegedly trained his rifle on her head and screamed at her to get on the floor. The officer allegedly continued pointing his gun at her head for several minutes while she was on the ground. Officers allegedly continued pointing guns at Plaintiffs after everything was secured despite requests that they not point any weapons at Leyalina. Defendant Officers strongly deny that they pointed any firearms directly at Plaintiffs. However, unlike some of the other cases, there is no BWC video of the incident. After the apartment was secured, Officers conducted a systematic search. Plaintiffs' allege that officers caused unreasonable property damage by cutting open pillows and stuffed animals because the warrant for a firearm, not narcotics. They also claim that Officers caused thousands of dollars' worth of damage to Jasmine Vale's nail business. The target of the search warrant, Jesse Lazar, was not present when the search warrant was executed and Officers did not recover any firearms.

In sum, there are many factual differences between this case and the four cases Plaintiffs wish to reassign to this Court for consolidated proceedings. As a careful and detailed factual analysis will be necessary when deciding the claims brought against the individual Defendant Officers, these five cases simply cannot be properly adjudicated in a single proceeding.

## B. The factual and legal differences as to the *Monell* claims are numerous

### 1. Significant factual differences exist between the *Monell* claims in the cases

---

[1] Of note, records from the Illinois Secretary of State further connected Jesse Lazar to the target residence as his business and car were registered to that location.

Examination of the *Monell* claims in the cases demonstrates these matters cannot be properly adjudicated in a single proceeding. The most obvious factual distinction rests with the *Blassingame* litigation. The alleged incident occurred on January 29, 2015. (19-cv-07287 *Doc. #: 67* at ¶ 2). Plaintiffs define the "*Monell* period" as six years prior to January 29, 2015, or from January 29, 2009 to the incident date. Such a "*Monell* period" varies greatly from the other lawsuits where the alleged constitutional deprivations purportedly occurred in 2019 or 2020. Thus, the "historical" context for the *Blassingame* litigation differs significantly.

Additional factual distinctions exist in *Archie* where the Third Amended Complaint alleges three different search warrant incidents taking place on February 8, 2019; April 25, 2019; and May 17, 2019. (19-cv-04838 *Doc. #: 125* at ¶¶ 3, 5, 8). The minor Plaintiffs allegedly were in the residence during the first two of these three occasions. Plaintiffs in *Archie* allege one of the purported *de facto* policies that proximately caused CPD officers to violate their constitutional rights was "a pattern of executing search warrants in the wrong residences, which traumatizes innocent children." *Id.* at ¶ 155. This allegation distinguishes the *Monell* claims in *Archie* from those in the other litigations.

Plaintiffs in *Tate* bring a different focus to their *Monell* allegations with an emphasis on how the City's alleged policy failures affect African-American citizens and children. (19-cv-07506 *Doc. #: 60* at ¶¶ 131, 139, 140). This emphasis can be seen in Plaintiffs' allegations that the *de facto* policies which allegedly caused CPD officers to use excessive force against the minor Plaintiff include: "a pattern and practice of using unnecessary or excessive force against African-American citizens, including children and youth" and "a systemic failure to investigate and discipline and/or otherwise correct allegations/incidents of officer excessive force against African-American citizens, including minors and/or their close relatives in the minors' presence. *Id.* at ¶ 130.

The *Lyons* lawsuit provides another example of factually distinct *Monell* claim allegations. The search warrant incident at issue occurred on February 26, 2020. This date is important because the

15

incident occurred <u>after</u> the CPD revised its search warrant policy and following the City's entering a Consent Decree in *State of Illinois v. City of Chicago*, 17-cv-6260. 20-cv-03412 *Doc. #: 1* at ¶¶ 31, 36. The *Lyons* complaint includes several allegations pertaining to the effectiveness of the CPD's efforts to remediate the issue of children and excessive force. *Id.* at ¶¶ 28-31.

