IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ARCHIE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 19 CV 4838 |
| | ) | |
| v. | ) | Judge Robert W. Gettleman |
| | ) | |
| CITY OF CHICAGO, et al., | ) | Magistrate Judge Jeffrey I. Cummings |
| | ) | |
| Defendants. | ) | |

## AMENDED MEMORANDUM OPINION AND ORDER

Plaintiff Krystal Archie, on behalf of herself and her three minor children (collectively, "Archie"), initiated this action against the City of Chicago and over 25 individual Chicago Police Department ("CPD") officers, alleging violations of their constitutional rights under 42 U.S.C. §1983, among other federal and state law claims. As explained in more detail below, Archie's claims arise out of the execution of three search warrants at her residence over a five-month period in 2019.

Currently before the Court is Archie's motion to compel, (Dckt. #214), in which Archie asks the Court to compel defendants to produce various categories of documents, including certain officers' complaint register files and tax returns, and information and documents related to a confidential informant. Defendants have filed a response, (Dckt. #228)[1], and Archie has filed a reply, (Dckt. #242). For the reasons set forth below, Archie's motion to compel is granted in part and denied in part.

---

[1] The Court previously granted defendants leave to file a certain exhibit to their response brief and references to that exhibit in the brief itself under seal. (Dckt. #227). Although defendants submitted a courtesy copy of their unredacted response brief to chambers, they failed to electronically file a sealed version of their unredacted brief as required by Local Rule 26.2. To preserve the record, defendants shall file their unredacted response brief under seal as soon as possible but no later than March 16, 2023.

## I.    BACKGROUND

At all relevant times, Archie and her three minor children – Savannah (14), Telia (11), and Jhaimarion (7) – resided in the first-floor apartment at 6832 S. Dorchester, Chicago. According to the allegations of Archie's fourth amended complaint, (Dckt. #189), on February 8, 2019, CPD officers executed a search warrant issued for the *second-floor* apartment at 6832 S. Dorchester and targeted at a male known as "Lord."  Upon executing the warrant, the officers followed three adult men from the second-floor apartment into Archie's first floor apartment, and – while subsequently searching her apartment without a warrant – pointed their guns at the three minor plaintiffs and destroyed plaintiffs' personal property.  Although CPD arrested individuals associated with the second-floor apartment on February 8, they did not arrest any of the plaintiffs or find any drugs or drug paraphernalia in the first-floor apartment.

About six weeks later, on April 25, 2019, CPD officers obtained and executed a search warrant for Archie's first-floor apartment.  The warrant was targeted at Archie's apartment and an individual named Mr. Ronald Anderson based – at least in part – on information from a confidential informant ("CI") that Anderson was selling drugs on the back porch of Archie's apartment.  According to Archie, when officers executed the warrant, they broke down her door, pointed their guns at her children, interrogated them about the location of any drugs, and again damaged her personal property.  The officers did not find any drugs or drug paraphernalia in Archie's apartment, did not locate Mr. Anderson, and no arrests were made.

Just a few weeks later, on May 17, 2019, CPD officers obtained and executed another search warrant for Archie's first-floor apartment, this time targeted at a male known as "Lord T," and again based on information obtained through a CI.  When executing the third warrant, the CPD officers broke open Archie's door, detained Archie and her friend in handcuffs for 45-60

minutes, and again damaged Archie's personal property.  Yet again, the officers did not find any drugs or paraphernalia, did not locate the intended target of the warrant, and did not make any arrests.

Based on these three incidents, Archie initiated this action asserting various claims under federal and state law for, *inter alia*, unlawful searches and seizures, false arrest and false imprisonment, excessive force, assault, battery, and intentional infliction of emotional distress. Archie also asserts a *Monell* claim against the City of Chicago alleging a long-standing pattern and practice of using unnecessary force against children and executing search warrants in the wrong residences.  With respect to the April and May 2019 warrants, and relevant to the instant motion, Archie also alleges that defendants failed to corroborate or reasonably investigate the information obtained through the confidential informant.

