IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KRYSTAL ARCHIE, SAVANNAH BROWN, TELIA BROWN, and JHAIMARION JACKSON,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF CHICAGO, DAVID ALVAREZ, JR., BRADLEY R. ANDERSON, SAMUEL ANGEL, LUCAS K. BOYLE, CORNELIUS BROWN, CRAIG BROWN, ANTHONY P. BRUNO, BRANDON CAMPBELL, YVETTE CARRANZA, DANIELLE M. CUSIMANO, ANTHONY V. CUTRONE, EMELIO F. DE LEON, CLARK W. EICHMAN, MICHELLE S. FRACTION, VICTOR J. GUEBARA, CRAIG M. HAMMERMEISTER, STEVEN HOLDEN, TONITA S. JONES, STEVEN G. LEVEILLE, CHRISTOPHER J. MARAFFINO, ANTONIO D. MIRANDA, SEAN RYAN, HUGO F. SANCHEZ, TIMOTHY J. SCHUMPP, CURTIS L. WEATHERSBY, CARL M. WEATHERSPOON, SCOTT P. WESTMAN, RAYMOND H. WILKE, and RUSSELL L. WILLINGHAM,<br><br>Defendants. | ) | No. 19 C 4838<br><br>Judge Robert W. Gettleman |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Krystal Archie, on behalf of herself and her minor children, Savannah Brown, Telia Brown, and Jhamarion Jackson ("plaintiffs"), have brought a fifteen-count, fourth amended complaint against the City of Chicago ("the City") and various Chicago police officers (collectively, "defendants").[1] Defendants move for summary judgment on all counts (Doc. 389),

[1] Count V was previously dismissed. <u>See</u> <u>Archie v. City of Chicago</u>, No. 19 CV 4838, 2020 WL 5751185, at *5 (N.D. Ill. Sept. 25, 2020). Count I is a claim under 42 U.S.C. §1983 alleging that the City of Chicago has a practice

Plaintiffs cross-move for partial summary judgment on liability (Doc. 403). For the reasons below, both motions are granted in part.

## BACKGROUND

In 2019, Chicago police officers raided plaintiffs' home three times over the course of four months. Plaintiffs lived in the first-floor apartment ("Unit #1") at 6832 South Dorchester Avenue in Chicago, in a two-unit building. Their upstairs neighbors resided in the second-floor apartment ("Unit #2").

On February 8, 2019, defendant officers were executing a search warrant drawn for 6832 S. Dorchester Ave Unit #2, the second-floor apartment. The officers were looking for an alleged heroin dealer and evidence of narcotics trafficking. Archie was at work, but her three minor children, Savannah, Telia, and Jhaimarion, then ages 14, 11 and 7, were at home. When the officers entered Unit #2, the target of the search warrant, along with other adults and children, fled from the second-floor apartment and knocked on the door of the first-floor apartment. Savannah let the neighbors in, thinking they were in danger. The officers followed into Unit #1 shortly after and arrested the adults who had run down from Unit #2. The officers then conducted a search of Unit #1. No evidence of narcotics trafficking was found in Unit #1 and neither Archie nor any of her children were arrested.

In April, officers obtained a search warrant for 6832 S. Dorchester Ave Unit #1, plaintiff's home. The officers were looking for a (different) alleged heroin dealer and evidence of narcotics trafficking. That warrant was executed on April 25, 2019, when Archie was at work

---

or policy of using excessive force against children. Discovery on that claim was bifurcated and stayed. (Doc. 179).

and her three children were at home. The officers did not find the target of the search warrant in the apartment or evidence of narcotics trafficking and did not make any arrests.

In May, officers obtained yet another warrant for 6832 S. Dorchester Ave Unit #1, plaintiffs' home. The officers were looking for a (different, third) alleged heroin dealer and evidence of narcotics trafficking. That warrant was executed on May 17, 2019. The officers never activated their body worn cameras ("BWCs") during the episode. This time, Archie was at home with a female friend, and her children were at school. Archie was handcuffed, and officers proceeded to conduct their third search of the home within four months. Again, the target of the search warrant was not found. No evidence of narcotics trafficking was found in plaintiffs' home, and no arrests were made in connection with the search.

## LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden, and the court must view all facts in the light most favorable to the nonmovant and draw all reasonable inferences in their favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). But the nonmovant must do more than raise "some metaphysical doubt as to the material facts." Id. at 586. Rather, the nonmovant "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

In addition, the record contains body-worn camera ("BWC") footage from officers involved in the February and April searches. Generally, the existence in the record of footage capturing the events in question does not change these applicable standards. But "[w]hen

opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). Rather, the court should "view[ ] the facts in the light depicted by the videotape." Id. at 381. Put simply, "a video record of the events at issue can evaporate any factual dispute that would otherwise exist." United States v. Norville, 43 F.4th 680, 682 (7th Cir. 2022).

## DISCUSSION

This case involves a voluminous factual record that would be impracticable to fully summarize in this opinion. For the sake of efficiency, the court will include relevant factual content in its discussion of each of the issues.

### I. February search: warrantless entry, consent, and scope of search (Count II)

Defendants move for summary judgment on Count II, an action under 42 U.S.C. § 1983 alleging that officers violated plaintiffs' Fourth Amendment rights when they searched Archie's home on February 8, 2019 (the "February search"). It is undisputed that officers did not have a search warrant for Archie's home. There are three issues related to the February search: (1) whether exigent circumstances justified the warrantless entry; (2) the scope of the search; and (3) whether Archie consented to the search.

Officers searched Archie's home on February 8, 2019, in the course of executing a warrant for the neighboring, second-floor unit. When officers entered Unit #2, several adults and children fled down the common staircase and entered Archie's home. Defendants move for summary judgment on the officers' initial entry and clearing of Archie's apartment, because they

were in hot pursuit of a fleeing search warrant target. Plaintiffs do not meaningfully contest this point. There are "several exigencies that may justify a warrantless search of a home." Kentucky v. King, 563 U.S. 452, 460 (2011). One of these exigencies is hot pursuit: " [p]olice officers may enter premises without a warrant when they are in hot pursuit of a fleeing suspect." Id. Because there is no genuine dispute of fact that the officers who entered Archie's apartment in February were in hot pursuit of fleeing suspects, the court grants defendants' motion for summary judgment as to the initial warrantless entry of Archie's apartment.

Although officers were justified in entering Archie's apartment without a warrant, the scope of the search that officers could lawfully conduct after entering is contested. After entering Archie's apartment, officers located the adults from the second-floor apartment in the kitchen and in Savannah and Telia's shared bedroom. It is undisputed that after locating the suspects, officers searched closets, storage bins, bags, and beds in all three bedrooms. Plaintiffs contend that the search was even broader, including the kitchen. Plaintiffs also contend that the search resulted in the destruction of property such as cracks in the walls, broken cabinets and drawers, and dry ingredients dumped out.[2]

A warrantless search "must be strictly circumscribed by the exigencies which justify its initiation." Mincey v. Arizona, 437 U.S. 385, 393 (1978) (internal quotation omitted). The exigency that justified the search of Archie's apartment was the presence of the fleeing suspects and the associated possibility that these suspects would seek to destroy or hide evidence. Defendants, movants here, do not argue that the search was circumscribed according to the exigency that justified it. Instead, defendants put forth a conclusory contention: the search,

---

[2] The destruction of property issue is further addressed in the discussion of Count VI.

according to defendants, was "reasonable and cursory." Because defendants fail to identify an undisputed fact (the extent of the search), and fail to explain why that fact, even if undisputed, would entitle them to judgment as a matter of law, the court denies defendants' motion for summary judgment on the scope of the search. See Rule 56(a).

Defendants instead focus on an alternate theory: Archie consented to the search. While voluntary consent to a search is an exception to the Fourth Amendment's warrant requirement, voluntary consent cannot be "the product of duress or coercion, express or implied." Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). Defendants have failed to show that the fact of Archie's voluntary consent is uncontested.

If anything, the record suggests that defendants may not have attempted to secure Archie's voluntary consent. The record shows that Officer Bruno, who was the ranking officer in the February search, stated to Archie, "We're going to have to take a look around because we're not sure if they brought something down here to hide when we came," and something to the effect of "go have a seat with your kids," to which Archie responded, "Okay." Archie testified that this "was a directive…that was not a question." Archie also testified that the directive to "have a seat" was accompanied by a physical nudge. The BWC footage also shows that Officer Bruno never explicitly asked for Archie's consent. Officer Bruno testified that the way he understood the interaction was that he "was giving [Archie] a courtesy by telling her this is what happened and this is what we need to do." On this record, a reasonable jury could easily determine that officers never asked for Archie's consent, and consequently never received it.