### 2. Significant legal differences between the *Monell* claims in the lawsuits

The factual differences between the cases identified result in important legal distinctions as well. For instance, in *Blassingame*, a significant issue concerns Plaintiffs' ability to establish the existence of a longstanding custom and practice of CPD officers using excessive force against children, particularly in the context of execution of residential search warrants. This issue arises due to the incident date, January 29, 2015, which significantly predates all the other incidents being litigated. Further, Plaintiffs' ability to establish a longstanding custom and practice of CPD officers' use of excessive force against children directly implicates whether the City had notice of the purported problem so that it could be found deliberately indifferent to the issue.

The factual distinctiveness of the three alleged search warrant incidents in *Archie* manifests itself in Plaintiffs' policy claim that CPD officers subjected the minor Plaintiffs to constitutional injury due to the CPD policy of executing search warrants at the wrong residences. Plaintiffs in *Archie* include a Fourth Amendment claim for illegal search as well as the excessive force action presented in the other lawsuits. (19-cv-04838 *Doc. #: 125* at ¶ 155). This additional legal claim distinguishes *Archie* from the other cases.

*Tate*, as noted above, includes allegations focusing on purported CPD officer use of excessive force against African-American citizens, including children. The *Monell* claims concern the results of alleged policy failures on African-American children. Plaintiffs' allegations that City policies caused CPD officers to use excessive force against African-American children pose legal issues that distinguish *Tate*. Plaintiffs allege a *Monell* claim for equal protection clause violations of the Fourteenth

16

Amendment as well as Fourth Amendment excessive force injuries. (19-cv-07506 *Doc. #: 60* at ¶¶140, 152-161.

*Lyons* also presents distinct *Monell* legal issues. The date of the alleged incident – February 26, 2020 – that follows CPD remedial measures indicated in the complaint poses particular legal issues. If the City took measures through policy and training changes and entered a Consent Decree focused on CPD reform prior to February 26, 2020, then Plaintiffs cannot maintain a *Monell* claim because the City's remedial actions show it was not deliberately indifferent to the issue of use of excessive force against and in the presence of children. Questions of "best practices" and remedial measures as well as evaluating the effectiveness of the City's reform efforts complicate Plaintiffs' *Monell* claims in this case.

As stated above, Plaintiffs contend that the factual and legal claims of 21 Plaintiffs against 81 police officers, 7 distinct search warrants, and an 11-year *Monell* policy period can be disposed of in a single proceeding. This is impossible. At either the summary judgment or trial phase, each case will concern different directives, different training curriculums, different civilian complaints as it relates to the alleged customs, different policymakers, different 30(b)(6) witnesses, and different expert opinions based on the policy years that may and may not apply to a particular case.

As the Court is aware, to establish liability under *Monell*, all of the Plaintiffs would need to ultimately prove three elements: "(1) a municipal action, which can be an express policy, a widespread custom, or an act by an individual with policy-making authority; (2) culpability, meaning, at a minimum, deliberate conduct; and (3) causation, which means the municipal action was the "moving force" behind the constitutional injury." *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 598 (7th Cir. 2019). As argued above, the *Monell* claims of each respective case share many differences depending on the year of the incident, the policies and training in place at the time, the civilian complaint data for the policy period, what the City's investigative practices were during a time period, and what the

policymakers' actions and inactions were during each case's defined *Monell* period. This will directly impact whether the municipal actions in each of the Plaintiffs' *Monell* period were the "moving force" behind the alleged gun pointing during the respective search warrant. It is simply not possible that every claim can be disposed of in a single summary judgment memorandum opinion or a single trial. The differences and time periods are simply too many. Plaintiffs' request is more akin to asking one judge (this Court) to preside over and try each case.

**III. Reassignment would result in unfair prejudice to all parties**

An equally compelling reason to deny Plaintiffs' motion is that unfair prejudice would result to all involved parties. Local Rule 40.4(b) contemplates whether all *cases* can be disposed of in a single proceeding. This contemplates whether the cases can be disposed of in a single motion to dismiss, motion for summary judgment, or trial.