Fact discovery in this matter is ongoing.  Despite the parties' continued meet and confer efforts throughout written discovery – which the Court commends – the parties remain at an impasse regarding three categories of documents.  In the instant motion, Archie asks the Court to compel defendants to produce: (1) each of the individual officers' full Complaint Register files, regardless of date, for complaints similar to the allegations made against them in this case; (2) the tax returns and a complete list of household expenses for the individual officers whom Archie alleges pointed guns at the three minor plaintiffs; and (3) non-privileged information and documents related to the CIs used and their communications with the officers in connection with

the April and May search warrants.[2]  The Court addresses each disputed category of documents

in turn below.

## II.     LEGAL STANDARD

A party may file a motion to compel under Federal Rule of Civil Procedure 37 whenever

another party fails to respond to a discovery request or when its response is insufficient.

Fed.R.Civ.P. 37(a).  Courts have broad discretion in resolving such discovery disputes and do so

by adopting a liberal interpretation of the discovery rules.  *Gile v. United Airlines, Inc.*, 95 F.3d

492, 495 (7th Cir. 1996); *Chicago Reg. Council of Carpenters Pension Fund v. Celtic Floor*

*Covering, Inc.*, 316 F.Supp.3d 1044, 1046 (N.D.Ill. 2018).  Rule 26 provides that the "[p]arties

may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or

defense and proportional to the needs of the case. . . ."  Fed.R.Civ.P. 26(b)(1); see *Motorola*

*Sols., Inc. v. Hytera Communications Corp.*, 365 F.Supp.3d 916, 924 (N.D.Ill. 2019)

("Relevance focuses on the claims and defenses in the case, not its general subject matter").

"Information within this scope of discovery need not be admissible in evidence to be

discoverable."  Fed.R.Civ.P. 26(b)(1).

## III.    ANALYSIS

### A.     Defendants must produce additional information related to defendant officers' Complaint Register files.

In RFP No. 44, Archie requested each defendant officer's complete, career-long

misconduct complaint file (hereinafter, referred to as complaint register (or "CR") file).  Through

the parties' meet and confer efforts, Archie has since narrowed her request to seek full

---

[2] Archie's initial motion also raised a fourth dispute related to defendants' response to interrogatory no. 7, which sought identifying information for the CPD supervisors who approved the April and May 2019 search warrants.  However, during the briefing process, the parties reached an agreement to attempt to resolve that dispute, and more recent filings indicate that defendants subsequently provided an amended answer to interrogatory no. 7.  (*See* Dckt. #256 at 11-12).

information regarding each CR file in which defendant officers were accused of misconduct similar to the misconduct alleged in this case (*i.e.,* those files containing allegations of improper search, property damage, false arrest, verbal abuse, and excessive force – including the unnecessary display of a weapon). Citing the high number of CRs – as many as 80 – that were created for certain of the defendant officers prior to the incidents at issue here, (*see* Dckt #214 at 9-10), Archie argues that she is entitled to pertinent CR files for each officer's entire career – as opposed to for a more limited time period – because they are relevant to show a pattern and practice of misconduct by the officers, to support her claim for punitive damages, and for potential impeachment.

For their part, defendants have already produced summary listings of each officer's CRs for their entire careers[3] and they have offered to produce – for a ten year period prior to the incidents – (1) "face sheets" (or summary sheets) for each of the defendant officer's CRs; (2) the full electronic file of any CRs that have been sustained against the officers; *and* (3) the full electronic file of any CRs that contain allegations similar to those claimed here (whether sustained, not sustained, or otherwise). (Dckt. #216-2 at 20, #216-3 at 19 & #228 at 4). For the following reasons, the Court finds that the scope of defendants' offer of production with respect to the CR files is largely appropriate.