**Qualified immunity:**

In the alternative, defendants argue that the court should grant summary judgment on this

claim based on qualified immunity. Qualified immunity is a two-step inquiry: "(1) whether the facts, read in favor of the non-moving party, amount to a constitutional violation; and (2) whether the constitutional right was clearly established at the time of the alleged violation." Rainsberger v. Benner, 913 F.3d 640, 647 (7th Cir. 2019).

Defendants argue that qualified immunity applies even where officers made "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."[3] Here, defendants argue that because officers may have been mistaken about Archie's consent, they are entitled to qualified immunity. But defendants stretch this statement from Pearson beyond its context. The Court in Pearson endorsed the two-step framework articulated above: "First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right. Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." 555 U.S. at 232 (cleaned up). Thus, the court cannot skip the two-step analysis on the basis that the officers may have made "a mistake of fact," as it seems defendants would have it.

Read in plaintiffs' favor, the facts show that defendants conducted a warrantless search of Archie's home without her consent that reached beyond the bounds of the exigency that justified its initiation.[4] This amounts to a constitutional violation that is clearly established: "No reasonable officer could claim to be unaware of the basic rule, well established by our cases,

---

[3] For this quotation, defendants cite Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018). The cited opinion does not contain this language, or even the proposition. This language is found in a different opinion, Pearson v. Callahan, 555 U.S. 223, 231 (2009). Counsel is reminded that they must provide accurate citations in the materials they submit to this court.

[4] The court notes that defendants' motion for summary judgment based on qualified immunity does not argue that the officers were mistaken about the permissible scope of search justified by the exigency of hot pursuit.

that, absent consent or exigency, a warrantless search of the home is presumptively unconstitutional." Groh v. Ramirez, 540 U.S. 551, 564 (2004). For these reasons, the court denies defendants' motion for summary judgment on Count II.

## II. April and May searches: warrant validity (Count III)

Count III is an action under 42 U.S.C. § 1983 alleging that officers violated plaintiffs' Fourth Amendment rights when they searched Archie's apartment on April 25, 2019 (the "April search") and May 17, 2019 (the "May search"), because the warrants authorizing those searches were unreasonably approved or obtained. Defendants move for summary judgment on Count III, and plaintiffs cross-move for summary judgment.

Defendants correctly argue that a search performed pursuant to a warrant is presumptively valid, Petersen v. Pedersen, 140 F.4th 421, 428–29 (7th Cir. 2025), and that there is "a presumption of validity with respect to the affidavit supporting the search warrant." Franks v. Delaware, 438 U.S. 154, 171 (1978). Nevertheless, there are two circumstances where an officer's warrant application violates the Fourth Amendment. First, "[a]n officer violates the Fourth Amendment if he intentionally or recklessly includes false statements in a warrant application and those false statements were material to a finding of probable cause." Rainsberger, 913 F.3d at 647. Second, "[a]n officer similarly violates the Fourth Amendment if he intentionally or recklessly withholds material information from a probable cause affidavit." Id. The method that the Seventh Circuit uses to determine whether the alleged falsehoods or omissions are material is to "eliminate the alleged false statements, incorporate any allegedly omitted facts, and then evaluate whether the resulting 'hypothetical' affidavit would establish

probable cause." Betker v. Gomez, 692 F.3d 854, 862 (7th Cir.2012).

As is further explained below, the court finds that Officer Anderson intentionally or recklessly withheld material information from the warrant application for the April search and consequently grants plaintiffs' cross-motion for summary judgment on liability as to Count III as to that search. Similarly, the court finds that Officer Brown intentionally or recklessly withheld material information and intentionally included material false statements in the warrant application for the May search and consequently grants plaintiffs' cross-motion for summary judgment on liability as to Count III as to that search.

**April 25, 2019, warrant**

Officer Anderson applied for the April 25, 2019, warrant. The application requested a warrant to search Ronald "Peanut" Anderson at "6832 S. Dorchester Ave 1st floor of a 2 flat apartment building." In his affidavit, Officer Anderson presented the following facts to support his belief that heroin and paraphernalia, money, and records relating to the distribution of heroin were located on the person and the premises. First, a J. Doe stated that he "went to the back porch on the 1st floor of 6832 S. Dorchester" and purchased heroin form a man he knew as "Peanut," who had a large bag with approximately 70 smaller bags of heroin in it. Peanut told the J. Doe to come back on Thursday to buy more drugs. Second, J. Doe pointed at the front of the building at 6832 S Dorchester to identify it to Officer Anderson. Third, Officer Anderson "conducted an ICLEAR search" of the description of "Peanut," and found a positive result for a man named "Ronald Anderson," including an image that the J. Doe positively identified as

"Peanut."

Omissions

Officer Anderson failed to include the following material information in the April warrant application. Officer Anderson personally participated in a search of the same premises in February 2019. The February warrant was drawn for the second-floor apartment and was based on information from the same informant that Officer Anderson identified as "J. Doe" in his affidavit. In February, the informant recounted a specific heroin transaction on the "back porch of the 2nd floor of 6832 S. Dorchester" and stated that he had purchased heroin "at 6832 S. Dorchester Ave **2nd floor**, a couple time a week times [sic] in the last month." (Emphasis added).

When officers executed the warrant for the second-floor apartment, they found evidence of an active narcotics operation: heroin, money, and ammunition. As mentioned above, the February search of the second-floor apartment also resulted in a search of the first-floor apartment. The search of the first-floor apartment yielded no evidence of drug trafficking and made it clear that the residents of that apartment were Archie, a single mother, and her three children. The search of the first-floor apartment also made it clear that the exterior back porch of Archie's apartment is a publicly open and accessible common area. The court finds that Officer Anderson intentionally or recklessly withheld this information because he personally participated in the February search of both apartments. See Rainsberger, 913 F.3d at 647; United States v.

Williams, 737 F.2d 594, 602 (7th Cir. 1984). No reasonable jury could conclude otherwise.

The hypothetical affidavit lacks probable cause

After incorporating these omitted facts, the court finds that the resulting "hypothetical" affidavit does not support probable cause. The probable cause analysis "is a common-sense inquiry requiring only a probability of criminal activity; it exists whenever an officer or a court has enough information to warrant a prudent person to believe criminal conduct has occurred." Whitlock, 596 F.3d at 411. "Importantly, a probable cause inquiry does not take each fact in isolation; it depends on the totality of the circumstances." Rainsberger, 913 F.3d at 648. Considering the totality of the circumstances in the hypothetical affidavit, the court finds that a prudent person would not believe that "the items sought in the search warrant [were] likely to be located in the place to be searched." United States v. Hobbs, 509 F.3d 353, 361 (7th Cir. 2007).

As an initial matter, the affidavit is weak on its face. Fundamentally, the affidavit relies on a minimally corroborated account from a single unnamed informant, and the affidavit offers no indicia of the informant's reliability. Other than the fact that the alleged drug dealer's nickname and image was in a police database, the John Doe's account of the drug purchase in the affidavit was uncorroborated by police officers. See, e.g. United States v. Alexander, 573 F.3d 465, 476 (7th Cir. 2009) (stating that "police corroboration of an informant's tip is valuable in determining the reliability of the tip and, ultimately, in establishing probable cause"); Kimbrew v. Evansville Police Dep't, 867 F. Supp. 818, 822 (S.D. Ind. 1994) (stating that "[a]n uncorroborated tip from an informant cannot by itself furnish probable cause for an arrest or search").

In addition, the affidavit contains no "information about the informant's credibility or

potential bias," which the Seventh Circuit has described as "crucial" to "the sufficiency of affidavits for warrants obtained based on informants." United States v. Glover, 755 F.3d 811, 816 (7th Cir. 2014). Beyond the single drug deal recounted by the informant, the affidavit contains no other information connecting the alleged dealer with the location. See United States v. Yarber, 915 F.3d 1103, 1106 (7th Cir. 2019) (explaining that "[i]n no way does this mean that any place to which a suspected drug dealer travels after a drug sale is subject to a search. But there is much more here than an isolated visit to some random apartment after a drug sale"). On its face, Officer Anderson's affidavit relies on the say-so of an informant with no established credibility and a one-off connection to the premises to be searched.

The court finds that after incorporating the omitted facts into this facially weak affidavit, the resulting "hypothetical" affidavit would not establish probable cause to search the first-floor apartment. Crucially, "when a building is divided into more than one residential unit, a distinct probable cause determination must be made for each unit." United States v. Butler, 71 F.3d 243, 249 (7th Cir. 1995). The omitted facts would have informed the reviewing judge that: (1) the same informant had reported that adult men were selling drugs from the second floor; (2) an earlier search confirmed that adult men were selling drugs from the second-floor apartment; (3) the first-floor apartment, which had been recently searched, contained no evidence of narcotics trafficking and was home to a single mother and her three children; and (4) the exterior back porch where the informant purchased narcotics is a publicly open and accessible common area.[5]

With this context, the common-sense conclusion that a prudent person would draw from

[5] The warrant application did not specify whether the informant purchased heroin on the exterior or enclosed, interior back porch of Unit #1. In his deposition, Officer Anderson stated that the informant made the purchases on the exterior back porch.

the informant's tip—which described an adult man selling heroin on the "back porch" of the building—is that the second-floor narcotics traffickers were continuing their operation. In context, the tip supports the inference that the heroin and paraphernalia, money, and records relating to the distribution of heroin that Officer Anderson's warrant application sought would be found in the second-floor apartment, not the first-floor apartment. Read in the totality of the circumstances with the omitted facts included, the affidavit "fails to allege specific facts and circumstances that reasonably lead to the belief that the items sought in the search warrant are likely to be located in the place to be searched," i.e. within Archie's apartment. Hobbs, 509 F.3d at 361.