First, the pending motions to dismiss are significantly different. For example, one of the key differences between *Lyons*, *Vale*, and *Blassingame* are that motions to dismiss for the two former cases concern the 2020 revised Search Warrant policy and the 2019 CPD Consent Decree. *Blassingame* is a 2015 case, which preceded any of the recent reforms and even the DOJ and PATF Reports. Moreover, the Defendant Officers' separate motions to dismiss in each of these cases are different based on the above summarized facts. There is simply no reason why this Court can or should rule on those motions, and Plaintiffs' request for this Court to do so is curious at best. It would be unduly prejudicial to Defendants to have a different judge rule on the motions for no apparent reason, as none of the cases share a common legal issue that can dispose all cases.

Next, since Plaintiffs suggest that this Court rule on one motion for summary judgment, it should be questioned whether Plaintiffs are suggesting that discovery or testimony that is not relevant in one case should be imputed or otherwise considered against Defendants in another case. The flip side of this is true – if any plaintiff gives untruthful statements (such as that guns were not pointed at

18

them), it is unclear how would be handled in relation to whether *all* plaintiffs have established an underlying constitutional violation. A single summary judgment opinion is simply not possible because the cases do not share a common legal issue that would dispose of all claims in all cases.

Finally, a combined trial would be nothing short of a circus. As stated above, these cases concern 21 Plaintiffs, 81 Defendants, 7 distinct search warrants and a *Monell* period from 2009-2020. From a purely practical standpoint, the Court could not host all of the parties in the courtroom without the courtroom being completely filled with police officers and plaintiffs. Even more concerning is how a jury could be expected to remember all of the facts regarding the individual search warrants and the *Monell* claims. There is certainly overlapping subject matter, but there is no one central issue that can dispose of all cases because the facts, legal claims, and time-periods are so different. Therefore, a single trial would lead to a debacle where conduct from one search warrant will be imputed to another, a lie from one plaintiff or defendant could be attributed to another, or policies from 2009 are discussed when some cases only concern 2014 to 2020. The Court would also be confronted with dozens of motions *in limine* as they pertain to the individual officers' disciplinary histories and other witnesses' criminal histories, and endless requests for limiting instructions so that evidence from one case is not imputed to another. Again, because these cases cannot be disposed of in a single proceeding, Plaintiffs' motion truly amounts to an unsanctioned request for a different judge to hear all pending motions to dismiss and any further proceedings.

WHEREFORE, for all the above-stated reasons, Plaintiffs' Motion to Reassign Related Cases should be denied.

          Respectfully submitted,

          CELIA MEZA
          Acting Corporation Counsel of the City of Chicago
             /s/Allen Wall
          Attorney Allen Wall
          Special Assistant Corporation Counsel
          Klein, Thorpe and Jenkins, Ltd.
          20 N. Wacker Drive, Ste 1660
          Chicago, IL 60603

          *Attorneys for Defendant City of Chicago*

Lance C. Malina, Special Assistant Corporate Counsel (lcmalina@ktjlaw.com)
Allen Wall, Special Assistant Corporate Counsel (jawall@ktjlaw.com)
Anthony G. Becknek, Special Assistant Corporate Counsel (agbecknek@ktjlaw.com)
Anne M. Skrodzki, Special Assistant Corporate Counsel (amskrodzki@ktjlaw.com)
KLEIN, THORPE AND JENKINS, LTD.
20 North Wacker Drive, Suite 1660
Chicago, Illinois 60606
(312) 984-6400

          Respectfully Submitted,

         By: */s/Larry S. Kowalczyk*
           Special Assistant Corporation Counsel

Larry S. Kowalczyk- Special Assistant Corporation Counsel
Megan K. Monaghan- Special Assistant Corporation Counsel
QUERREY & HARROW, LTD.
120 N. LaSalle Street, Suite 2600
Chicago, IL 60602
(312) 540-7000
lkowalczyk@querrey.com
mmonaghan@querrey.com
*Counsel for Defendant Officers*