To begin, although the parties spend a considerable amount of effort quibbling over the potential admissibility and probative value of the defendant officers' CR files, the officers' CR files concerning similar allegations are – at least to some extent – relevant for purposes of discovery within the meaning of Rule 26(b)(1). *See, e.g., Velez v. City of Chicago*, No. 18 C 8144, 2021 WL 1978364, at *4 (N.D.Ill. May 18, 2021) ("[T]here is no question as to the

---

[3] Archie asserts that these summary complaint histories for the defendant officers are "virtually useless" because they contain no facts about any CR and no information about the investigation (if any) that was conducted in connection with any CRs. (Dckt. #214 at 7, n.6).

relevance of the . . . CR files. . . . The real question is how many.")  And of course, a

determination as to the admissibility and the probative value of any of the officers' CR files is

for another day.  *See ED&F Cap. Markets Ltd. v. JVMC Holdings Corp.*, No. 18 C 5704, 2020

WL 3469128, at *3 (N.D.Ill. June 25, 2020) ("At this stage the Court is only concerned with

relevance under Federal Rule of Civil Procedure 26(b)(1), not relevance and admissibility under

Federal Rule of Evidence 401.") (internal quotation and citation omitted).

Moreover, defendants' offer to produce up to ten years of relevant CR files (that is, those

that were sustained *and* - as requested by plaintiff – those that contain similar allegations to those

made here) goes well beyond the temporal scope often permitted by courts in this District.  *See,*

*e.g., Bouto v. Guevara*, No. 19-CV-2441, 2020 WL 4437671, at *4 (N.D.Ill. Aug. 3, 2020)

(noting that five years "strikes the right balance between Plaintiff's need to have a large enough

sample size to make meaningful analyses and the City's burden in producing CR files");[4] *Cortez*

*v. City of Chicago*, No. 09-CV-653, 2010 WL 780358, at *1 (N.D.Ill. Mar. 4, 2010) (noting that

a limit to five years "resolv[ed] any concerns about the nearness in time of the allegations at

issue and the requested CR files.").  Thus, given the number of officers involved, the length of

several of their careers (which in some instances date back to the 1990s), and the burden in

producing decades old CR files, the Court within its discretion declines to order the production

of career long CR files for the defendant officers except to the limited extent specified below.

Both sides claim that the court's resolution of an analogous discovery dispute in *Tate v.*

*City of Chicago*, 18 CV 7439 (N.D.Ill.), a case where – as here – plaintiffs alleged that several

---

[4] Like defendants, the Court disagrees that the cases relied on by plaintiffs allow for the unbridled
production of career-long CR files. *See e.g.*, *Bond v. Utreras*, No. 04 C 2617, 2006 WL 695447, at *7
(N.D.Ill. Mar. 10, 2006) (holding simply that "[t]o the extent that Defendants have failed to produce more
recent and relevant complaints in the Individual Defendants disciplinary files, they are directed to do
so."); *Santiago v. City of Chicago*, No. 09 C 3137, 2010 WL 1257780, at *2 (N.D.Ill. Mar. 26, 2010)
(addressing the discoverability of the open CR files after closed files were produced by agreement).

Chicago police officers pointed their weapons at minor children during their execution of an improper search warrant, supports their respective position. Plaintiffs assert that the *Tate* court "ruled that, for the specific defendant officers whom plaintiffs alleged pointed guns at the children, plaintiffs could obtain their full CR files alleging excessive force that were older than 10 years prior to the incident," whereas defendants assert that the court denied such discovery. (Dckt. #242 at 4; Dckt. #228 at 7). The truth lies somewhere in between. The *Tate* court determined that CRs for defendant officers who were in plaintiffs' home at the time the excessive force was allegedly used could be relevant even if they were more than 10 years old so long as the CRs concerned the use of excessive force against minors. *Tate v. City of Chicago*, 18 CV 7439, Hearing Transcript (N.D.Ill. Dec. 18, 2019) (Dckt. #144 at 30-35, 59-60, 83-84, 86). Specifically, when discussing the extent to which plaintiffs' request for the production of the totality of defendants' CRs sought relevant information, the *Tate* court found that "the sweet spot is the officers in the house with excessive force CRs involving kids. That's an easy call." (*Id.*, Dckt. #144 at 86). Even so, the court denied plaintiffs' efforts to discover such CRs *without prejudice* to plaintiffs' efforts to seek such CRs in the future. *Tate v. City of Chicago*, 18 CV 7439, Order (N.D.Ill. Dec. 12, 2019) (Dckt. #140).