The court briefly addresses the fact that the informant was brought before the judge who issued the April warrant. According to the record, the informant was brought before Judge O'Hare and made available for questioning at which time the informant's criminal history, including any possible pending investigations, if any, were made known to Judge O'Hare. In their reply, defendants argue that "Judge O'Hare would have been able to question the J. Doe if he had any questions regarding the location where the buy occurred." As the above analysis makes clear, omissions in the affidavit undercut a neutral magistrate's ability to evaluate the reliability of informant (and probable cause generally). See, e.g., Glover, 755 F.3d at 817 (stating that "[t]he omission of that adverse information impaired the neutral role of the magistrate deciding whether to issue the warrant"); Rainsberger, 913 F.3d at 651, (stating that "[a]n affidavit that misleads by lies or omission undercuts the magistrate's ability to make an independent probable cause determination"). Put more practically, Judge O'Hare was not in a position to learn about the omitted February search just because the informant was available for questioning. Consequently, the fact that the informant was made available to the judge for

questioning cannot cure the material omissions in the affidavit.

**May 17, 2019, warrant**

Officer Craig Brown applied for the May 17, 2019, warrant. The application requested the issuance of a search warrant for an unknown black male known as "Lord T" and the premises of a "two-story multi-family apartment located at 6832 S. Dorchester Apt # 1." Officer Brown presented the following facts in support of his belief that heroin, distribution paraphernalia, money, and records of drug transactions would be found at the premises.

Officer Brown met with an informant on May 14, 2019. Officer Brown stated that he had utilized the informant over the past two years, and "[o]ver the course of that time period, the C/I has conducted more than (20) controlled buys and provided information cited in affidavits for search warrants on more than (10) occasions. In each of those instances, the narcotics sought were recovered and tested positive for the presence of narcotics." Officer Brown stated that at the time of his meeting with the informant, the informant had conducted three previous controlled buys from 6832 S. Dorchester from an individual known as "Lord T." Officer Brown did not provide any further details on those buys. The informant agreed to participate in another controlled buy.

Officer Brown led a team that surveilled the controlled buy. They observed the informant "knock on the rear door of the first floor," walk in briefly, and exit after less than a minute. After meeting at the predetermined pickup location, the informant produced the heroin he had purchased. The informant relayed that he had purchased the heroin from "Lord T" and

that Lord T encouraged him to return in the future to purchase narcotics.

False Statements and Omissions

Officer Brown included three false statements in the warrant application. The first false statement is about the informant's track record. Officer Brown stated that "[o]ver the course of [the past two years], the C/I has conducted more than (20) controlled buys and provided information cited in affidavits for search warrants on more than (10) occasions. In each of those instances, the narcotics sought were recovered and tested positive for the presence of narcotics." (Emphasis added). It is undisputed that the informant that Officer Brown used is the same informant that was used for the April search warrant.[6] And, contrary to Officer Brown's statement, the narcotics sought were not recovered from the April search.

The second false statement was that the informant had made "three previous 'controlled buys' of Heroin at 6823 [sic] S. Dorchester Apt#1." The undisputed record shows that the second of these three controlled buys occurred at Apartment # 2, not Apartment #1. Officer Brown testified that during the second controlled buy referred to in his affidavit, he personally observed the informant walk up the back stairs to the second-floor apartment and knock on the window to initiate the heroin sale.

The third false statement is that the informant had conducted "three previous 'controlled buys' of Heroin [at the address] from an individual….that the [informant] knows as 'Lord T'" in the previous month. Lord T was the subject of the May warrant. The undisputed record shows that the first of the three controlled buys described in the warrant application was from a man

[6] In the April warrant application, this same informant was referred to as "John Doe."

named "Fitzgerald Wooten," the second controlled buy was from a man named "Big C," and the third controlled buy was from a man named "Peanut."[7] In the accompanying police reports, all three of these men are named and described as different from one another (i.e., differing ages, heights, weights, and hairstyles). Contrary to Officer Brown's statement in the affidavit, none of the three previous controlled buys was from an individual that the informant knew as "Lord T." In addition to his signed reports, Officer Brown's own testimony confirms that he knew the statement in the affidavit was false. When asked whether Lord T was the same individual who had sold to the informant in the three previous buys, Officer Brown testified that: "Well, I wrote the search warrant not thinking about what specific individuals on each day. I wrote the search warrant knowing that drugs were coming out of that residence, so the last positive buy that I received from that residence, this is the person that I put on the search warrant."

In addition to including false statements in his affidavit, Officer Brown omitted the following material information from the warrant application. On April 25, only few weeks prior to the warrant application, officers executed a search of the same premises seeking the same type of evidence, heroin and distribution materials. The April warrant relied on a tip from the same informant, who reported that he had purchased heroin on the back porch of the first-floor unit. The April search did not locate the target of the warrant or the evidence sought. Instead, officers found, again, a home of a single mother and her children with no evidence of drug trafficking and no evidence that any adult men resided in the home. In addition, the first of the three controlled buys referred to in the May warrant application occurred on April 24, 2019, one day

[7] One can speculate that this is perhaps the same Peanut that was the target of the April warrant.

before the negative April 25 search.

Officer Brown also failed to mention the February search and the circumstances surrounding it, discussed above. In February, Officer Brown's informant recounted a specific heroin transaction on the "back porch of the 2nd floor of 6832 S. Dorchester" and stated that he had purchased heroin "at 6832 S. Dorchester Ave 2nd floor, a couple time a week times [sic] in the last month." This information was the basis of a February warrant for Unit #2. The resulting search confirmed that Unit #2 was an active narcotics trafficking operation and contained the type of evidence that was sought in the May warrant. The February search also revealed that the first-floor apartment had an enclosed back porch that was separated from the rest of the first-floor apartment by a dead-bolt lock.[8] The search of Unit #1 incident to that warrant also revealed no evidence of narcotics trafficking in Unit #1, and that its occupants were a single mother and her three children.

Intentionality and reckless disregard for the truth

Before evaluating the "hypothetical" affidavit stripped of the false statements and including the omissions, the court must first determine if the false statements or omissions were made intentionally or with a reckless disregard for the truth. See Rainsberger, 913 F.3d at 647 (explaining that an "officer violates the Fourth Amendment" if he "includes false statements" or "withholds material information" from a warrant application "intentionally or recklessly"). Because this is a factual determination, the court must evaluate this question according to the

[8] This was, of course, also apparent form the April search as well,

applicable summary judgment standards.[9]

This determination is straightforward for some of Officer Brown's false statements. Officer Brown knew that the three previous controlled buys did not involve Lord T; this is confirmed by his testimony and his signed police reports accompanying those buys. Officer Brown also knew that one of the controlled buys was at Unit #2 not Unit #1, because he testified that he personally observed it. No reasonable jury could find that these statements were not made intentionally or with a reckless disregard for the truth.

As to the other false statements and omissions, Officer Brown claims ignorance. He claims that he was unaware of the previous February and April searches and that he was unaware that his informant was the primary information source for those searches. The Seventh Circuit has explained that reckless disregard may be inferred "from circumstances evincing obvious reasons to doubt the veracity of the allegations" contained in the affidavit. United States v. Williams, 737 F.2d 594, 602 (7th Cir. 1984) (internal quotation omitted). In Glover, the Seventh Circuit explained that relevant evidence to this inquiry includes "direct evidence of the affiant's state of mind or circumstantial evidence that the affiant had a subjective intent to deceive based on the nature of the omissions." 755 F.3d at 820. Upon its review of the record, the court finds that no reasonable jury could find that Officer Brown's omissions were not made with (at least) reckless disregard for the truth. The court briefly addresses each set of false statements or omissions.

As a starting point, the record unequivocally shows that Officer Brown knowingly made

[9] The court notes that because there are cross-motions for summary judgment on this issue, the summary judgment standard flips (i.e. the identity of the non-movant that the court must construe all genuine factual disputes in favor of) depending on whether the court is weighing the motion or the cross-motion.

false statements in his affidavit. He stated that his informant made three previous controlled buys from a man known as Lord T, when in truth none of those buys were from someone known as Lord T. Officer Brown's testimony as to this false statement is nonchalant— "[w]ell, I wrote the search warrant not thinking about what specific individuals on each day"—but his nonchalance does not undermine the seriousness of including false statements in a warrant affidavit. This is direct evidence as to Officer Brown's state of mind as to the statement about the three previous buys, and it is also strong circumstantial evidence about his state of mind as to the other falsehoods and omissions in the affidavit.