The Court agrees with the reasoning of *Tate*, and it finds that CRs involving the use of excessive force against minors that concern the defendant officers who allegedly pointed guns at the minor children during the execution of the warrants are relevant and proportional to the needs of the case under Rule 26(b)(1) even if they pre-date the incidents that lead to this lawsuit by more than ten years. The Court further finds that the likely benefit of such CRs outweighs any incremental burden and expense that defendants will incur to produce them.

7

In sum: defendants shall produce for the ten year period prior to May 17, 2019 (the date plaintiffs' apartment was last searched), the: (1) "face sheets" for each of the defendant officer's CRs; (2) full electronic files of any CRs that have been sustained against the officers; and (3) the full electronic files of any CRs that contain allegations similar to those claimed here (*i.e.,* allegations of improper search, excessive force (including the unnecessary display of a weapon), property damage, false arrest, and verbal abuse, and criminal misconduct) regardless of how the CRs were resolved. In addition, for the defendant officers who allegedly pointed guns at the minor children during the execution of the warrants,[5] defendants shall produce the full electronic files of all CRs (*including* those pre-dating the ten-year period specified above) that contain allegations of the use of excessive force against minors regardless of how the CRs were resolved. Defendants are ordered to produce this documentation by April 15, 2023.

> **B.** **The financial information of the ten officers whom plaintiffs allege pointed their guns at minor children must be produced.**

In RFP No. 25, issued back near the outset of discovery, Archie requested each of the individual defendant officer's tax returns and a complete list (with all supporting documentation) of personal and household expenses for the years 2017-2019. (Dckt. #216-3 at 12). Archie has since agreed to narrow this request to tax returns and expenses from the past three years of the officers who she specifically alleges pointed guns at the minor children during the execution of

---

[5] After a review of the complaint and in consideration of the May 27, 2022 voluntary dismissal of officers Campbell and Ryan (*see* Dckt. #219), it appears to the Court that Archie is alleging that defendant officers Holden, Alvarez, Angel, Geubara, DeLeon, Anderson, Cusimano, Sanchez, Miranda, and Boyle pointed guns at the minor children during the incidents in question. Although Archie also included officer Weatherspoon in her narrowed list, (*see* Dckt. #242 at 14), she alleges that Weatherspoon was only involved in the execution of the May 17 search warrant, where no minor children were present. Furthermore, Archie included officer "*Cornelius* Brown" in her narrowed list in the motion itself, but then included "*Craig* Brown" in the reply brief. (*Compare* Dckt. #214 at 13, n.13 *with* Dckt. #242 at 14). The Court excludes both Cornelius Brown and Craig Brown from the narrowed list because Archie has not made specific allegations that either officer pointed their guns at the minor children.

the warrants (*supra*, at footnote 5). (Dckt. #214 at 13). In her motion, Archie argues that the financial records of these officers are relevant to the issue of punitive damages and – to assuage any confidentiality concerns – can be produced pursuant to the protective order already entered in this case. (Dckt. #74).

In response, defendants argue that Archie's request for the officers' financial information is: (1) premature when the Court has not yet ruled on the issue of qualified immunity and the officers have not yet raised an inability to pay defense; and (2) is overly broad because it dates back to 2017 and thus does not reflect the "current" picture of the officers' financial situation. Respectfully, the Court disagrees.[6]

Defendants do not dispute that the financial information of those defendant officers accused of pointing guns at the minors is relevant to the issue of punitive damages in this §1983 action. *See, e.g., Lanigan v. Babusch*, No. 11 CV 3266, 2011 WL 5118301, at \*4 (N.D.Ill. Oct. 27, 2011) ("A party's net worth is discoverable where punitive damages are at issue."); *Challenge Aspen v. King World Prods. Corp.*, 00 C 6868, 2001 WL 1403001, at \*3 (N.D.Ill. Nov. 9, 2001) ("[T]here can be no doubt that net worth is discoverable under Rule 26(b)(1) of the Federal Rules of Civil Procedure, as it regards a matter 'that is relevant to the claim' of a party: that is, plaintiff's punitive damages claim."). Instead, the parties' dispute centers on whether the officers should either produce the financial information now or whether they should be entitled to wait until after dispositive motions are resolved and plaintiff has made a sufficient showing that punitive damages should be presented to the jury. As explained below, the Court