Officer Brown was the assigned "handler" for the informant who was used for the February, April, and May search warrants. He testified that he became the informant's handler beginning in late 2017 or early 2018. At that point, Officer Brown "had to fill out the paperwork to get…the informant transferred over to [him]" from Officer Bruno, his previous handler. In the warrant for the May affidavit, Officer Brown stated falsely that in each instance that the informant provided information for a warrant, the narcotics sought were recovered. Officer Brown's testimony shows that he made an affirmative, objective (and false) representation of his informant's credibility without verifying it. See Glover, 755 F.3d at 816 (explaining that "information about the informant's credibility" is "crucial" to "the sufficiency of affidavits for warrants obtained based on informants"). The court finds that this conduct constitutes a reckless disregard for the truth, and that no reasonable jury could find otherwise. See United States v. Tanguay, 787 F.3d 44, 53 (1st Cir. 2015) (explaining that in certain circumstances, a "reckless omission" can arise from an officer's failure to fulfill the "duty of further inquiry" when there is "an obvious and unexplored reason to doubt the truthfulness of the allegations").

Officer Brown claims ignorance as to the February and April searches. Given the

surrounding circumstances, the court finds this almost impossible to believe. In any event, the court finds that these omissions were made with reckless disregard for the truth. No reasonable jury could find otherwise. It is undisputed that Officer Brown oversaw a controlled buy on April 24, just one day before the execution of the April 25 warrant. Thus, Officer Brown was leading an ongoing investigation into 6832 S. Dorchester Unit #1 when the April 25 search was executed. According to his testimony, Officer Brown was completely unaware that a search warrant based on information from his own informant was executed at the premises he was actively investigating. The April 25 investigation and search was largely led by Officer Bruno, the same officer who transferred the informant to Officer Brown.

According to Officer Brown, he did not read the incident reports and other reports related to the execution of the February and April search warrants. When asked if "[d]uring the course of your investigation, at any point did you check CPD records of any kind to see if there had been police activity at the 6832 address," Officer Brown answered no. In summary, Officer Brown testified that he did not undertake extremely basic investigatory steps that would have informed him of the April and February searches.[10]

In addition, it is undisputed that Officer Brown was the handler for the informant who supplied the information that the February and April warrants were premised upon. Despite this relationship, Officer Brown's testimony is that he was unaware that his informant was the key information source for the affidavits for the February and April searches.

Taken together with the undisputed evidence that Officer Brown knowingly included

[10] The information about the April search was even more obvious than the information about the February search. Nevertheless, it is almost impossible that Officer Brown could learn about one without learning about the other; they were executed by largely the same team, at the same address, using information from the same (Officer Brown's) informant.

false information in the affidavit about the details of three controlled buys, there is a strong inference that his omission of information about the previous searches from his warrant affidavit was intentional. Put simply, Officer Brown was willing to intentionally lie about facts that hurt his case for probable cause, and the facts about the April and February searches that he omitted similarly hurt his case for probable cause. In any event, even if Officer Brown's testimony that he was ignorant were to be credited, then his omission of information about the previous searches was the product of a reckless disregard for the truth. Officer Brown was surrounded by "obvious and unexplored reason[s] to doubt the truthfulness of the allegations" in his affidavit that he failed to explore. Tanguay, 787 F.3d at 53. The court finds that no reasonable jury could conclude otherwise.

The hypothetical affidavit lacks probable cause

Finally, the court must determine whether Officer Brown's false statements and omissions were material. To do so, the court will "eliminate the alleged false statements, incorporate any allegedly omitted facts, and then evaluate whether the resulting 'hypothetical' affidavit would establish probable cause." Betker, 692 F.3d at 862. The court finds that after eliminating the false statements and including the omitted facts, the resulting hypothetical affidavit would not establish probable cause. Given the totality of the circumstances, the hypothetical affidavit does not provide a prudent person with reason to believe that the person and the items sought in the search warrant were likely to be located in the place to be searched. See Rainsberger, 913 F.3d at 648; Hobbs, 509 F.3d at 361.

The hypothetical affidavit provides little reason to believe that Lord T would be found inside of Archie's apartment at 6832 S. Dorchester Unit #1. The connection between Lord T, the

person sought by the warrant, and the premises consists of a single controlled buy reported by the informant. The officers did not visually observe Lord T and instead relied exclusively on the informant's report of the purchase. The officers observed the informant enter into an area that other officers had previously determined to be the enclosed, interior back porch of Archie's apartment. Previous searches revealed that the interior back porch was separated from the rest of the unit by a dead-bolt lock. The officers did not establish that Lord T lived in the first-floor apartment or establish any other connection between Lord T and the first-floor apartment. See Yarber, 915 F.3d at 1106.

Moving beyond Lord T, the hypothetical affidavit provides little reason to believe that evidence of narcotics trafficking would be found in Unit #1. First and foremost, Unit #1 had been searched twice for evidence of narcotics trafficking in the previous three months, and no such evidence was found. The April search occurred only three weeks before the May affidavit was submitted. Crucially, one of the controlled buys reported in the May affidavit occurred in the interior back porch just one day before the negative April search. This severely weakens the inference that a controlled buy in the interior back porch was an indication that evidence of heroin trafficking would be found in Unit #1.

The previous searches also provided information about Units 1 and 2 that provides important context for the rest of the information in the May affidavit. Previous searches revealed that no adult men resided in Unit #1. The February search also revealed that adult men were trafficking narcotics from Unit #2. The May affidavit describes four instances of adult men selling narcotics. The only time that Officer Brown visually observed a sale, the informant walked up to Unit #2 (using the staircase connected to the first-floor back porch) and knocked on the window. With this context, the information in the May affidavit did not provide a basis for a

prudent person to believe that evidence of heroin trafficking would be found in Unit #1. Instead, the information points to the men who lived in Unit #2 continuing to traffic narcotics and using Archie's interior back porch as a point of sale. After excluding the false statements and including the material omissions about the February and April searches, the affidavit does not support the conclusion that evidence of narcotics trafficking would be found in Unit #1.

The court's determination that the hypothetical affidavit does not support probable cause is based on the factors discussed above. Nevertheless, the court notes that Officer Brown's own testimony draws a similar conclusion. In his deposition, Officer Brown maintained that he was unaware of the April and February searches. Nevertheless, when asked if he would have "proceeded with [his] investigation of the first floor apartment" had he known about the April search, he answered "no." When asked if he would have proceeded with his investigation if he had known about the February search, Officer Brown also answered "no." While the court does not rely on this testimony to reach the conclusion that the hypothetical affidavit does not support probable cause, it is notable that the investigating officer testified that he would have dropped the investigation if he had known about the prior searches.

**Qualified Immunity**

Officers Anderson and Brown move for summary judgment on Count III on the basis that they are entitled to qualified immunity.[11] The section above takes care of the first prong of the qualified immunity analysis. Rainsberger, 913 F.3d at 647. The court finds that the facts, when

[11] The court analyses qualified immunity here, and elsewhere in the opinion, using the same principles discussed above.

read in favor of the non-moving party, amount to a constitutional violation.

Next the court must determine whether the constitutional right was clearly established at the time of the alleged violation. For Officer Brown's knowingly false statements, this is straightforward. In 2019, the Seventh Circuit held that "[t]he unlawfulness of using deliberately falsified allegations to establish probable cause could not be clearer." Rainsberger, 913 F.3d at 653.

For Officer Brown and Anderson's violations of the Fourth Amendment by omission, the question is whether "it would have been clear to a reasonable officer that the omitted fact was material to the probable-cause determination." Leaver v. Shortess, 844 F.3d 665, 669 (7th Cir. 2016). The court finds that it would have been clear to reasonable officers in Brown and Anderson's shoes that the omitted facts were material to the probable-cause determination. A reasonable officer in Anderson's position would recognize that the information about the February searches of Units #1 and #2, discussed in more detail above, would be material to the probable-cause determination. Similarly, a reasonable officer in Brown's positions would recognize that the information about the February and April searches, discussed in more detail above, would be material to the probable-cause determination. Consequently, the court finds that Officers Brown and Anderson are not entitled to qualified immunity on Count III.

Having determined that Officers Anderson and Brown are not entitled to qualified immunity for their respective false statements and omissions in the April and May warrants, the court grants plaintiffs' cross-motion for summary judgment on Count III. The court grants plaintiffs' cross-motion for summary judgment as to Officers Anderson and Brown and denies it

as to all other defendants.[12]

## III. Failure to Knock and Announce (Count IV)

Defendants move for summary judgment on Archie's § 1983 claim alleging that the manner in which officers searched her residence was unreasonable because: (1) they failed to knock and announce before entering the residence; (2) they handcuffed her when she did not pose a threat; and (3) they cursed at and insulted her. [13] The court will address these in reverse order.