---

[6] Alternatively, defendants argue that the officers need not produce their financial documents because they can testify about their financials at their forthcoming depositions and/or Archie can simply access their salary information, which is a matter of public record. The Court disagrees. As Archie points out, overtime pay and pay from any side jobs are not a matter of public record, and the financial documents themselves will serve as the best starting place for determining each officer's financial situation, which can then be further explored through deposition testimony as need be.

finds that the discovery into certain of the defendant officer's financial information should proceed now.

First, although defendants correctly note that some courts have stayed this type of financial discovery where the plaintiff's claim for punitive damages is based "merely…on broad, conclusory allegations in the complaint," *Lanigan*, 2011 WL 5118301, at *4 (internal quotation marks omitted), Archie has gone well beyond conclusory allegations here. Particularly, Archie's complaint includes detailed and specific allegations against each of the defendant officers that pointed their guns at the minor children, describing the who, when, and where of each occurrence. (*See e.g.*, Dckt. #189 at ¶¶ 43-44, 75, 78-80 (describing the officer and type of gun involved, where in the house each occurrence took place, and where on the minor children's body the guns were pointed)). Moreover, the District Court has given wings to Archie's claim for punitive damages with its characterization of the defendant officers' conduct in its decision denying their motion to dismiss. *See Archie v. City of Chicago*, No. 19 CV 4838, 2020 WL 5751185, at *8 (N.D.Ill. Sept. 25, 2020) (noting in the context of the IIED claim that holding an unarmed child at gunpoint while she cried for her mother, "would outrage anyone living in a civilized society with any sense of decency. Such conduct is extreme.").

The record here and well-established case law support moving forward with the discovery related to punitive damages even though qualified immunity has not yet been assessed and no defendants have raised an inability to pay defense. *See Marshall v. GE Marshall, Inc.,* No. 09 CV 198, 2012 WL 2343368, at *4 (N.D.Ind. June 20, 2012) (collecting cases and opining that "[t]he majority of federal courts, and courts within this Circuit, have permitted plaintiffs seeking punitive damages to discover information related to the defendant's financial condition prior to making a prima facie case that she may recover punitive damages"); *see also Challenge*

*Aspen,* 2001 WL 1403001, at *4 ("[S]ince plaintiff's fraud claims – which are the basis for the punitive damages prayer – have survived a motion to dismiss, we see no good reason to deprive plaintiff of discovery into the liability and damages issues that flow from those claims. And, that includes discovery concerning punitive damages.").

Furthermore, the record before the Court leaves this case easily distinguishable from *Cefalu v. Vill. of Glenview*, No. 12 C 5995, 2013 WL 5878603 (N.D. Ill. Nov. 1, 2013) and *Finch v. City of Indianapolis*, No. 08–432, 2011 WL 2516242 (S.D.Ind. June 23, 2011), on which defendants so heavily rely. In *Cefalu*, the court commented that the "production of [financial] information could be postponed . . . where the issue of qualified immunity had not yet been resolved *and* the plaintiff's punitive damages claim was based solely on broad allegations that the officers' conduct was willful, malicious and oppressive." *Cefalu*, 2013 WL 5878603, at *3 (emphasis added). Similarly, in *Finch*, the court delayed punitive damages discovery because qualified immunity had not yet been resolved *and* plaintiffs had made "nothing more" than "bare allegation[s]" to support their claim for punitive damages. *Finch*, 2011 WL 2516242 at *4. Again, as discussed above, Archie has gone well beyond making bare allegations here.[7]

Second, defendants correctly note that only a defendant's "current" financial information is relevant to the issue of punitive damages, and a request for the prior three years of financial information – as Archie seeks here – has been found overly broad by at least one court in this Circuit. *Platcher v. Health Pros.*, Ltd., No. 04-1442, 2007 WL 2772855, at *3 (C.D. Ill. Sept. 18, 2007); *but see Peach v. City of Kewanee*, No. 05-4012, 2006 WL 8443111, at *5 (C.D.Ill. Oct. 23, 2006) (permitting a request for three years of tax returns because "2003 is not exactly