The court grants defendants' motion for summary judgment on Archie's § 1983 claim alleging that the manner in which officers searched her residence was unreasonable because they cursed at and insulted her. Section 1983 claims "must be premised on the violation of a constitutional right." McCann v. Mangialardi, 337 F.3d 782, 790 (7th Cir. 2003). Police officers' use of profanity, cursing, and insults, while unprofessional and uncalled for, do not violate a constitutional right. See, e.g., Patton v. Przybylski, 822 F.2d 697, 700 (7th Cir. 1987); DeWalt v. Carter, 224 F.3d 607, 612 (7th Cir. 2000), abrogated on other grounds by Savory v. Cannon, 947 F.3d 409 (7th Cir. 2020).

The court grants defendants' motion for summary judgment on Archie's § 1983 claim alleging that the manner in which officers searched her residence was unreasonable because they handcuffed her during the execution of search warrants. Archie's claim fails because "officers

[12] The record shows that Officers Anderson and Brown were in a position to make false statements and omissions in their affidavits amounting to a Fourth Amendment violation. Neither party has shown that the undisputed facts entitle them to judgement as a matter of law as to other officers who may have been involved in the warrant applications.

[13] The other claims in Count IV—that officers pointed guns at Archie and destroyed her property—overlap with other counts in the complaint and will be addressed in those contexts.

executing a search warrant have categorical authority to detain any occupant of the subject premises during the search." United States v. Jennings, 544 F.3d 815, 818 (7th Cir. 2008).[14]

The last subset of claims relates to officers' alleged failure to knock and announce their presence before entering Archie's residence on February 8, April 25, and May 17, 2019. Generally, "police officers are required to knock and announce their presence." United States v. Jones, 208 F.3d 603, 609 (7th Cir. 2000). There is no brightline rule setting the amount of time that officers must wait after knocking before forcible entry. Since this waiting period is ultimately about the Fourth Amendment right of the people to be "secure ... against unreasonable searches and seizures," the requisite waiting period is governed by what is "what is reasonable under the circumstances of the particular case." Jones, 208 F.3d at 610.

Defendants argue that BWC footage establishes that on February 8, Officer Cornelius Brown knocked and announced prior into entering Archie's apartment. Plaintiffs do not contest this. Consequently, the court grants defendants' motion for summary judgment as to the alleged failure to knock and announce on February 8, 2019.

The court grants plaintiffs' cross-motion for summary judgment as to the April 25th alleged failure to knock and announce. The BWC footage is indisputable. Officers did not knock on either the building's door or the unit's door, and there was no waiting period. Instead, while crashing through the building's front door with a battering ram, an officer yelled "search warrant Chicago Police." Three seconds later the same officer knocked down Unit #1's front

[14] The court notes that this rule highlights the importance of a valid probable cause determination before a search. The Seventh Circuit explains that the "categorical authority to detain….exists in part because the probable cause underlying a warrant to search a premises gives police reason to suspect that its occupants are involved in criminal activity." Jennings, 544 F.3d at 818.

door without saying anything. Officers immediately poured in with weapons drawn.

The court denies summary judgment as to the May 17th alleged failure to knock and announce. Whether officers in fact knocked and announced their presence and waited a reasonable time before entry is disputed. Archie testified that she heard three to five loud bangs and no announcements before police swarmed into her apartment. She testifies that the bangs did not sound like knocking, but rather like someone breaking in. This testimony is consistent with the sounds that would be made by battering rams being used to knock down the outer doors followed by the inner doors. It also, of course, could have been the sound of knocking. Officers who conducted the search testified that they knocked on the door and announced their presence before forcibly entering the apartment. A reasonable jury could find either way. Because this is a genuine dispute of material fact, the court denies defendants' motion for summary judgment and plaintiffs' cross-motion for summary judgment.

Qualified Immunity

Defendants also move for summary judgment on these claims on the basis of qualified immunity. Because the court has already determined that it will grant summary judgment as to the February 8 claim, the court will analyze qualified immunity in the context of the April 25 and May 17 claims.

The court finds that the facts related to the April 25 and May 17 claims, when read in favor of the non-moving party, amount to a constitutional violation. In addition, the constitutional right was clearly established. The Supreme Court has held that "police officers entering a dwelling must knock on the door and announce their identity and purpose before attempting forcible entry" since at least Wilson v. Arkansas, 514 U.S. 927 (1995), which was

decided in 1995. Richards v. Wisconsin, 520 U.S. 385, 387 (1997).

In 2019, it was clearly established that the Fourth Amendment right to be secure from unreasonable searches included the requirement that police officers knock and announce their presence before forcible entering a dwelling. Consequently, the court denies defendants' motion for summary judgment on Count IV on the basis of qualified immunity.

## IV. Unconstitutional Seizure of Property (Count VI)

Defendants move for summary judgment on plaintiffs' claim that officers unnecessarily damaged or destroyed their property during the three separate searches of Archie's home. Plaintiffs claim that the property damage amounted to a violation of their Fourth Amendment right "to be secure in their persons, houses, papers, and effects, against unreasonable…seizures." Plaintiffs cross-move for summary judgment on this claim.

"The Fourth and Fourteenth Amendments provide a remedy when a citizen's property is unreasonably damaged during a search." Heft v. Moore, 351 F.3d 278, 282 (7th Cir. 2003). Even if "the entry itself is lawful," "[e]xcessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment." United States v. Ramirez, 523 U.S. 65, 71 (1998). This inquiry is governed by the "general touchstone of reasonableness which governs Fourth Amendment analysis." Id.

Defendants' arguments in favor of summary judgment are thin and barely reference the governing legal standard. Instead, defendants urge the court to grant summary judgment for two reasons. First, defendants argue that there is no evidence other than "rampant speculation" that officers "intentionally or destroyed their property." Defendants do not show the legal relevance

of their contention that there is no evidence that offices intentionally destroyed their property. The argument seems to imply that intentionality is a necessary condition of plaintiffs' claim, but defendants provide no authority for this proposition.

Second, citing Hessel v. O'Hearn, 977 F.2d 299, 305 (7th Cir. 1992), defendants argue that the court must grant summary judgment because plaintiffs fail to connect specific officers to specific instances of property damage.[15] More recently, however, the Seventh Circuit has recognized that it may "be problematic to require plaintiffs to specifically identify which officers caused property damage when officers commonly remove these individuals from the search area." Colbert v. City of Chicago, 851 F.3d 649, 657 (7th Cir. 2017). In Colbert, the Seventh Circuit continued to state that "plaintiffs in this context can still satisfy § 1983's personal-responsibility requirement by including in their complaint allegations of misconduct that are unaffected at summary judgment by the inability to observe the search. For example, plaintiffs may allege that the named officers participated in something akin to a 'conspiracy of silence among the officers' in which defendants refuse to disclose which of their number has injured the plaintiff." Id. at 657–58. Here, plaintiffs have alleged just that. That allegation differentiates this case form Hessel, wherein "plaintiffs allege[d] no conspiracy." 977 F.2d at 305.

Returning to the heart of the Fourth Amendment claim—whether the destruction of property was unreasonable—the facts are in dispute. Defendants flatly maintain that they did not see any damage to personal property or cause any damage to personal property. In contrast, Archie testified that officers caused widespread property damage and broke items such as a cable box, cabinets, dressers, nightstands, and doors. In addition, Archie testified that officers dumped

[15] The court notes that the reporter for this case was incorrectly cited as F.3d instead of F.2d. It is an insignificant mistake, but the court flags it because of the recurrence of citation errors in counsel's brief. See, footnote 3, above.

out her food from the freezer (causing it to spoil), dumped out her spices, and cut open her couch instead of using the zipper. Because a reasonable jury could believe either account, the court denies summary judgment. Defendants have not carried their burden to show that there is no genuine dispute of material fact such that they are entitled to judgement as a matter of law.

Defendants are not entitled to qualified immunity on this claim. The facts, as read in favor of plaintiffs, amount to a constitutional violation. See Rainsberger, 913 F.3d at 647. Plaintiffs allege that officers caused widespread destruction to their property that was unreasonable in the circumstances surrounding the three searches. See Ramirez, 523 U.S. at 71 (explaining that "[e]xcessive or unnecessary destruction of property in the course of a search" that is unreasonable violates the Fourth Amendment). That right was clearly established in United States v. Ramirez, 523 U.S. 65 (1998). See also, e.g., Irwin v. City of Lawrenceburg, Ind., 693 F. Supp. 2d 846, 855 (S.D. Ind. 2010) (finding that the Ramirez "made it very clear…that a violation of the Fourth Amendment occurs when excessive or unnecessary destruction of property results from a search").