---

[7] The Court acknowledges defendants' position that the body worn camera footage from the incidents refutes Archie's allegations. Nonetheless, the veracity of plaintiff's allegations and the ultimate admissibility of the officers' financial information on the issue of punitive damages need not be addressed to resolve this motion. *See, e.g., ED&F Cap. Markets Ltd.*, 2020 WL 3469128, at *3.

ancient history . . . [and] those documents might lead to information relevant to defendants'

financial situation at the present."). A number of district courts, however, have held that a

request for the past *two* years of financial documents is appropriate to establish a defendant's

"current" net worth. *See United States v. Autumn Ridge Condo. Ass'n*, *Inc.*, 265 F.R.D. 323, 329

(N.D.Ind. 2009) (collecting cases permitting disclosure of financial documents dating back two

years); *see also Breuder v. Bd. of Trustees of Cmty. Coll. Dist. No. 502*, No. 15 CV 9323, 2021

WL 229655, at *4 (N.D.Ill. Jan. 22, 2021) (ordering the production of two years of financial

documents). Given this case law, and the fact that the defendant officers have likely not filed

their tax returns for 2022, the Court will further narrow plaintiff's request for tax returns and a

list of household expenses from 2020 through the present. Of course, the Court expects that

defendants will update their production as needed and as required under Fed.R.Civ.P. 26(e).

Finally, the defendant officers' privacy concerns – which are understandable given their

line of work – can be alleviated by an amendment to the confidentiality order previously entered

in this case, (Dckt. #74), to allow for the production of the officers' tax returns and financial

information under an attorneys' eyes-only designation. Such a designation will provide

sufficient protection of the individual defendants' private financial information. *See Challenge*

*Aspen*, 2001 WL 1403001, at *5 (opining that the attorneys' eyes only designation "strikes a

proper balance between plaintiff's right to discover relevant information and the defendants'

confidentiality interests."); *see also Apex Colors, Inc. v. Chemworld Int'l Ltd., Inc.*, No. 14 CV

273, 2017 WL 164335, at *2 (N.D.Ind. Jan. 17, 2017) (allowing "punitive damages discovery" in

part because "there [was] a protective order in place that allow[ed] for discovery to be designated

as 'attorneys eyes only'"). By March 16, 2023, the parties shall submit an agreed, proposed

amended protective order to the Court's proposed order inbox

(proposed_order_cummings@ilnd.uscourts.gov), to govern the production of the defendant officers' financial documents.

For these reasons, Archie's motion to compel the production of financial documents is granted in part. By April 15, 2023, defendants shall produce the individual tax returns and a list (with all supporting documentation) of personal and household expenses for the years 2020-2021 for the following officers: Holden, Alvarez, Angel, Geubara, DeLeon, Anderson, Cusimano, Sanchez, Miranda, and Boyle.

> **C.      Defendants must produce a revised affidavit from Barbara Jotautas to provide additional information about their confidential informant.**

In RFPs Nos. 21, 31, and 53, Archie requested information and documents about the confidential informant used in connection with the April and May 2019 search warrants, including: (1) the CI's criminal background; (2) the informant's track record, including the results of all previous and subsequent search warrants; and (3) the CPD informant file (RFP Nos. 21, 31 & 53).[8] According to Archie, this information is relevant to her claims for unlawful searches in connection with the April and May 2019 warrants because it "go[es] to the reasonableness of the officers' reliance on the informant and his statements – statements that ultimately proved unreliable on two separate occasions because no sign of the target of either search warrant was found in or connected to plaintiffs' apartment." (Dckt. #214 at 17).

---

[8] In other RFPs, Archie requested all written communications between the affiant officers and the informant who provided the factual basis for each warrant (RFP No. 30); all records that would show that each affiant officer spent time with the informant (RFP Nos. 32 & 51); and all records that would show that the informant was in custody and available to the affiant officers on the dates of communications regarding plaintiff's apartment (RFP No. 52). Archie included these requests in her motion. However, defendants have since agreed to amend their responses to these RFPs to indicate that "no responsive materials exist with the exception of notes taken by Officer Brown which were already produced." (Dckt. #228 at 20). Accordingly, the Court need not address these requests. To the extent that defendants have not formally amended their responses, they shall do so by March 16, 2023.