## V. Excessive Force (Count VII)

Defendants move for summary judgment on plaintiffs' claim that officers used excessive force on the three occasions that they entered Archie's apartment. This claim covers the conduct of multiple officers over three episodes. In general, plaintiffs' claim is that officers used excessive force when they pointed their guns at them despite being fully compliant and posing no threat. Defendants move for summary judgment on the basis that the record shows that the gun-pointing alleged did not occur. Defendants also move for summary judgment on the basis of

qualified immunity.

Excessive force is analyzed under the Fourth Amendment's "reasonableness standard." Graham v. Connor, 490 U.S. 386, 395 (1989). The determination of whether a particular use of force was reasonable "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Id. at 396 (internal quotations omitted). The reasonableness of an officer's use of force is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. The Fourth Amendment's reasonableness standard is objective, it asks, "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397. "In the end, the excessive force inquiry looks to whether the force used to seize the suspect was excessive in relation to the danger he posed—to the community or to the arresting officers—if left unattended." Jacobs v. City of Chicago, 215 F.3d 758, 773 (7th Cir. 2000) (internal quotation omitted).

Some factors that are helpful in analyzing whether a use of force was reasonable include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. But these three factors are not exhaustive. The "proper application" of the objective reasonableness standard "requires careful attention to the facts and circumstances of each particular case." Id.; see also Cyrus v. Town of Mukwonago, 624 F.3d 856, 861–62 (7th Cir. 2010) (explaining that the inquiry requires examination of "the totality of the circumstances"); Smith v. City of Hemet, 394 F.3d 689, 701 (9th Cir. 2005) (noting that the Court in Graham "did not, however, limit the inquiry to those [three] factors").

In general, pointing a gun can constitute excessive force. See, e.g., Jacobs, 215 F.3d at 774; McDonald v. Haskins, 966 F.2d 292, 294 (7th Cir. 1992); Baird v. Renbarger, 576 F.3d 340, 344 (7th Cir. 2009). In excessive force cases involving gun-pointing, a key consideration is the threat posed by the person between the crosshairs. See id. The Seventh Circuit has commented that these "cases so often involve children because they are much less likely to present the police with a credible threat. In other words, the unreasonableness of the gun-pointing is more apparent in these cases, though pointing a gun at a compliant adult in a non-threatening situation…can also constitute excessive force." Baird, 576 F.3d at 346.

After reviewing the record in detail, the court finds that the material facts that are determinative of this claim are highly contested and must be decided by a jury. Ultimately, "Whether a particular use of force was objectively reasonable is a legal determination rather than a pure question of fact for the jury to decide." Dockery v. Blackburn, 911 F.3d 458, 464 (7th Cir. 2018) (internal quotation omitted). But to make that legal determination on summary judgment, a court requires clarity as to the facts that occurred: what the officers did, when and for how long they did it, and the information that was objectively known to them. As is typical of excessive force cases in a summary judgment posture, here there is uncertainty as to almost all these facts. See Cyrus v. Town of Mukwonago, 624 F.3d 856, 862 (7th Cir. 2010) (explaining that "we have recognized that summary judgment is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations"). The court will briefly catalogue some of the crucial factual contests that preclude it from granting summary judgment.[16]

[16] This discussion will inevitably fail to be exhaustive given the voluminous factual record.

**February Search**

In February, officers executing a search warrant for the second-floor apartment learned that some of its occupants had fled to the first floor. The facts from this episode that are relevant to the use of force are disputed.

Plaintiffs allege that as officers entered the apartment, Officer Holden yelled out "room full of kids" twice, alerting his colleagues there were children present. According to plaintiffs, officers pointed their guns at fully compliant children. Specifically, Officer Alvarez pointed his pistol at Jhaimarion, while he was sitting calmly on the floor. Officer Guebara pointed a rifle at Telia's neck and chest; she testified that she saw a red dot trained on her. After Telia and Savannah got on the ground and put their hands up, Officer Guebara continued to point his rifle at Savannah and Telia.

In contrast, defendants deny that these events occurred. Defendants claim that Alvarez "raised his firearm to address the [target of the search warrant], during which he did not target Plaintiff Jhaimarion Jackson." Defendants also claim that when Officer Guebara entered the room "where Plaintiffs Savannah and Telia Brown were lying on the floor," his "rifle was slung downward and he never intentionally targeted either Plaintiff with it." Contrary to defendants' argument, the BWC footage is not clear enough to resolve this factual dispute. See Kailin v. Vill. of Gurnee, 77 F.4th 476, 481 (7th Cir. 2023) (explaining that "[v]ideo evidence, however, can eviscerate a factual dispute only when the video is so definitive that there could be no reasonable disagreement about what the video depicts"). Because these facts are obviously contested, the court denies defendants' motion for summary judgment on the basis that "[t]he undisputed material facts, however, refute Plaintiffs' claims."

Moving to the first prong of the qualified immunity analysis, the court finds that when read in the light most favorable to plaintiffs, Officer Alvarez and Guebara's actions constitute excessive force. The children were not suspects or the target of the search warrant. They obviously did not pose danger to the officers or the community. They were not resisting or evading arrest. See Baird, 576 F.3d at 344 (listing the Graham factors). To be clear, the court reads plaintiffs' version of events to mean that officers' weapons were trained on the children, as opposed to sweeping past them momentarily. Jhaimarion testified that Officer Alvarez pointed a pistol at him for "a couple of seconds." Similarly, Telia and Savannah testified that guns were trained on them for a few seconds while they were on the ground.

The Seventh Circuit has stated that "the critical point" is that "while police are not entitled to point their guns at citizens when there is no hint of danger, they are allowed to do so when there *is* reason to fear danger." Baird, 576 F.3d at 346. The court recognizes that officers faced a fraught situation in February. While executing a valid search warrant for a drug crime, officers learned that potential suspects had fled to the neighboring apartment. In a fast-moving situation, officers were required to enter and then clear the first-floor apartment for officer safety. While the situation might excuse a sweep of a gun barrel that regrettably passes over children momentarily, that is not plaintiffs' version of events. Plaintiffs claim that Officers Alvarez and Guebara pointed their firearms at the chests and heads of unarmed and complaint children. These children posed no danger to a reasonable officer.

Moving to the second prong of the qualified immunity analysis, the court finds that the right that Officers Alvarez and Guebara allegedly violated was clearly established at the time. Prior to 2019, the Seventh Circuit held multiple times that "gun pointing when an individual presents no danger is unreasonable and violates the Fourth Amendment." Baird, 576 F.3d at 345

(citing Jacobs v. City of Chicago, 215 F.3d 758, 773–74 (7th Cir.2000)).

The court grants summary judgment on this claim to all officers other than Alvarez and Guebara. These are the only two officers who allegedly pointed their guns at the children during the February search. The court agrees that plaintiffs' "failure to intervene" theory fails here. "An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring." Yang v. Hardin, 37 F.3d 282, 285 (7th Cir. 1994). Here, given that the gun-pointing spanned a matter of seconds, the court finds that other officers did not have a realistic opportunity to intervene to prevent the gun-pointing from occurring. Consequently, liability under § 1983 for excessive use of force for the February search can attach only to Officers Alvarez and Guebara.

**April Search**

In April, a group of officers executed a search warrant on the first-floor apartment. This group included Officers Anderson, Dunn, Weathersby, and Bruno, who had also participated in the February search. Again, the relevant facts as to whether officers used excessive force in conducting this search are contested by the parties.

According to plaintiffs, Officer Anderson "pointed his large assault rifle directly at Savannah's chest and upper body" and then "kept his firearm trained on Savannah as she got down on the floor. Then, Officer Anderson "panned his rifle over to Jhaimarion, pointing directly at Jhaimarion as he got down on the floor, then continued pointing at the children after

they were down on the floor." Officer Anderson had his finger on the trigger. Officer Miranda also pointed his firearm at Savannah's upper body as she lay on the floor. Additionally, Officers Anderson, Boyle, and Cusimano pointed their rifles and pistols at Telia and continued to do so "even after Telia was on the ground."

Defendants, in contrast, claim that Officer Anderson "briefly looked into" the bedroom where Savannah and Jhaimarion were located. Defendants deny that Cusimano and Boyle ever pointed their guns at any plaintiff. According to defendants, Officer Miranda did not point firearms at any of the children. Again, the BWC footage is not clear enough to resolve these factual disputes. See Kailin, 77 F.4th at 481. Because these facts are contested, the court denies defendants' motion for summary judgment on the basis that "[t]he undisputed material facts, however, refute Plaintiffs' claims."