In their response, defendants argue that the CI's criminal background, track record, and CPD informant's file are protected under the confidential informant's privilege, *see Rovairo v. United States*, 353 U.S. 53, 60 (1957), because such information and documents could be used to identify the CI. This privilege recognizes the government's ability "to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." *Walker v. City of Chicago*, No. 21 C 2648, 2022 WL 5245339, at *1 (N.D.Ill. Oct. 6, 2022), *quoting Roviaro*, 353 U.S. at 59. The privilege is designed to further and protect "the public interest in effective law enforcement," and it "recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and . . . encourages them to perform that obligation" by preserving their anonymity. *Roviaro*, 353 U.S. at 59. The privilege is applicable in both criminal and civil cases, *Guzman v. City of Chicago*, 242 F.R.D. 443, 447 (N.D.Ill. 2007), and its scope extends not only to the identity of the informant, but also to communications and other information that would "tend to reveal the informant's identity." *Tate v. City of Chicago*, No. 18 C 7439, 2021 WL 1885991, at *3 (N.D.Ill. May 11, 2021).

Nonetheless, in an effort to resolve the parties' dispute on this issue, defendants have produced a sealed affidavit of a CPD Officer Barbara Jotautas, who maintains and monitors the security of the CPD's registered CI files. The affiant reviewed the CI's file and identified twenty-one occasions in which the CI provided reliable information (*i.e.,* "information about criminal activity resulting in the seizure or recovery of contraband, or currency and/or an arrest of an offender"). The affiant also stated – without elaboration – that the CI has been arrested more than twenty times. Defendants ask the Court to accept the affiant's statement that the disclosure of any additional information or documents about the CI beyond that included in the

14

affidavit could be linked to the CI's identity, thereby posing a significant safety risk to the CI. The Court respectfully disagrees.

Because Archie has made clear that she is not seeking the identity of the CI at this stage, (*see* Dckt. #214 at 18, n.17), the Court need only determine whether any of the additional information that she seeks to assess the CI's reliability might run afoul of the privilege by inadvertently exposing the CI's identity. The Court finds that the most expeditious way of providing Archie with such additional information – while simultaneously preserving the privilege – is to require Officer Jotautas to produce a revised affidavit to Archie's counsel on an attorneys' eyes-only-basis that contains the following additional information: (1) the overall number of occasions where the CI provided information that did *not* lead to arrest or recovery of contraband; (2) the number of occasions prior to April 2019 where the CI provided reliable information that lead to arrest or recovery of contraband; (3) the number of occasions prior to April 2019 where the CI provided information that did not lead to arrest or recovery of contraband; and (4) for each of the CI's arrests, including the twenty arrests identified in the current affidavit, provide: (a) the date of arrest, (b) the charge(s) filed in connection with the arrest, (c) the disposition of the charge(s) (*i.e.*, conviction, SOL, not guilty finding), and (d) the date of disposition for the charge(s). Defendants shall produce Officer Jotautas' revised affidavit to Archie's counsel by March 30, 2023.

## CONCLUSION

For the reasons stated above, Archie's motion to compel, (Dckt. # 214), is granted in part and denied in part. The parties are ordered to submit an agreed proposed amended protective order to the Court's proposed order inbox by March 16, 2023. Defendants are ordered to produce a revised affidavit from Officer Jotautas to Archie's counsel by March 30, 2023.

15

Defendants shall produce the additional documentation regarding defendant officers' CR files and the financial documentation of certain defendant officers to Archie by April 15, 2023. Finally, by March 16, 2023, the parties shall file a joint status report setting forth a proposed schedule for the completion of fact discovery, what additional discovery has been completed, what discovery remains (including a schedule for any depositions), and whether there are any additional discovery disputes require the Court's attention.

**DATE:** **March 9, 2023**

**Jeffrey I. Cummings**
**United States Magistrate Judge**

!