Moving to the first prong of the qualified immunity analysis, the court finds that when read in the light most favorable to plaintiffs, the force used by Officers Anderson, Boyle, Cusimano, and Miranda was excessive. The circumstances surrounding this use of force differ in a significant respect from the circumstances officers confronted in February. See Graham, 490 U.S. at 396 (explaining that the "proper application" of the objective reasonableness standard "requires careful attention to the facts and circumstances of each particular case"). The record shows that prior to executing the search, the officers involved attended a briefing, where Officers Bruno and Anderson, both of whom had participated in the February search, spoke. The previous search was mentioned, and officers were told that children were present previously and that there was a possibility that they would be present again. Unlike during the February search, which was a fast-moving exigent circumstance, in April officers knew exactly what they were getting into: the home of a single mother and her three children.

For Officer Anderson in particular, the use of force analysis is colored by the fact that the warrant lacked probable cause. Officer Anderson was the affiant, and as discussed above, he recklessly omitted material information from his affidavit. From an objective standpoint, Officer Anderson not only knew that he was likely to confront children in the apartment, but he also knew that there was no probable cause to believe that the target of the warrant would be present. The same knowledge cannot be imputed to the other officers, because there is no evidence that Anderson revealed to Boyle, Cusimano, or Miranda that his affidavit lacked probable cause.

When viewed in the light most favorable to plaintiffs, Officer Anderson, Boyle, Cusimano, and Miranda's use of force was excessive. The children were not suspects or the target of the search warrant. Instead, they were known to the officers as (obviously innocent) residents of the apartment. Of course, these children did not pose danger to the officers or the community. They were not resisting or evading arrest. See Baird, 576 F.3d at 344 (listing the Graham factors). And for Officer Anderson in particular, not only did the children not pose a danger, but the entire situation also posed little danger, because there was not probable cause that the target of the warrant would be at the premises.

Moving to the second prong of the qualified immunity analysis, the court finds that the right that Officers Anderson, Boyle, Cusimano, and Miranda allegedly violated was clearly established at the time. Prior to 2019, the Seventh Circuit held multiple times that "gun pointing when an individual presents no danger is unreasonable and violates the Fourth Amendment." Baird, 576 F.3d at 345 (citing Jacobs, 215 F.3d at 773–74 (7th Cir.2000)).

Like the February search, the court finds that plaintiffs' failure to intervene theory also fails here. Because the gun-pointing spanned a matter of seconds, the court finds that other

officers did not have a realistic opportunity to intervene to prevent the gun-pointing from occurring. Consequently, liability under § 1983 for excessive use of force for the February search can attach only to Officers Anderson, Boyle, Cusimano, and Miranda, and the court grants defendants' motion for summary judgment as to all other officers.

**May Search**

In May, another group of officers executed a search warrant for the first-floor apartment. At least six of these officers entered Archie's home. Plaintiffs claim that all six officers had their guns drawn and pointed at Archie's upper body as they swarmed in. Archie was compliant from the moment the officers first entered the building. Archie testified that two officers had their guns drawn on her from the range of approximately one foot away. In total, according to plaintiffs, officers pointed their guns at Archie for between 45 seconds to a minute and a half.

In contrast, "Defendants deny that any Officer pointed guns at Ms. Archie." Because these facts are contested, the court denies defendants' motion for summary judgment on the basis that "[t]he undisputed material facts, however, refute Plaintiffs' claims."

Moving to the first prong of the qualified immunity analysis, the court finds that when read in the light most favorable to plaintiff, the use of force was excessive. Archie was not the target of the search warrant—a black male described as 5'10" to 6'00", 220 pounds, and bald headed—nor could she have been reasonably mistaken for him. Archie was not evading arrest and did not pose a danger to officers or the community. She was not evading or resisting arrest. See Baird, 576 F.3d at 344 (listing the Graham factors). While Archie was an adult, "pointing a gun at a compliant adult in a non-threatening situation…can also constitute excessive force." Baird, 576 F.3d at 346.

For Officer Brown in particular, the excessive force analysis is colored by the fact that the warrant lacked probable cause. As discussed above, Officer Brown's affidavit contained false statements and material omissions. A reasonable officer in Officer Brown's shoes would not only know that Archie did not pose danger, but would also know that the entire situation did not pose danger, because there was not probable cause to believe the target of the warrant would be found at the premises.

Moving to the second prong of the qualified immunity analysis, the court finds that the right that the officers in the May search violated was clearly established at the time. Prior to 2019, the Seventh Circuit held multiple times that "gun pointing when an individual presents no danger is unreasonable and violates the Fourth Amendment." Baird, 576 F.3d at 345.

Unlike with the February episode, the court does not grant summary judgment on this claim to any of the officers. "An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring." Yang, 37 F.3d at 285. Here, the alleged gun-pointing spanned a long enough period where, based on the record viewed in the light most favorable to plaintiffs, other officers had a realistic opportunity to intervene to prevent the gun pointing from occurring. Consequently, at the summary judgment stage with the record before it, the court cannot, as a matter of law, rule out liability under § 1983 for excessive use of force for any of the officers involved in the May search.

## VI. State Law Claims (Counts VIII through XIII)

Defendants move for summary judgment on all of plaintiffs' state law claims. All these claims are subject to the Illinois Tort Immunity Act ("TIA"), which states that "[a] public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202. The TIA defines "willful and wanton conduct" as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210. Thus, when evaluating these claims on summary judgment, the court must consider—in addition to the underlying elements of the claim at issue—whether a reasonable jury could find that the officers' conduct at issue was "willful and wanton."[17]

**Assault (Count VIII)**

Defendants move for summary judgment on plaintiffs' claim that officers assaulted them during the three searches of their home. Defendants' argument for summary judgment is that the undisputed facts show that the officers did not point their firearms at any plaintiff. Of course, these facts are disputed. A reasonable jury could find that the gun-pointing episodes showed "an utter indifference to or conscious disregard for the safety of others." Defendants have failed to carry their burden to show that the undisputed facts entitle them to judgment as a matter of law on the assault claim. Consequently, the motion for summary judgment is denied as to the assault claim.

---

[17] Defendants' memorandum for summary judgment fails to connect the TIA's "willful and wanton" requirement to all the state law claims at issue (defendants mention the TIA only in relation to the false arrest and conversion claims). Nevertheless, for the sake of judicial efficiency, the court evaluates all of plaintiffs' state law claims with reference to the TIA's applicable willful and wanton standard.

**Battery (Count IX)**

Defendants move for summary judgment on Archie and Savannah's battery claims. Archie's battery claim stems from when she was handcuffed during the May search. Savannah's battery claim stems from when Officer Miranda allegedly put his foot on the middle of her back during the April search. Under Illinois law, a person commits battery if "if he or she knowingly without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." 720 ILCS 5/12-3(a).

Defendants move for summary judgment on Archie's battery claim. Plaintiffs do not contest this motion in their response. Defendants argue "[n]o reasonable jury could find that the handcuffing of Krystal Archie was an unlawful touching or that the Officers' conduct was willful or wanton." Because plaintiffs do not address this assertion, the court considers this fact undisputed. See Rule 56(e)(2). Consequently, the court grants defendants' motion for summary judgment on Archie's battery claim.

Defendants also move for summary judgment on Savannah's battery claim. Defendants' argument is that "Officer Miranda's BWC video clearly shows that he never once placed his foot on Savannah's back as she was on the ground as he is merely seen placing his right hand lightly near her shoulders." The court agrees that the BWC indisputably shows Officer Miranda placed his hand rather than his foot on Savannah's back. Nevertheless, it does not follow that because Miranda placed his hand rather than foot on Savannah's back, no reasonable jury could find that he willfully or wantonly made "physical contact of an insulting or provoking nature with an individual." 72- ILCS 5/12-3(a).

Viewed in the light most favorable to plaintiffs, a reasonable jury could find that Officer

Miranda committed battery. "Illinois follows the common law rule that any contact, however slight, may constitute a battery." Garcia-Meza v. Mukasey, 516 F.3d 535, 538 (7th Cir. 2008). In the context of the events surrounding it—officers had pointed rifles at Savannah even though she posed no danger, Savannah was already compliant and laying on the floor, and Officer Miranda yelled at her to "shut up!"—a reasonable jury could find that Officer Miranda made "physical contact of an insulting or provoking nature" with Savannah. Because the alleged battery occurred alongside the gun-pointing discussed above, a reasonable jury could also find that Officer Miranda acted with "an utter indifference to or conscious disregard for the safety of others." 745 ILCS 10/1-210. Consequently, defendants have failed to carry their burden to show that the undisputed facts entitle them to judgment as a matter of law on Savannah's battery claim.[18]

**False arrest/ false imprisonment (Count X)**

Defendants move for summary judgment on Archie's claim that she was falsely arrested and imprisoned when she was detained during the May search of her home. In Illinois, "[t]he essential elements of a cause of action for false arrest or false imprisonment are that the plaintiff was restrained or arrested by the defendant, and that the defendant acted without having reasonable grounds to believe that an offense was committed by the plaintiff." Meerbrey v. Marshall Field & Co., 564 N.E.2d 1222, 1231 (Ill. 1990).

The court grants summary judgment on the false arrest and imprisonment claim as to all officers except Officer Brown. The other officers were executing what they believed to be a valid warrant. Defendants correctly argue that "officers executing a search warrant for

[18] The court notes that this claim is against Officer Miranda only.

contraband have the authority to detain the occupants of the premises while a proper search is conducted." Muehler v. Mena, 544 U.S. 93, 98 (2005) (internal quotation omitted). But the premise underpinning this position is that "the presence of a warrant assures that a neutral magistrate has determined that probable cause exists to search the home." Id.

Here, while the other officers could reasonably believe that probable cause existed, the same is not true of Officer Brown. Because, as discussed above, Officer Brown recklessly omitted material information and knowingly included material, false statements in his warrant affidavit, he was aware or reasonably should have been aware that probable cause did not exist to search Archie's home. Thus, a reasonable jury could find that Archie was "restrained or arrested by" Officer Brown, and that he "acted without having reasonable grounds to believe that an offense was committed by the plaintiff," or that there was probable cause to search her home. Meerbrey, 564 N.E.2d at 1231. Because this alleged false arrest occurred in the context of Officer Brown's procurement of an invalid search warrant through intentional and reckless conduct, a reasonable jury could also find that the alleged false arrest was willful or wanton conduct. Consequently, the court denies summary judgment on the false arrest and imprisonment claim as to Officer Brown.

**Intentional infliction of emotional distress ("IIED") (Count XI)**

Defendants move for summary judgment on plaintiffs' claim that officers intentionally inflicted emotional distress on them during the course of the three searches of their home. Under Illinois law, IIED requires conduct that: (1) was extreme and outrageous; (2) was intended to inflict severe emotional distress (or conduct that the actor knew carried a high probability of

doing so); and (3) actually caused severe emotional distress.[19] Schweihs v. Chase Home Fin., LLC, 77 N.E.3d 50, 63 (Ill. 2016). Defendants make two arguments for summary judgment on the IIED claim. The first argument is that the officers' conduct was not extreme and outrageous. The second argument is that Archie "has not presented any evidence that she did in fact suffer extreme emotional distress."

The court agrees with defendants that a reasonable jury could not find that the officers' conduct in February was extreme and outrageous. While some of the officers' uses of force may have been excessive, officers were responding to a fast-moving exigency based on the execution of a valid search warrant. Unlike in the later incidents, officers did not have foreknowledge of what they would expect to find in plaintiffs' home.

The court finds that, when the record is viewed in the light most favorable to plaintiffs, a reasonable jury could find that the conduct of the officers in the April and May searches was extreme and outrageous. As discussed, both searches were executed without probable cause. Instead, they were based on warrants that were procured by the reckless or intentional omission of material information (or false statements) of the affiant officers. Viewed in the light most favorable to the plaintiffs, a reasonable jury could find that the officers' conduct was extreme and outrageous. The context is important. In February, officers conducted a search of plaintiffs' home and found no evidence of narcotics trafficking, or evidence that the plaintiffs had any association with narcotics trafficking. This search involved holding children at gunpoint. Officers returned to the home with a warrant procured through intentional or reckless omissions,

[19] The court need not separately analyze whether officers' conduct was "willful and wanton" because a determination that officers' conduct meets the elements of IIED is, a fortiori, a determination that the conduct was willful and wanton.

did knock and announce their presence, and held the children—who officers knew were likely to be present—at gunpoint again. In April, while the children were home without their mother, officers improperly interrogated them and tore up their apartment. No evidence of narcotics trafficking was found.

Despite two negative searches, officers returned again in May seeking evidence of narcotics trafficking. As discussed, this warrant was procured through intentional false statements and intentional or reckless omissions. Again, officers broke down the doors to the home without knocking and announcing and, this time, held Archie at gunpoint. Officers again tore up the apartment in search of evidence that they did not have probable cause to believe they would find. During the search, officers acted disrespectfully; they taunted Archie, ate food from her refrigerator, vaped in her home, and intentionally let their cat run outside the house. A reasonable jury considering the totality of the circumstances could find that this conduct would outrage anyone living in a civilized society with any sense of decency. See Feltmeier v. Feltmeier, 798 N.E.2d 75, 83 (Ill. 2003).

Defendants' second argument fails because whether Archie suffered extreme emotional distress is a disputed fact which must be decided by a jury. Consequently, the motion for summary judgment on the IIED claim is denied as to the April and May searches.

**Conversion (Count XIII)**

Defendants move for summary judgment plaintiffs' claim for conversion. In Illinois, a plaintiff seeking to recover for conversion must show: "(1) a right to the property; (2) an absolute and unconditional right to the immediate possession of the property; (3) a demand for possession; and (4) that the defendant wrongfully and without authorization assumed control,

dominion, or ownership over the property." Van Diest Supply Co. v. Shelby Cnty. State Bank, 425 F.3d 437, 439 (7th Cir. 2005).

Defendants' argument is that because the search was lawful, the damage of property does not amount to a conversion claim. The court agrees with the premise that the conversion claim for the damage of property rises and falls with the Fourth Amendment claim that the property destruction was unreasonable in the circumstances. Because that is disputed, the court denies summary judgment on the conversion claim for the alleged damage of property during the searches.

The conversion claim also covers a separate issue: Archie's lawfully owned firearm. In February, Archie returned home from work after being informed of the search. When Archie returned home, she voluntarily led officers to her legally owned firearm, which officers then confiscated. Archie has made multiple requests for the return of her firearm, none of which have been granted. Defendants' argument for summary judgment on this claim is that the confiscation of the gun was not willful and wanton. The court finds that a reasonable jury could find that the confiscation and refusal to return the gun is willful and wanton. Willful and wanton conduct is defined as conduct is intentional or that "shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210. A reasonable jury could easily find that the officers' refusal to return the lawfully owned weapon shows an utter indifference to Archie's property. Consequently, the court denies summary judgment as to the conversion claim.

## VII. Monell, repsondeat superior and indemnification (Counts I, XIV, and XV)

Defendants move for summary judgment on three claims against the City—Monell

(Count I), Respondeat Superior (Count XIV) and indemnification (Count XV)—because of the failure of plaintiffs' underlying claims. The court denies this motion because the underlying claims are disputed.

Defendants are correct that without an underlying constitutional violation, there cannot be Monell liability. Milchtein v. Milwaukee County, 42 F.4th 814, 825–26 (7th Cir. 2022). But this court has denied summary judgment on the underlying constitutional violations. Consequently, the motion for summary judgment on the Monell claim is denied.

Defendants argue that should this court grant summary judgment in favor of the officers, it should also grant summary judgment in favor of the City, because where the agent is not guilty, it necessarily follows that the party for whom he acted, the master, cannot be guilty. The court agrees. Consequently, for each underlying claim against individual officers that the court has granted summary judgment, the court also grants summary judgment on the associated indemnification and respondeat superior claim against the City.

## CONCLUSION

For the above reasons, defendants' motion for summary judgment is granted in part and denied in part (Doc. 389). Summary judgment is granted in favor of defendants as to the following claims. As to Count II, the court grants summary judgment to defendants limited to plaintiffs' § 1983 claim that the initial warrantless entry of Archie's apartment in February was unreasonable. As to Count IV, the court grants defendants' motion for summary judgment limited to: (1) plaintiffs' § 1983 claim alleging that the manner in which officers searched their residence was unreasonable because they cursed at and insulted her; and (2) plaintiffs' § 1983 claim alleging that the manner in which officers searched their residence was unreasonable because they failed to knock and announce before the February search. As to Count VII, the court grants summary judgment on the excessive force claim as to: (1) all officers other than Alvarez and Guebara, for the February related claims; (2) all officers other than Anderson, Boyle, Cusimano, and Miranda for the April related claims. As to Count IX, the court grants summary judgment on Archie's battery claim related to the May search. As to Count X, the court grants summary judgment on the false arrest and imprisonment claim as to all officers except Officer Brown. As to Counts XIV and XV, the court grants summary judgment on each indemnification and respondeat superior claim against the City where the court has granted summary judgment on the underlying claim against the individual officer. Of course, the indemnification and respondeat superior claims survive for all claims where the underlying claim against the individual officer survives. Defendants' motion for summary judgment is denied as to all other claims.

For the above reasons, plaintiffs' partial cross-motion for summary judgment on liability (Doc. 403) is granted in part. Plaintiffs' cross-motion for summary judgment is granted as to the

following claims. As to Count III, the court grants plaintiffs' cross-motion for summary judgment on plaintiffs' claims against Officers Anderson and Brown. As to Count IV, the court grants plaintiffs' cross-motion for summary judgment limited to defendants' failure to knock and announce before executing the April search. Plaintiffs' cross-motion for summary judgment is denied as to all other claims.

The parties are directed to file a joint status report using this court's form by November 19, 2026.

**ENTER:**

**Robert W. Gettleman**
**United States District Judge**

**DATE: October 30, 2026**